UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **MIG, INC.,** | **Case No. 09-12118 (KG)** |
| **Debtor.** | |

## DEBTOR MIG, INC.'S OBJECTION TO MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ORDER GRANTING THE COMMITTEE STANDING TO: (i) PROSECUTE ACTIONS ON BEHALF OF THE DEBTOR'S ESTATE; AND (ii) SEEK A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND OTHER RELATED RELIEF

1.     The above-captioned debtor and debtor-in-possession (collectively, **"MIG"** or the **"Debtor"**) hereby files its Objection (the **"Objection"**) to the Official Committee of Unsecured Creditors' (the **"Committee"**) Motion for Order Granting the Committee Standing to: (i) Prosecute Actions on Behalf of the Debtor's Estate; and (ii) Seek a Temporary Restraining Order, Preliminary Injunction and Other Related Relief (the **"Standing Motion"**). In support of its Objection, the Debtor states as follows:

### PRELIMINARY STATEMENT

2.     On the heels of filing its Motion for Order Pursuant to Sections 105(a), 1104(a), 1121(c)(1) and (d)(1) and 1112(b), Appointing a Chapter 11 Trustee and Terminating the Debtor's Exclusivity to File a Plan or, in the Alternative Dismissing Chapter 11 Case for Cause [Docket No. 78] (**"Trustee Motion"**), the Committee has filed its Standing Motion purportedly based on discovery taken to date with respect to the Trustee Motion and certain exchanges with the Debtor as part of the Debtor's apparently futile effort to establish some cooperation with the Committee. What the Standing Motion shows is that the Committee refuses to recognize the true facts of this case as repeatedly established by the ten depositions taken to date, the document production, responses to interrogatories and responses to requests to admit in conjunction with

the Trustee Motion as well as additional exchanges between the Committee and the Debtor. The Committee repeatedly misstates facts, takes statements out of context, ignores key testimony or otherwise misrepresents the salient facts of this case in its effort to conjure up some reason for this Court to grant its requests for extraordinary relief, all to the detriment of the Debtor's estate. Apparently, the Committee cannot be dissuaded from its unfounded position regardless of how much discovery it obtains to the contrary or how many witnesses testify to facts that simply do not support the Committee's position. Since the beginning of this case, and despite no factual support for their positions, all the Committee has done is create unnecessary and virtually continuous litigation that requires the Debtor to continue to expend resources defending meritless claims.

3.  The true facts show that the Debtor has not and is not in the process of doing anything nefarious nor is there any evidence that would justify interference with the Debtor's management of its estate. The facts certainly do not support the extraordinary remedies of appointing a trustee, granting the Committee standing to pursue claims, terminating exclusivity, or imposing a temporary restraining order. To the contrary, the Debtor and its current management have taken actions and made decisions, and will continue to do so, that have and will benefit the Debtor, its stakeholders, and the Debtor's estate. From the time they acquired the Debtor, the current management has faced difficult circumstances including a disgruntled partner, a Russian invasion, and a global economic crisis. During that period and directly as a result of the current management, the Debtor has increased in value and has been able to reduce costs making it more valuable today than at the time of the acquisition. Similarly, in managing its investment in Magticom Ltd. ("**Magticom**"), a telephony company located in the Republic of Georgia, the Debtor's management's actions reflect the practical and political realities of doing

business in Georgia, the active role and control asserted by the primary Georgian shareholder, Dr. George Jokhtaberidze ("**Dr. Jokhtaberidze**") in the management of Magticom, and the exercise of its sound business judgment to maximize the returns on MIG's investment. Although the Committee continues to make the same unfounded and conclusory statements that it did at the very beginning of the case, the evidence developed in connection with the Trustee Motion shows that the Debtor and its current management are acting in the best interests of the estate and consistent with the Bankruptcy Code.

4.     The Committee's citation and application of legal authorities is equally misguided. The cases cited by the Committee do not support the concept of granting standing to the Committee under these circumstances or this early in a Chapter 11 case. Moreover, the Committee continually misstates the law with regard to the fiduciary duties under Delaware law and mixes numerous concepts that have no application in this case. As with its approach to "facts," the Committee has chosen to rewrite or ignore the applicable legal standards in order to support its unfounded assertions.

5.     The Debtor will file a plan of reorganization before the hearing scheduled for November 18, 2009 that will provide substantial value to all of the Debtor's constituencies including giving the appraisal creditors the full value of the judgment, albeit in the form of cash, equity and a par value note. As a result, any claim of the nature for which the Committee seeks standing rightly belongs to the Debtor not its creditors. The Debtor should be given the opportunity to pursue confirmation of its plan for the benefit of all of its stakeholders. Granting the Committee standing at this stage can only impede those efforts. Moreover, no prejudice will result from allowing the Debtor to proceed with its plan process without granting standing to the Committee. In the event the Debtor's plan process is unsuccessful, the claims can still be

pursued because there is no expiring statute of limitations or other exigency that requires pursuit of the claims immediately.

6. In addition, the Committee has failed to meet its burden to establish standing to bring its proposed claims. The claims are not colorable, and the Committee has presented no evidence that its claims have a sufficient likelihood of success. Further, the Committee failed to make the requisit pre-suit demand on the Debtor under Delaware law to assert its putative derivative claims and has failed to articulate any facts that would support a finding of demand futility. In reality, the demand would not have been futile because the Debtor, through the formation of a Special Committee comprised of independent directors, is, in fact, investigating these claims. Finally, the Committee cannot demonstrate that granting it standing would benefit the Debtor's estate. The reality is that bringing these claims at this stage would damage the Debtor's estate as it impedes reorganization and hinders its ability to manage its primary asset and its relationship with its joint venture partner. The Standing Motion must be denied.

## FACTUAL BACKGROUND

### A. Current Management of MIG

7. Currently, all of the common shares of MIG are owned by CaucusCom Ventures, L.P. ("**CaucusCom**"), which acquired the shares through a tender offer effective August 21, 2007. CaucusCom is a joint venture created between Salford Capital Partners, Inc. ("**Salford**") and Sun Capital Partners Ltd. ("**Sun**"), on or about May 10, 2007, to pursue a transaction with MIG. (MIG's Form SC 14D-9 ("**14D-9**"), attached hereto as Exhibit 1, at 42.) At the time of the acquisition by CaucusCom, MIG's Board of Directors had two members who were appointed by the preferred shareholders of MIG pursuant to a Certificate of Designation, Wayne Henderson and David Gale. Mr. Henderson was appointed to the Board in 2004 at the request of Chris

Cook[1] and is the longest continuously serving member of the Board. (Deposition of Wayne Henderson ("**Henderson Tr.**"), attached hereto as Exhibit 3, at 7:5-10, 7:21-25; Cook Tr. at 44:16-17.)  Mr. Gale also was appointed to the Board in 2004 and served on the Board until his resignation in August 2008. (Deposition of David Gale ("**Gale Tr.**"), attached hereto as Exhibit 4, at 12:1-8; 14:25-15:1.)  At the time of the tender offer, Mark Hauf served as the CEO of MIG as well as a Director. (*Id.* at 83:4-10.)

8.      Subsequent to its acquisition of MIG, CaucusCom appointed six directors in addition to the two independent directors, Messrs. Henderson and Gale.  Three of those directors are affiliated with Sun:  Edward Spencer-Churchill, Graydon Bellingan, and Alan McIntosh. The other three of those directors are affiliated with Salford:  Peter Nagle, Irakli Rukhadze, and Jamal Khan.  After Mr. Gale's resignation from the Board, the Board appointed another independent director, Alan Greene, in April 2009. (May 1, 2009 Board meeting minutes at 1, attached hereto as Exhibit 5.)  Mr. Greene previously had served as a Director of MIG from 1998 until the acquisition of MIG by CaucusCom in August 2007. (Deposition of Alan Greene ("**Greene Tr.**"), attached hereto as Exhibit 6, at 10:6-23.)

9.      MIG made all of its current directors available for depositions, and the Committee has taken the depositions of Messrs. Spencer-Churchill, Nagle, McIntosh, Rukhadze, Henderson, and Greene.  In addition, MIG took the deposition of Mr. Gale.  All of the current and former directors have offered consistent testimony on issues such as the *de facto* control that Dr. Jokhtaberidze exercised in the management of Magticom as well as MIG's ability to sell or monetize its stake in Magticom, the challenges MIG has faced with managing its investment in Magticom, the negotiations and approval of the Purchase and Sale Agreement dated as of

---

[1] Mr. Cook is affiliated with Zazove, a Petitioner in the Appraisal Action, and currently serves as the Chairman of the Official Committee of Unsecured Creditors. (Deposition of Chris Cook ("**Cook Tr.**"), attached hereto as Exhibit 2, at 52:3-6.)

January 15, 2009 by and among ITC Cellular, LLC and Dr. George Jokhtaberidze (the **"PSA"**) and the Second Amended and Restated LLC Agreement of International Telcell Cellular, LLC (the **"Second LLC Agreement"**) (attached hereto as Exhibit 7), and the decision to file the bankruptcy petition in this case. The testimony also has been consistent with regard to the actions (or lack thereof) of management after the filing of the bankruptcy petition regarding the non-existent UTG transaction.

## B.    History of MIG Before the Acquisition by CaucusCom

10.    Magticom, the leading mobile telephony and largest telephone operator in the Republic of Georgia, was founded by Dr. Jokhtaberidze in 1997. (Declaration of Peter Nagle in Support of the Debtor's Chapter 11 Petition and Request for First Day Relief (**"Nagle Decl."**) ¶ 22, attached hereto as Exhibit 8.) Also in 1997, MIG acquired a minority position, with certain minority rights, in Magticom. (*Id.* ¶ 23.) MIG holds its interest in Magticom through its 100% ownership ITC Cellular LLC (**"ITCC LLC"**), which currently owns a 46% interest in International Telcell Cellular LLC (**"ITCL"**). Dr. Jokhtaberidze owns 51% of ITCL, and Gemstone Partners, an entity affiliated with Dr. Jokhtaberidze, owns 3% of ITCL. ITCL owns 100% of Magticom.[2] The testimony demonstrates that MIG's management is active in the operations and management of Magticom on a daily basis. (*See, e.g.,* Deposition of Edward Spencer-Churchill (**"Spencer-Churchill Tr."**), attached hereto as Exhibit 9, at 219:21-220:23.)

11.    MIG's relationship with its partner Dr. Jokhtaberidze and its transactions with him have been well-documented. In its Form 10-K filed on December 14, 2006 for fiscal year

---

[2] As acknowledged by the Committee in its Standing Motion and other papers, MIG's interest in Magticom was and remains a joint venture with Dr. Jokhtaberidze through each party's respective interest in ITCL. The elements of a joint venture are: (1) a community interest in the performance of a common purpose; (2) joint control or right of control; (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits; and (5) a duty to share in the losses which may be sustained. *Warren v. Goldinger Bros., Inc.*, 414 A.2d 507, 509 (Del. 1980) (citing *Kilgore Seed Co. v. Lewin*, 141 So.2d 809, 810-11 (Fla. Dist. Ct. App. 1962)).

end 2004 (the "**2006 Filing**") (attached hereto as <u>Exhibit 10</u>), MIG described the factual

predicate for a 2004 transaction in which MIG purchased a percentage interest in Magticom from

Dr. Jokhtaberidze. (2006 Filing at 4.) Specifically, it stated:

> [I]n February 2004, Dr. George Jokhtaberidze, who is also the son-in-law of former
> Georgian president Eduard Shevardnadze, was arrested in Georgia pending investigation
> of various tax-related matters related to his ownership interest in Magticom. On April
> 26, 2004, the prosecution of Dr. Jokhtaberidze by the Georgian government was dropped
> without any finding of wrongdoing and Dr. Jokhtaberidze was released from
> investigative detention.

(*Id.*) To resolve the investigation by the Georgian government, Dr. Jokhtaberidze was forced to

sell an effective 4.1% interest in Magticom to MIG. (*Id.* at 4.) ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

     12.     After the transfer of Dr. Jokhtaberidze's 4.1% interest in Magticom to MIG in

2004, MIG owned 50.1% of Magticom. This 50.1% interest, however, did not provide MIG with

"control" over Magticom. Rather, at best, MIG shared consensual decision making with Dr.

Jokhtaberidze. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████



(Henderson Tr. at 20:21-21:11.) Referencing the 2005 LLC Agreement, Mr. Henderson testified that: "Although the partnership agreement, we had three directors and they had two, as far as the management of affairs appointed by Dr. Jokhtaberidze, it was very clear that Dr. Jokhtaberidze was in my observation, the power and the decisionmaker." (*Id.* at 22:11-21.)

14.     The Company's public filings likewise report the circumstances in Georgia that contributed to Dr. Jokhtaberidze's *de facto* control of Magticom.   With respect to Dr. Jokhtaberidze's control, MIG's 2006 Filing states:

> *Unusually High Degree of Dependence on Interpersonal Relationships in Georgia.* The absence of a well-developed rule of law and commercial code in Georgia requires that a substantial portion of the Company's activities in Georgia must rely upon the strength of direct personal relationships with Georgian counterparties. **The Company also has a significant minority Georgian partner in its Magticom business venture holding company, with whom continuing favorable personal relations are important.** If key Company personnel are unable to form suitable relationships with business, trade or governmental counterparties in Georgia,   . . . there is material risk that ordinary contractual and civil compacts will be insufficient to protect and preserve the Company's business and financial interests in Georgia. . . .   **The failure of a critical relationship for any reason could result in material erosion in performance or value of the Company's Georgian business operation.**

(2006 Filing at 75 (emphasis added).)

15.     KPMG, MIG's auditors, also investigated the issue of Dr. Jokhtaberidze's control over Magticom. Under generally accepted accounting principles, an entity may not consolidate its interest in an investment unless the entity has control over the investment. (2006 Filing at 12-14 (citing the Consensus Guidance provided by the Financial Accounting Standards Board ("FASB") Emerging Issues Task Force ("EITF") Issue No. 96-16[3]).) KPMG did not permit MIG to use "Consolidation Accounting" and instead determined that MIG's interest in Magticom should still be accounted for following the equity method of accounting for its interest in Magticom because MIG lacked the requisite control over Magticom. (*Id.* at 45.)

16.     In addition to the necessity of maintaining its relationship with Dr. Jokhtaberidze, the 2006 Filing identified a litany of other risk factors regarding MIG's investment in Magticom, some of which included:

> *Limited Protection of Shareholder Rights in Georgia.* Shareholders have limited practical rights and protections under present Georgia law and practice. . . . Obtaining customary legal redress for [unauthorized actions of local officers] in the court systems of Georgia may prove to be unusually cumbersome or time consuming.

> *Limitations on Georgian Judicial Protections.* The Georgian judicial system is presently in a state of considerable uncertainty following the November 2003 "Rose Revolution" in Georgia. . . . [T]he Company cannot assure you that legal actions initiated by or affecting the Company's Georgian operations can or will be handled in a fashion that might be expected in the United States or other world jurisdictions, or that the outcomes of such actions will be transparently reached or meet the impartiality standards expected in such other jurisdictions.

> *Absence of Effective Georgian Commercial Code.* Laws may go unenforced or be unenforceable in practical terms.

(2006 Filing at 74-75.) The conditions articulated in the 2006 Filing continue today and were only exacerbated by the Russia-Georgia War of 2008. (Spencer-Churchill Tr. at 302:3-303:17.)

---

[3] Since 1973, the Financial Accounting Standards Board (FASB) has been the designated organization in the private sector for establishing standards of financial accounting. Those standards govern the preparation of financial statements. They are officially recognized as authoritative by the Securities and Exchange Commission. Specifically, Issue No. 96-16 reflects the agreement of the Task Force that the assessment of whether the rights of a minority shareholder should overcome the presumption of consolidation by the investor with a majority voting interest in its investee is a matter of judgment that depends on facts and circumstances.

**C.    The Sales Process and the Acquisition of MIG's Common Shares by CaucusCom**

17.    Against this backdrop in 2006 and 2007, MIG's management attempted to sell its interest in Magticom.  Because of Salford's significant presence in Georgia, Salford expressed interest in acquiring MIG early in the process.  (14D-9 at 27-31.)  Salford explored arrangements with several bidding partners before Sun and Salford agreed to form CaucusCom.  (*Id.*)

18.    MIG described the sales process (the "**Sales Process**") in its 14D-9.  (14D-9 at 25-51.)  In addition, MIG's minutes of meetings of the Board of Directors and other corporate documents reflect developments in the Sales Process.  Mr. Hauf frequently reported on the developments of the Sales Process to the Board of Directors.

19.    A recurring theme in the description of the Sales Process is the difficulty many potential bidders encountered in establishing a relationship with Dr. Jokhtaberidze and addressing his *de facto* control of any attempt by MIG to sell and/or monetize its stake in Magticom.  There are many examples of this in MIG's pre-acquisition documents.

■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■

20.    During the Sales Process, MIG sought bids from potential suitors interested in acquiring MIG other than Salford. (14D-9 at 33-48.) As many as six potential bidders signed confidentiality agreements and began the due diligence process. (14D-9 at 33-48; Henderson Tr. at 36:18-37:10.) As the Company's documents reflect, throughout the Sales Process, Dr. Jokhtaberidze was viewed by most if not all of the interested parties as having *de facto* control over Magticom and MIG's ability to sell and/or monetize its stake in Magticom. (14D-9 at 45; Henderson Tr. at 40:24-41:2; Spencer-Churchill Tr. at 135:6-12.) Recognizing the important role played by Dr. Jokhtaberidze as the local partner in MIG's primary asset Magticom, the potential bidders conducted due diligence on Magticom and discussed the potential acquisition with Dr. Jokhtaberidze. (Henderson Tr. at 37:2-10, 14-21, 40:22-41:17; 14D-9 at 42-43, 46-47.)





22.    Dr. Jokhtaberidze's control of Magticom also was confirmed by Roberts W. Brokaw III, the expert retained by the Petitioners in the Appraisal Action (as defined below). In his report, Mr. Brokaw stated: "The combination of Jokhtaberidze's rights and courtesies afforded him as a minority owner in Magticom and his unwillingness to sell his interest may indicate that perhaps Jokhtaberidze controls Magticom." (Report of Roberts W. Brokaw III at 15, attached hereto as Exhibit 20.) This observation led Mr. Brokaw to conclude that MIG was not entitled to a control premium in his valuation of MIG's interest in Magticom. (*Id.* at 16.)

23.    Like other potential bidders, in May 2007, representatives of CaucusCom met with Dr. Jokhtaberidze in Georgia to discuss their respective thoughts on Magticom's future. (Deposition of Peter Nagle ("**Nagle Tr.**"), attached hereto as Exhibit 21, at 88:21-89:9; Spencer-

Churchill Tr. at 52:11-16, 95:20-96:20; McIntosh Tr. at 38:3-7.) As was the case for other potential bidders meeting with Dr. Jokhtaberidze, MIG's Board of Directors was aware of the meeting between CaucusCom and Dr. Jokhtaberidze. (Henderson Tr. at 36:12-18.) Both CaucusCom and Dr. Jokhtaberidze believed that the other shared its vision for the future of the company. (Rukhadze Tr. at 80:12-15; Spencer-Churchill Tr. at 100:12-16.) Specifically, CaucusCom and Dr. Jokhtaberidze shared a vision of expansion and growth within the Georgia telecommunications market, as well as his interest in pursuing an initial public offering of Magticom. (*Id.*) CaucusCom was willing to work with Dr. Jokhtaberidze to remedy what he viewed as a wrongful share transfer in 2004. (Nagle Tr. at 97:4-13; Rukhadze Tr. at 92:18-93:15; Spencer-Churchill Tr. at 103:6-24; McIntosh Tr. at 38:20-39:7.) As part of this process, Dr. Jokhtaberidze, whose cooperation every single witness has testified is necessary and vital to the on-going business and value of Magticom, had developed a personal trust with the Salford and Sun principals, especially Salford Georgia's representatives, Mr. Irakli Rukhadze and Mr. Badri Patarishvili. (Rukhadze Tr. at 193:23-194:8; Henderson Tr. at 45:12-25.) As a result of their May 2007 meeting, Dr. Jokhtaberidze permitted the representatives from CaucusCom to inspect Magticom's facilities and records as part of its due diligence. (Nagle Tr. at 106:4-9; Rukhadze Tr. at 83:13-84:4, 92:18-93:15; Spencer-Churchill Tr. at 103:25-104:14, 106:10-18.)

24.     On July 13, 2007, the MIG Board of Directors authorized MIG to enter into a merger agreement with CaucusCom. (July 13, 2007 Board meeting minutes at 11-12, attached hereto as Exhibit 22; 14D-9 at 48.) Pursuant to this merger agreement, CaucusCom would participate in a tender offer to acquire all of MIG's outstanding common shares at $1.80 per share, followed by a back-end short-form merger (the "**Merger**"). (*Id.*) The total amount of CaucusCom's investment was approximately $200 million. Believing that this transaction was

in the best interests of MIG, all but one of the members of the Board of Directors voted for the Merger and recommended that common stockholders tender their shares.[4] (*Id.*)

### D. The Appraisal Action

25. At the time of the Merger, MIG had 4,140,000 shares of preferred stock outstanding (the "**Preferred Shares**"). The terms of the Certificate of Designation governing the Preferred Shares determined the rights of the preferred shareholders in relation to the Merger. Accordingly, the Merger gave rise to appraisal rights for dissenting preferred shareholders and certain of them (the "**Petitioners**") commenced litigation to bring an appraisal action against MIG in the Court of Chancery of the State of Delaware (the "**Chancery Court**") in the matter captioned *In re: Appraisal of Metromedia International Group, Inc.*, Civil Action No. 3351-CC (the "**Appraisal Action**"), to determine the value of their preferred shares.[5] (Nagle Decl. ¶ 20, Appraisal Compl., attached hereto as Exhibit 23.) The Appraisal Action was filed by the Petitioners on November 14, 2007. (Appraisal Compl.)

26. MIG's management believed that the Appraisal Action would result in a judgment of $18 per share. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[4] ████████████████████████████████████████████████

[5] The petitioning preferred shareholders include Committee members Farallon Capital Offshore Investors II, LP, Black Horse Capital, and Zazove Associates, LLC.

### E. Steps by CaucusCom to Improve MIG

27. Almost immediately after assuming control of the Board, the Board members appointed by CaucusCom began to implement their business strategy to maximize the value of MIG. A key component of this strategy was to cut overhead of MIG and devote more resources closer to the Republic of Georgia where MIG's main asset was located. (Rukhadze Tr. at 86:14-19; Spencer-Churchill Tr. at 230:9-14; September 5, 2007 Board meeting minutes at 3-5, attached hereto as Exhibit 24.) This meant reducing the number of employees based in the United States and relying on CaucusCom representatives to manage MIG's interest in Magticom. (*Id.*) MIG's management has been successful in implementing this strategy as it has gone from a negative cash position in 2007 to a positive cash position in 2009 and cut overhead from a normalized level in 2007 of approximately $15 million to a normalized level in 2009 of $4.5 million. (SAL 90B, attached hereto as Exhibit 25.)

### F. The 2008 Negotiations and 2009 Transaction with Dr. Jokhtaberidze

28. In the weeks following the Merger, despite sharing a similar vision for Magticom, Dr. Jokhtaberidze's relationship with CaucusCom began to deteriorate.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████

██   █████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

32.    After about sixteen months of negotiations, MIG finally reached an agreement with Dr. Jokhtaberidze regarding the operation of the Magticom business and the payment of dividends. On or about January 15, 2009, MIG's subsidiary ITCC, the parent entity of ITCL, and Dr. Jokhtaberidze entered into the PSA and the Second LLC Agreement. As a result, Dr. Jokhtaberidze again became the majority shareholder in Magticom with a 51% stake, and MIG became a minority shareholder with a 46% stake. All key decisions related to the management of Magticom, however, are made on a 50/50 basis. The transaction brought significant benefit to MIG that include: (i) the cooperation of Dr. Jokhtaberidze; (ii) an alignment of interests between Dr. Jokhtaberidze and MIG; (iii) a greater ability of MIG to monetize its stake in Magticom through a clear path to exit; (iv) the right of MIG to IPO Magticom as opposed to a separate MIG

vehicle; (v) express covenants on Dr. Jokhtaberidze to support MIG in an IPO of Magticom; (vi) the elimination of any duress claim by Dr. Jokhtaberidze against MIG in either the United States or the Republic of Georgia; (vii) improved and clear rules of corporate governance; (viii) increased ability for MIG to raise debt; (ix) guaranteed dividends to provide MIG with the cash to pay its continuing and accrued financial obligations; (x) receipt of a loan of up to $30 million from Dr. Jokhtaberidze to help satisfy MIG's obligations to the holders of its Preferred Shares; (xi) inclusion of appropriate carve-outs to provide equity to holders of Preferred Shares; and (xii) claw-back provisions for MIG in case of certain breaches by Dr. Jokhtaberidze of the PSA and Second LLC Agreement. (Henderson Tr. at 78:20-82:3, 84:18-24, 85:12-86:2; Nagle Tr. at 102:17-103:10; March 11, 2009 Board meeting minutes at 1-2, attached hereto as <u>Exhibit 30</u>.)

33. In exchange for these numerous benefits, Dr. Jokhtaberidze, from the very early stages of the negotiations, insisted that MIG include a non-alienation provision in the PSA that would restrict a change of control. (Henderson Tr. at 78:20-82:3, 84:18-24, 85:12-86:2; Nagle Tr. at 111:1-12) Dr. Jokhtaberidze felt very strongly about ensuring that the management of the company stayed with himself and a set of partners that he trusted. (Henderson Tr. at 80:19-81:21, Nagle Tr. at 113:15-21, Rukhadze Tr. at 133:20-134:16)





Although the Committee alleges that the change of control provisions were negotiated to "entrench" MIG management, the uncontroverted evidence demonstrates that Dr. Jokhtaberidze insisted on this provisions over the objection of MIG management.

### G. Planning to Satisfy the Appraisal Judgment

35.     After the collapse of Lehman Brothers in September 2008, MIG's management grew concerned over its ability to satisfy a potential judgment in the Appraisal Action. The worsening condition of the credit markets and the deterioration of the global economy raised concerns that MIG would encounter great difficulty in borrowing money to satisfy a judgment. (Nagle Decl. ¶ 39; Spencer-Churchill Tr. at 188:25-189:7.) MIG's inability to pay any judgment in the Appraisal Action was exacerbated by the death of Badri Patarkashvilli in 2008. Mr. Patarkashvilli had the means and expressed willingness to provide liquidity to MIG, but following his death, his estate became the subject of litigation. (Henderson Tr. at 69:25-70:7; Spencer-Churchill Tr. at 270:21-271:5; McIntosh Tr. at 98:5-8.) These circumstances caused

MIG's management to seek the concessions from Dr. Jokhtaberidze in the PSA and Second LLC

Agreement ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ These concessions, coupled

with cash from dividends, led MIG to believe that it had sufficient resources to satisfy a

reasonably anticipated judgment in the Appraisal Action. (Nagle Tr. at 153:5-15; Spencer-

Churchill Tr. at 230:21-231:20.)

36. On June 5, 2009, the Chancery Court entered judgment in the Appraisal Action in

the total amount of $188,367,736.47 (the "**Judgment**.) (Nagle Decl. ¶ 21.) The Judgment is

substantially higher than MIG had anticipated, and MIG continues to believe that the Judgment

is wrong. The Delaware Supreme Court, however, affirmed the Chancery Court's decision on

November 2, 2009. Given the size of the Judgment and the lack of liquidity in the financial

markets, MIG was forced to seek Chapter 11 protection in order to give it the time and means to

satisfy the Judgment and maximize the value for its other stakeholders.

## H.    The Long-Considered UTG Transaction

37. Lacking any true facts that remotely suggest that any directors of MIG have or

will breach their fiduciary duties to the Debtor, the Committee manufactures a purported

emergency out of business discussions (which have been disclosed to the Committee) between

ITCL and Magticom on one hand and a fixed line telecommunications operator in Georgia called

UTG. (Mot. ¶¶ 11-12.) The Committee's characterization of this potential transaction as part of

the "admitted Salford/CaucusCom strategy of diverting Magticom revenues to engage in 'high

risk M&A activity" rather than use the funds to pay creditors of MIG" is insupportable and is another example of the Committee's refusal to accept the uncontroverted facts. (*Id.* ¶ 12.) In fact, although it has periodically engaged in discussions with UTG, the Debtor has been clear and consistent with the Committee that no such transaction is imminent nor would any such transaction be considered or approved during the pendency of this case without prior disclosure to the Committee.

38. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ These discussions, both externally and internally, have been ongoing since 2004 and before the acquisition by CaucusCom, with little to no progress having been made. (2006 Filing at 8.) In fact, two weeks before the deposition of Irakli Rukhadze in October 2009, discussions in Munich with UTG representatives broke up with the parties parting ways with no plans to convene again. The discussions have been "long, tiresome and unfruitful." (Spencer-Churchill Tr. at 245:21-246:17.) The UTG negotiators are difficult as they are ever changing their demands. (Spencer-Churchill Tr. at 245:21-246:17, 247:10-12, 15-17, 248:3-8.) ITCL and Magticom have never made any formal offer to UTG and have never discerned what UTG is seeking. (Spencer-Churchill Tr. at 250:7-14.)

39. The mere existence of these discussions does not warrant the Committee's purported alarm or claims of some conflict or breach of a duty. For the Committee's position to have merit, there would have to be: i) an imminent transaction; ii) a conflict; and iii) no appropriate method to address the conflict under applicable law. None of these circumstances

exists here. First, the discussions with UTG are not currently on-going and, in any case, were nothing more than an exploration of a possible, future business opportunity. There is no agreement on even the broad outlines of a deal with UTG. Second, even if an agreement were reached with UTG at some point in the future, the Committee fails to provide any evidence as to the reason this theoretical transaction would somehow be detrimental to MIG and this present a conflict. Depending on the structure and economic terms of the transaction, it may be in the best interests of both MIG and ITCL.[6] Third, if a transaction were agreed to with UTG and if it resulted in a conflict for MIG and/or ITCL directors, that agreement would be presented to the ITCL and MIG boards for approval. If at that point there are any conflicts for the directors of either MIG and ITCL, then Delaware law provides a proper procedure for directors in dealing with those conflicts. There is no impropriety in having discussions about a possible future business opportunity or in following Delaware corporate law. The Committee's speculative concern about certain directors viewing themselves as fiduciaries to ITCL and Magticom has no support in the evidence developed to date and is another instance of the Committee's tenacity despite the lack of any supporting and existence of only contradictory evidence.

---

[6] MIG has considered acquiring UTG since at least 2004, long before Sun or Salford ever entered the picture. (2006 Filing at 8.) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Growing a business in a reasonable manner that has been considered beneficial to MIG since at least 2004 does not qualify as highly risky activity.

## EVENTS DURING THE CHAPTER 11 CASE

### A.     Confidential Stipulation

40.     Shortly after the commencement of this case, the Debtor and the Committee entered into a confidential stipulation (the "**Confidential Stipulation**").  The Confidential Stipulation was agreed to by the Debtor voluntarily to demonstrate its good faith to the Committee in the hopes that the two sides could work productively together.  Unfortunately, to date, the Committee has continued its relentless litigation rather than engaging in any productive activities.  The Committee's "concerns" regarding the change of control provisions contained in the PSA and Second LLC Agreement are addressed completely by virtue of the Confidential Stipulation agreed to by the Debtor and the Committee and entered by this Court. ▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

41.     These are all concessions to the Committee.  So too is the ability of the Debtor to terminate the Confidential Stipulation; it may only do so with five (5) business days written notice.  This 5 day notice provision provides significant protection for the Committee and permits the Committee more than sufficient time to seek a remedy from this Court for any perceived transgression.  The Committee cannot now complain that the concessions agreed to

---

[7] It is important to note that CaucusCom has approximately $200 million invested in MIG, and accordingly, has a strong economic interest to preserve the status quo and abide by the change of control provisions so as to maximize the value of its investment and the value of MIG for all stakeholders.

voluntarily by the Debtor are now to be viewed as anything but a reflection of the Debtor's willingness to work productively with the Committee.

### B.  Trustee Motion

42.  The Committee's allegations in support of its Standing Motion are based on the same set of operative facts underlying its Trustee Motion. In the Trustee Motion, the Committee requests that the Court "automatically appoint a chapter 11 trustee under section 1104(a)(3) of the Bankruptcy Code." (Trustee Mot. at ¶ 48.)  In the Trustee Motion, the Committee asserts "[i]n January 2009, mere weeks after the Appraisal Trial and during post-trial briefing, MIG sold 4.1% of its interest in ITC to Dr. J -- giving Dr. J a controlling interest in Magticom -- and reducing MIG's interest to that of a minority shareholder." (*Id.* at ¶ 24.) Further, the Committee alleges that the Dr. J. transfer "materially (and intentionally) altered the nature of the asset with 'booby-traps' designed to entrench Salford/CaucusCom even at the expense of triggering a material destruction in value adverse to creditors." (*Id.* at ¶ 48.) Thus, in the Trustee Motion, the Committee claims that an appointment of a trustee is be necessary to: (1) invalidate the "poison pill" provisions (Trustee Mot. at ¶ 48.); and (2) to "invalidate all or a portion of" the transfer of 4.1% of MIG's interest to Dr. J. (*Id.* at ¶ 72.) These same allegations form the basis of the Committee's Standing Motion.

43.  The Trustee Motion, however, has been pending since July and substantial discovery has been taken, including written discovery, the production of thousands of pages of documents by MIG, and ten depositions. The Committee has failed to provide any form of evidence to support its theory. In addition to the substantial fact discovery taken in connection with the Trustee Motion, expert discovery continues. The Court has set aside two days for a hearing on the Trustee Motion, which will provide the Committee with ample opportunity to

present to the Court any evidence regarding the conduct of MIG's executives regarding Magticom. The Standing Motion, therefore, is duplicative of the Trustee Motion and premature while discovery continues on the Trustee Motion and in advance of the two-day hearing scheduled by the Court.

### C.  Current Valuation of MIG

44.     Lazard Frères & Co. LLC ("**Lazard**"), the Debtor's financial advisor, has evaluated each of MIG's businesses, assets, and investments on a going-concern basis to estimate its total enterprise value ("TEV"). The TEV for MIG is comprised of MIG's interests in the following: (i) 46% ownership interest in Magticom; (ii) other operating assets; (iii) 85% interest in Ayety TV; (iv) 100% interest in Telecom Georgia; (v) 100% interest in Telenet; and (vi) Other assets (i.e., cash). To arrive at its estimate of the range of TEV of MIG, Lazard utilized three generally accepted valuation methods for assessing TEV: (1) discounted cash flow analysis; (2) comparable company analysis; and (3) precedent transactions analysis. Lazard placed equal weight on each of these three analyses. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

### D.  Plan of Reorganization

45.     On October 16, 2009, the Debtor moved the Court (the "**Exclusivity Motion**") for entry of an order pursuant to section 1121(d) of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), extending the period during which the Debtor has the exclusive right to file a chapter 11 plan (the "**Exclusive Filing Period**") by 124 days through and including

February 16, 2009, and extending the period during which the Debtor has the exclusive right to solicit acceptances thereof (the "**Exclusive Solicitation Period**," together with the Exclusive Filing Period, the "**Exclusive Periods**") through and including April 16, 2009, or 122 days after the expiration of the Exclusive Solicitation Period. The Exclusivity Motion, is scheduled to be heard on November 18, 2009 (the "**November 18 Hearing**"). Having filed the Exclusivity Motion prior to the expiration of the Debtor's initial Exclusive Periods, the Debtor's Exclusive Filing Period currently extends through at least the November 18 Hearing.

46.     The Debtor is finalizing a plan of reorganization (the "**Plan**") and related disclosure statement that it intends to file before the expiration of the Exclusive Filing Period. The Plan will designate six classes of claims - comprised of a priority claims, secured workers' compensation obligations, the secured claims of Mark Hauf, general unsecured claims, Appraisal Action claims, and preferred share claims - and one class of interests for the Debtor's common equity interests. These classes take into account the differing nature and priority of the various claims and interests under the Bankruptcy Code and claims are treated generally in accordance with the priorities established under the Bankruptcy Code. Claims that have priority status under the Bankruptcy Code or that are secured by valid liens are to be paid in full, reinstated or otherwise as agreed upon or provided for under the Plan. Under the Plan, all of the Debtor's constituencies will receive substantial value on account of their claims. In particular, the holders of judgment in the Appraisal Action will receive the full value of that judgment through a pro rata share of all of the following:

- All of the Debtors' cash on the day immediately preceding the effective date of the Plan less (a) reserves necessary to make other Distributions or other payments under the Plan and (b) $5 million (the "**Excess Cash**"). The Debtor currently estimates that Excess Cash will total approximately $40 million.

- New common LLC interests representing fifteen percent (15%) of the fully-diluted equity of the reorganized Debtor on the effective date (the "**Maximum Appraisal Claims Equity Distribution**"). The Debtor estimates, in accordance with the valuation of MIG prepared by Lazard Frères, that the value of this equity interest will be $84 million.

- Par notes in the principal amount equal to the difference between the (a) judgment in the Appraisal Action and (b) the sum of the Excess Cash and the value of the Maximum Appraisal Claims Equity Distribution.

The Debtor believes that the Plan provides the best means currently available for the Debtor's emergence from Chapter 11[8].

### E.    MIG Board's Appointment of a Special Committee

47.    In accordance with Section 141(f) of the Delaware General Corporation Law and the applicable provisions of Certificate of Incorporation and Bylaws of the Debtor, the Debtor's Board of Directors has authorized the formation of a Special Committee to investigate and analyze the Committee's proposed form of derivative Complaint. The Special Committee is authorized to determine what action, if any is in the best interest of the Debtor, its creditors and other parties in interest. The Special Committee will consist of disinterested and independent directors Alan Greene and Wayne Henderson.

48.    The Special Committee has and may exercise in connection with the discharge of its responsibilities all the powers and authority of the Board and such other powers and authority as may be accorded to a committee of a board of directors under applicable law. In addition, the Special Committee is authorized by the Board, subject to Bankruptcy Court approval, to engage such experts and advisors, including independent legal counsel, as the Special Committee shall deem necessary or desirable in order to assist it in connection with the discharge of its responsibilities. The Special Committee has interviewed counsel from the law firm Young

---

[8] Any alleged preferences or fraudulent transfers will be addressed in the Plan or be limited or eliminated by the recoveries to creditors under the Plan.

Conaway Stargatt & Taylor, LLP and likely will seek leave from this Court to retain that firm as its counsel in this matter.

**ARGUMENT**

49.     In order to be granted derivative standing to assert a variety of tort and contract claims against the directors of the Debtor (the "**MIG Directors**"), the Committee must demonstrate to the Court that it has satisfied four requirements: "(1) a demand has been made upon the statutorily authorized party to take action; (2) the demand is declined; (3) a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court; and (4) the inaction is an abuse of discretion (*i.e.,* unjustified) in light of the debtor-in-possession's duties in a Chapter 11 case." *See In re G-I Holdings, Inc.*, 313 B.R. 612, 628 (Bankr. D.N.J. 2004). The Committee has the burden of demonstrating that it has satisfied all four of these requirements. *Id.* at 629. Only after the Committee has offered sufficient evidence satisfying each of these requirements does the burden then shift to the Debtor to demonstrate that it had a valid reason for not acting. *Id.*

50.     The Committee does not make the necessary evidentiary showing to satisfy any of these four requirements. The Standing Motion thus fails, and the Court's inquiry need not extend any further. Furthermore, even if the Committee could meets its burden, the Debtor is wholly justified in not acting on these claims at this juncture. For the reasons set forth below, the Standing Motion should be denied.

# I. THE RELIEF REQUESTED IS PREMATURE AT BEST.

## A. The Committee Should Not Be Granted Standing In Light of the Substantial Recovery Provided for the Unsecured Creditors in the Debtor's Upcoming Proposed Plan.

51. Part of the Debtor's Plan will provide means for the investigation of and potential pursuit of claims, including avoidance claims. In addition, the unsecured creditors will receive substantial recovery, albeit in the form of cash, equity and par value note, under the Debtor's Plan. There is no reason at this stage to permit the Committee derivative standing to pursue claims that might yield recovery to the creditors sometime in the future when the Debtor's Plan provides substantial recovery to all classes and maximizes the value of the estate.

## B. The Debtor Has Appointed a Special Committee of the Board of Directors to Investigate the Claims Asserted in the Draft Complaint.

52. The Committee's Standing Motion is based in part on the premise that the Debtor is not investigating, nor will it investigate, the claims set forth in the Draft Complaint because of the alleged self-interest of the MIG Directors. (Mot. ¶ 16.) As an initial matter, the Committee has not made any factual allegations to support the purported self-interest other than its entrenchment argument, which the Delaware Supreme Court has expressly held is insufficient to state a claim for breach of fiduciary duty. *Gantler v. Stephens*, 965 A.2d 695, 707 (Del. 2009). Moreover, the Committee's assertions that the Debtor is not investigating the claims in the Draft Complaint are incorrect. The Debtor has investigated the causes of action asserted by the Committee and believes them to be meritless.

53. The Debtor, however, recognizes that, in connection with the upcoming Plan approval process and now this Standing Motion, a more formal investigation may be necessary to satisfy the Committee. The Debtor, therefore, is in the process of forming a special committee of the Board of Directors (the "**Special Committee**") for the sole purpose of investigating

potential claims against MIG Directors, including those set forth in the Draft Complaint. The Special Committee will be comprised of the independent directors, Messrs. Greene and Henderson, and intends to have its own legal counsel from the law offices of Young, Conaway, Stargatt & Taylor, LLP in Wilmington, Delaware. Mr. Cook and the former independent director, Mr. Gale, have both testified that Messrs. Greene and Henderson are capable board members. (Cook Tr. 47:13-48:1, 49:25-50:3; Gale Tr. 38:6-9, 39:5-8, 39:23-40:7.) Mr. Green was not a Board member during the negotiation and execution of the PSA or the Second LLC Agreement. Demand by the Committee, therefore, would not have been futile; nor has the Board failed to take action. Given the formation of the Special Committee, the Committee's Standing Motion fails both the first two requirements necessary for a grant of derivative standing: that a demand to pursue the claims was made and denied.

### C.    The Court Should Decide the Outstanding Trustee Motion Before Addressing the Standing Motion.

54.    On July 23, 2009, the Committee filed its Trustee Motion. The Debtor does not believe that this Court will grant the Committee any of the relief requested in the Trustee Motion and is vigorously opposing that motion. But given its decision to file the Trustee Motion, the Committee must obtain a ruling on the Trustee Motion before proceeding with the Standing Motion. If the Trustee Motion is granted and a trustee is appointed in this case, the trustee would be tasked with investigating and, potentially, pursuing any claims against the MIG Directors, and this effort to prematurely decide this issue serves only to deplete resources of the estate.

55.    Only if an appointed trustee fails to pursue causes of action would the Court then consider whether to grant the Committee derivative standing. *See Off. Comm., of Unsecured Cred. of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568-69 (3d Cir. 2003) ("This representative role explains why § 544(b) allows the trustee, but not a creditors'

committee, to bring an avoidance action on its own authority, *i.e.,* without court permission. But that provision does not foreclose a bankruptcy court's equitable power to substitute *itself* as gatekeeper *when the trustee is delinquent*") (emphasis added); *see also In re Racing Svcs.*, 540 F.3d 892, 898 (8th Cir. 2008) (holding that "derivative standing is available to a creditor to pursue avoidance actions when it shows that a Chapter 7 trustee (or debtor-in-possession in the case of Chapter 11) is 'unable or unwilling' to do so."); *Fogel v. Zell,* 221 F.3d 955, 965 (7th Cir. 2000) ("If a trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim of a creditor, the creditor may obtain the permission of the bankruptcy court to bring the action in place of, and in the name of, the trustee."); *In re STN Enters.*, 779 F.2d 901, 905-906 (2d Cir. 1985) (if party makes requisite showing on four requirements, court must consider whether to granting derivative standing or appointing a trustee is more better course). Until the Court issues its decision with respect to the Trustee Motion, the Standing Motion is premature.

II.   **THE COMMITTEE HAS NOT STATED A "COLORABLE CLAIM" SUFFICIENT TO WARRANT DERIVATIVE STANDING.**

      A.   **The Committee Must Present Evidence that it has a Sufficient Likelihood of Success on the Merits.**

56.   The Committee concedes that it must establish that it has stated a "colorable claim" but asserts that in order to satisfy this requirement the claim must only be sufficiently meritorious to withstand a motion to dismiss. (Mot. at ¶ 28.) This is not the proper analysis. In evaluating whether a "colorable claim" exists, the Court must first weigh appropriate evidence to determine whether or not the Committee presented a claim that has a sufficient likelihood of success that would support a recovery. *See In re Smart World Techs., LLC,* 423 F.3d 166, 177 (2d Cir. 2005); *In re STN Enters.,* 779 F.2d 901, 905-906 (2d Cir. 1985); *In re iPCS,*

*Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003). This Court's analysis must examine all of the facts of the case, whether or not presented in the initial motion or draft complaint. *See id.*

57.     The Committee has not presented any actual evidence that their asserted claims are colorable. Rather, the true facts in this case show that the Committee's Standing Motion is unwarranted. The change of control provision is not a "poison pill" and was agreed to and ratified by the MIG Board of Directors after serious consideration of its value to the Debtor. Nor is there any imminent transaction involving UTG that would adversely effect the Debtor, its creditors or its estate. Without any facts to support any claims that have a likelihood of success on the merits, the Committee has failed to show that it has any colorable claims that it could assert derivatively.

**B.     The Standing Motion Fails to Address Fiduciary Duty Law in Delaware, Further Discrediting the Committee's Claims.**

58.     The Committee implies that the MIG Directors breached their duties of care and duty of loyalty to the Debtor by "deliberating on the PSA and the New ITCL JV Agreement at only two board meetings," by failing to obtain a fairness opinion or requesting a market check, and failing to appoint a committee of disinterested directors "in connection with approval of the Poison Pill Provisions." (Mot. at ¶ 31.) As a factual matter, this ignores the uncontroverted testimony of Mr. Henderson that he had numerous discussions with Mr. Nagle about the negotiations, including the change of control provisions, outside of board meetings and the complex negotiations and discussions involved with the PSA and the Second LLC Agreement. (*See* Factual Background Section F at 16-18, *supra*.)

59.     As a legal matter, the Committee noticeably fails to set forth or explain the standards for breach of fiduciary duty claims under Delaware law. The Committee concludes that a breach of fiduciary duty resulted from the transaction decisions of the MIG directors.

(Mot. ¶¶ 15-16.)   Under Delaware law, however, to properly sustain a claim for breach of fiduciary duty, the Committee must plead particularized facts which demonstrate, at this stage of the case, gross negligence and/or self-dealing on the part of the MIG directors.  *See In re NYMEX Shareholder Litig.*, 2009 WL 3206051, *6 (Del. Ch. 2009); *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1113 (Del. Ch. 2008) ("a corporate director is only considered to have breached his duty of care in instances of gross negligence."); *In re Lear Corp. Shareholder Litig.*, 967 A.2d 640, 651-652 (Del. Ch. 2008) (same); *In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, *4 (Del. Ch. Oct. 17, 2007) (unpublished opinion).  The Committee has not demonstrated any facts sufficient to show that any of the MIG Directors have breached their fiduciary duties, either by acting with gross negligence or by self-dealing.

60.     Sixteen months of difficult negotiations that culminated in the execution of the PSA, with continuous updates and discussions with Board members about the status of discussions with Dr. Jokhtaberidze, cannot be considered gross negligence. ███████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████ Such change of control restrictions are quite common in joint venture agreements, are allowed by Delaware law, and bear no resemblance whatsoever to "poison pills."

61.     Indeed, the Delaware Limited Liability Company Act sections addressing management of the limited liability company (Section 18-402), rights to information (Section 18-305), restrictions on transfer (Section 18-702), members' rights to distribution prior to dissolution and winding up (Section 18-601) and, in particular, the policy to give maximum effect to the principle of freedom of contract and to the enforceability of limited liability

company agreements (Section 18-1101(b)), all support the proposition that board members have the latitude under the Delaware statutory scheme to include change of control provisions within agreements such as the PSA and Second LLC Agreement here and that the statutory scheme is designed to allow parties to these agreements to set the terms of their own arrangement.[9]

62.     The Committee's Draft Complaint recognizes that the Second LLC Agreement is best viewed as a joint venture agreement. (Draft Complaint ¶¶ 36-38.)  Fundamental change of control provisions are often standard within the framework of a joint venture arrangement. *See generally, BASF v. POSM II Props. P'ship, LLC*, 2009 WL 522721 (Del. Ch. March 3, 2009) (stating that change of control provisions "are used in many contexts, including in the joint venture context analogous to the limited partnership here").  Section 8.2(g) of the American Bar Association Model Joint Venture Agreement ("**Model JV Agreement**") contains provisions which expressly deal with a change of control of one of the members and resulting consequences.  The related commentary to this section of the Model JV Agreement makes clear that the identity of the parties to a joint venture and their control persons is a critical factor in the joint venture and that changes thereto calls into question the fundamental premise of a joint venture as to the parties decision to, and ability to, work together.  While the Second LLC Agreement in this case does not strictly follow the model agreement, the fact that the Model JV Agreement contemplates fundamental changes and consequences as a result of a change of control makes perfectly clear that the provisions fancifully referred to by the Committee as "poison pill" provisions are standard in commercial settings.  Difficult, arms length negotiations of the parties with respect to the change of control provisions evidence their reasonableness and fairness to both sides.

---

[9] Moreover, the Act was recently amended – in 2009 – to make specifically clear that actions permitted under one section of the Limited Liability Corporation Act are to be given independent legal significance from restrictions that may be applicable under other sections of the Act. Section 18-1101(h).

63.     As allowed by the Delaware Limited Liability Company Act and as also recognized in practice by the ABA Joint Venture Model Agreement, the Board's actions with respect to the change of control provisions both legitimate and reasonable.

### C.  The Change of Control Provisions in the Purchase and Sale Agreement and Amended Limited Liability Company Agreement Do Not Constitute a "Poison Pill" Because They Were Not Adopted as a Defensive Measure.

64.     The actions of MIG's Board in negotiating and approving the PSA and Second LLC Agreement clearly comport with provisions of the Delaware LLC Act and common-place commercial practice and demonstrate the considered and difficult business decisions that were made in that context.  As a result, the business judgment rule applies to the Board's actions.  To evade the natural application of the business judgment rule, the Committee desperately has characterized the change of control provisions as "poison pills," but inaccurately describes what constitutes a "poison pill."

65.     The term "poison pill" refers to a specific dividend of rights to company shareholders as a defense against hostile takeovers (otherwise known as a "shareholder rights plan").  In this case, the Committee disingenuously likens the change of control provisions to the defensive adoption of a stockholder rights plan.  The primary purpose of a poison pill is to enable the board of directors of a target corporation to prevent the unsolicited acquisition of a majority of the company's voting stock through an inadequate or coercive tender offer, while giving the board leverage to negotiate with potential acquirers.  *In re Gaylord Container Corp. Shareholders Litig.*, 753 A.2d 462, 481 (Del. Ch. 2000).

66.     The Committee has not pled any allegations that would suggest any actual or perceived hostile act or that the Board was in a defensive posture.  The Committee simply ignores the uncontroverted testimony demonstrating that the change of control provision was the

result of a long negotiation process given Dr. Jokhtaberidze's fervent requests (indeed insistence) to have these provisions and CaucusCom's strong reluctance with respect thereto. Any "poison pill" characterization or analysis is inappropriate.

**D.      The Business Judgment Rule Applies and Insulates the Board from the Committee's Challenge to its Change of Control Provisions.**

67.     The *Moran* decision does not put preclude the application of the business judgment rule in this case. (Mot. ¶ 29 (citing *Moran v. Household Int'l Inc.*, 500 A.2d 1346, 1348-50, 1355-57 (Del. 1985) (validating a flip-over poison pill adopted as "a preventative mechanism to ward off future advances").) In *Moran*, the Delaware Supreme Court upheld the adoption of a shareholder rights plan -- a so-called "poison pill" -- and held that directors and officers have the right to implement such takeover defenses. 500 A.2d at 1357. In fact, it was the *Moran* decision that legitimated poison pills and made them a part of the American corporate landscape. Yet, this is not a hostile takeover case - it is a normal commercial arrangement commonplace in joint ventures. As a result, the Court here should apply the business judgment rule when examining the Board's actions with respect to the change of control provisions.

68.     The business judgment rule generally provides that a decision by a board of directors in which the directors possess no direct or indirect personal interest, which is made with reasonable awareness of all reasonably material information, and after prudent consideration of the alternatives, and which is in good faith furtherance of a rational corporate purpose, will not be interfered with by the courts, either prospectively or by injunction, or retrospectively by imposition of liability for damages upon the directors, even if the decision appears to have been unwise or to have caused loss to the corporation or its stockholders. *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 928 (Del. 2003); *see also McMullin v. Beran*, 765 A.2d 910, 916

(Del. 2000); *Unitrin v. American Gen. Corp.*, 651 A.2d 1361, 1373 (Del. 1995); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *Gagliardi v. Trifoods Int'l, Inc.*, 683 A.2d 1049, 1053 (Del. Ch. 1996).

69.      The business judgment rule protects directors and officers from a claim for breach of the duty of due care as it creates a presumption "that in making a business decision the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation." *Aronson*, 473 A.2d at 812; *see also Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000). The presumption will apply at the outset, and to survive a motion to dismiss, the plaintiff will need to plead and demonstrate particularized facts as to a breach of duty. Only if the presumption is rebutted, the defendant-directors have the burden of proving the legitimacy of their action. *Gantler*, 965 A.2d at 706

70.      The Committee has not pled sufficient facts to overcome the business judgment rule. Indeed, the Committee's Motion merely makes non-specific and conclusory allegations of self-dealing entrenchment, an approach recognized recently by one court as insufficient to overcome the presumption of the business judgment rule. *See Id.* at 707 (discussing an entrenchment style claim and holding that "plaintiffs must plead, in addition to a motive to retain corporate control, other facts sufficient to state a cognizable claim that the Director Defendants acted disloyally").

71.      Just as *Moran* does not apply, *Unocal* does not apply here, as claimed by the Committee.[10] (Mot. ¶ 29 (citing *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 953-55 (Del. 1985)).) The Delaware Supreme Court recently made clear in its opinion in *Gantler* that, in order to invoke the *Unocal* standard, a plaintiff must demonstrate that a company took

---

[10] In *Unocal*, the Delaware Supreme Court articulated that the defensive measures adopted by a board were subject to enhanced judicial scrutiny over and above the business judgment rule. 493 A.2d at 954.

defensive measures in response to a perceived threat. *Gantler*, 965 A.2d at 695, 705 ("enhanced judicial scrutiny under *Unocal* applies 'whenever the record reflects that a board of directors took defensive measures in response to a perceived threat to corporate policy and effectiveness which touches on issues of control.'" (citation omitted)). There is no allegation that any defensive measure was taken in response to a perceived threat. Just as in *Gantler*, the Committee's allegations of disloyalty (by entrenchment) cannot remove the business judgment rule as the standard by which the Debtor's actions are to be reviewed.

72.     Even if the Court determined that the control provisions are "defensive measures," thereby invoking *Unocal*, application of the *Unocal* standard can not rescue the Standing Motion because the provisions are not coercive or preclusive and, as demonstrated above, the provisions are permissible and legitimate under the Delaware statutory scheme. *See Unitrin* at 1372-74.

73.     In *Unitrin*, the Delaware Supreme Court explained that, unless a defensive measure was "draconian," by being "coercive or preclusive," the board's actions would be upheld so long as they were within a "range of reasonable responses." *Id.* at 1367, 1388-91  The *Unitrin* Court addressed the question of whether the change of control transaction at issue was itself preclusive. The court ultimately upheld the board's use of a poison pill and stock buyback to defeat a hostile tender offer. In the present case, the change of control provision did not coerce an alternative change of control, nor did it preclude the preferred stockholders from exercising their other legal rights.

III.     **THE COMMITTEE PROVIDES NO EVIDENCE THAT ITS PROPOSED CAUSES OF ACTIONS WOULD BENEFIT THE ESTATE.**

74.     To satisfy the third requirement, the Court must also undertake a cost/benefit analysis to determine whether or not the cost of asserting the claims outweighs the resulting

economic benefit to the estate. "Such an analysis is designed to ensure that the expected benefit to the estate will be reasonably sufficient to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *In re iPCS*, 297 B.R. at 291. The Committee's Standing Motion fails to satisfy this requirement.

75.     Pursuing claims against the MIG Directors could have an adverse effect on its relationship with Dr. Jokhtaberidze. ██████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████  █████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████ The risk of pursuing the Committee's claims at this point makes the cost too high to justify it, as such an action jeopardizes the entire efforts to maximize the value of the Debtor, a risk to both the Debtor and the unsecured creditors.

76.     The Committee focuses its inquiry on the elimination of the "poison pill" provisions that it claims exist in the new ITCL JV Agreement. (Mot. at ¶¶ 30-31.) First, the provisions at issue are not "poison pills." ███████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████ The Committee cannot demonstrate that the costs associated with bringing this lawsuit will financially benefit the estate.

---

[11] The tenth deponent is Chris Cook, chair of the Committee, who has not had any dealings personally with Dr. Jokhtaberidze.

77. Another aspect of the costs that the Committee (and its attorneys) significantly omit is the heightened scrutiny applied in cases such as this one where the Committee's attorneys' fees are being paid by the Debtor's estate. Where the fees sought as part of the proposed complaint are to be borne by a debtor's estate (rather than by the Committee itself), the Court must "carefully examine" this as part of its cost analysis. *In re STN Enters.*, 779 F.2d at 905-906. Courts are more willing to grant derivative standing in cases involving contingency fee arrangements or self-funded committees where there is no fiscal downside to a debtor's estate. *Id.* In the instant matter, every penny paid to the Committee's professionals comes directly out of the estate and thus diminishes the funds available to pay creditors. Further, given the pace at which the Committee's attorneys are pursuing endless litigation in this case further indicates that granting the Committee derivative standing may result in a severe diminution of the estate. The costs sought to be imposed by the Committee are too high to justify the Committee's request for standing to pursue claims.

## IV. THE COMMITTEE HAS PUT FORTH NO EVIDENCE WARRANTING INJUNCTIVE RELIEF.

78. As a last ditch effort, the Committee makes a cursory attempt to seek injunctive relief preventing the MIG Directors from invoking the "poison pill" provisions of the ITCL JV Agreement. (Mot. at ¶ 41.) In order to warrant injunctive relief, the Committee must demonstrate: (1) that there is a likelihood that the Committee will succeed on the merits; (2) that the creditors will suffer irreparable harm without injunctive relief; (3) that the Debtor will not suffer irreparable harm if the injunction is issued; and (4) that the public interest militates in favor of injunctive relief. *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 556 (3d Cir. 2009). The Committee has offered no evidence that is can, or will, meet the designated requirements for injunctive relief.

79.     As discussed above, there is no imminent or planned action of any sort that would implicate the change of control provision.  There is no likelihood that the Committee will succeed on the merits of its efforts to trump out claims based on the change of control provision nor is there is any planned action that would cause the creditors to suffer any harm let alone irreparable harm.  The Debtor, on the other hand, needs to be allowed to run its business, and its directors allowed to fulfill their fiduciary duties, without artificial limitations imposed by the Committee's unfounded concerns.  No public interest militates in favor of injunctive relief.  In fact, that parties' Stipulation precludes any such action without notice to the Committee.  Unless and until the Debtor terminates the Stipulation and attempts to trigger the change of control provision, no injunctive relief is appropriate.  Until that time, however, the Committee's request is just part of its continuous effort to create issues where they do not exist, thereby expending significant resources of the Debtor's estate to defend against meritless claims.

## CONCLUSION

80.     For the foregoing reasons, the Debtor respectfully requests that this Court enter an Order: (1) denying the Committee's Motion for Order Granting the Committee Standing to: (i) Prosecute Actions on Behalf of the Debtor's Estate; and (ii) Seek a Temporary Restraining Order, Preliminary Injunction and Other Related Relief; and (2) granting such other and further relief as the Court finds to be necessary and appropriate.

Dated:    Wilmington, Delaware

          November 12, 2009

                                        Scott D. Cousins (DE Bar No. 3079)
                                        GREENBERG TRAURIG, LLP
                                        The Nemours Building
                                        1007 North Orange Street
                                        Suite 1200
                                        Wilmington, DE 19801
                                        Tel.: (302) 661-7000
                                        Fax: (302) 661-7360
                                        cousinss@gtlaw.com

                                        - and -

                                        Nancy A. Mitchell
                                        Maria J. DiConza
                                        GREENBERG TRAURIG, LLP
                                        MetLife Building
                                        200 Park Avenue
                                        New York, NY 10166
                                        Tel.: (212) 801-9200
                                        Fax: (212) 801-6400
                                        mitchelln@gtlaw.com
                                        diconzam@gtlaw.com