**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MIG, INC., | Case No. 09-12118 (KG) |
| Debtor. | |

**SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE**
**JOINT SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR MIG, INC.**

Scott D. Cousins (DE Bar No. 3079)
Sandra G. M. Selzer (DE Bar No. 4283)
GREENBERG TRAURIG, LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
cousinss@gtlaw.com
selzers@gtlaw.com

-and-

Nancy A. Mitchell
Maria J. DiConza
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
mitchelln@gtlaw.com
diconzam@gtlaw.com


Counsel to the Debtor and Debtor-in-
Possession

Ian Connor Bifferato
Thomas F. Driscoll III
BIFFERATO, LLC
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Telephone: (302) 225-7600
Facsimile: (302) 254-5833
cbifferato@bifferato.com
tdriscoll@bifferato.com


-and-

Carmen H. Lonstein
Andrew P.R. McDermott
BAKER & MCKENZIE LLP
One Prudential Plaza, Suite 3500
130 E. Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-8000
Facsimile: (312) 698-2370
carmen.lonstein@bakernet.com
andrew.mcdermott@bakermckenzie.com

Counsel to the Official Committee of
Unsecured Creditors

DATED: August 15, 2010

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE JOINT SECOND AMENDED CHAPTER 11 PLAN FOR MIG, INC. PROPOSED BY THE DEBTOR AND THE COMMITTEE (THE "<u>PLAN PROPONENTS</u>") AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

EXCEPT AS OTHERWISE PROVIDED HEREIN, CAPITALIZED TERMS NOT OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN. UNLESS OTHERWISE NOTED, ALL DOLLAR AMOUNTS PROVIDED IN THIS DISCLOSURE STATEMENT AND THE PLAN ARE GIVEN IN UNITED STATES DOLLARS.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASE, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT ALL SUCH SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF UNDERLYING DOCUMENTS AND TO THE EXTENT THAT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. NEITHER OF THE PLAN PROPONENTS WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. EXCEPT WITH RESPECT TO THE PRO FORMA FINANCIAL PROJECTIONS PREPARED BY THE DEBTOR'S MANAGEMENT SET FORTH IN THE ATTACHED EXHIBIT B (THE "<u>PROJECTIONS</u>") AND EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE PLAN PROPONENTS DO NOT UNDERTAKE ANY OBLIGATION TO, AND DO NOT INTEND TO, UPDATE THE PROJECTIONS; THUS, THE PROJECTIONS WILL NOT REFLECT THE IMPACT OF ANY SUBSEQUENT EVENTS NOT ALREADY ACCOUNTED FOR IN THE ASSUMPTIONS UNDERLYING THE PROJECTIONS. FURTHER, THE PLAN

PROPONENTS DO NOT ANTICIPATE THAT ANY AMENDMENTS OR SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE DISTRIBUTED TO REFLECT SUCH OCCURRENCES. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. MOREOVER, THE PROJECTIONS ARE BASED ON ASSUMPTIONS THAT, ALTHOUGH BELIEVED TO BE REASONABLE BY THE DEBTOR, MAY DIFFER FROM ACTUAL RESULTS.

ALL HOLDERS OF CLAIMS OR INTERESTS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT DOCUMENTS ONCE FILED, AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(C) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF MIG, INC. IN THIS CASE SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER APPLICABLE EVIDENTIARY RULES. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, MIG, INC. IN THIS CASE. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR WITH RESPECT TO ANY

QUESTIONS OR CONCERNS REGARDING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREIN BY THE DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ..................................................................................................1

II.  OVERVIEW OF THE PLAN .................................................................................1

     A.   General Structure of the Plan ...................................................................2
     B.   Summary of Treatment of Claims and Interests under the Plan .............3

III. PLAN VOTING INSTRUCTIONS AND PROCEDURES ....................................7

     A.   Notice to Holders of Claims and Interests in the Debtor .......................7
     B.   Voting Rights ............................................................................................8
     C.   Solicitation Materials ...............................................................................9
     D.   Voting Procedures, Ballots, and Voting Deadline ..................................9
     E.   Confirmation Hearing and Deadline for Objections to Confirmation ..................10

IV.  GENERAL INFORMATION CONCERNING THE DEBTOR...................................10

     A.   Overview of Debtor's Corporate History and Management ..................10
     B.   The Debtor's Assets ...............................................................................12
          1.   Magticom Ltd. .............................................................................. 12
               a.   ITCL LLC Agreement and Change of Control Provisions ............... 15
          2.   MIG's Other Interests ................................................................. 18
          3.   Debtor's Cash ............................................................................... 18
     C.   Events Leading to the Filing of the Chapter 11 Case............................19
          1.   The Appraisal Action ................................................................... 19
          2.   The Appraisal Judgment .............................................................. 19

V.   THE CHAPTER 11 CASE ....................................................................................19

     A.   Commencement of the Case....................................................................19
     B.   Modification of the Stay to Pursue the Appeal .....................................20
     C.   Other First Day Orders...........................................................................20
     D.   Retention of Professionals......................................................................21
     E.   The Committee.........................................................................................21
     F.   Other Matters Addressed During the Chapter 11 Case..........................22
          1.   Motion to Extend Exclusivity Periods ....................................... 22
          2.   Claims Process ............................................................................. 22
               a.   Schedules and Statements of Financial Affairs....................... 22
               b.   Bar Date ............................................................................. 22
               c.   First Omnibus Objection to Claims ....................................... 23
               d.   Ayety Claims Objection ......................................................... 23
               e.   Babunashvili Claim Objection ............................................... 23
               f.   Late Claim Motions ............................................................. 24
     G.   The Committee's Motions.......................................................................26

Second Amended Disclosure Statement

| | | | |
|---|---|---|---|
| | 1. | Motion for Trustee, Termination of Exclusivity or Dismissal of the Chapter 11 Case | 26 |
| | 2. | The "Standing" Motion | 26 |
| H. | | The Standstill Order | 27 |
| I. | | Settlement | 28 |

VI. SUMMARY OF THE PLAN OF REORGANIZATION ........................................ 28

| | | | |
|---|---|---|---|
| A. | | Overall Structure of the Plan | 29 |
| B. | | Classification and Treatment of Claims and Interests | 29 |
| | 1. | Treatment of Unclassified Claims under the Plan | 30 |
| | | a. Administrative Claims | 30 |
| | | B. Priority Tax Claims | 31 |
| | 2. | Treatment of Classified Claims and Interests under the Plan | 31 |
| | | a. Class 1 | 31 |
| | | b. Class 2 | 31 |
| | | c. Class 3 | 32 |
| | | d. Class 4 | 32 |
| | | e. Class 5 | 32 |
| | | f. Class 6: Common Equity Interests | 33 |
| | 3. | Special Provisions Regarding Insured Claims | 34 |
| | 4. | Reservation of Rights Regarding Claims | 34 |
| C. | | Reorganized Debtor's Obligations Under the Plan | 34 |
| D. | | Description of New Securities under the Plan | 36 |
| | 1. | Summary Description of New MIG Notes Indenture and the Notes | 37 |
| | 2. | Description of New Limited Liability Company Operating Agreement | 42 |
| | 3. | Description of New Common LLC Interests | 43 |
| | 4. | Summary Description of New Warrants | 43 |
| E. | | Establishment of the Class 5 Trust, Appointment of the Class 5 Trustee; Funding of the Class 5 Trust; Termination of the Class 5 Trust; Exculpation and Indemnification; International Recognition | 44 |
| F. | | Claims, Distribution Rights and Objections | 45 |
| | 1. | Distributions for Allowed Claims | 45 |
| | 2. | Interest on Claims | 45 |
| | 3. | Designation; Distributions by Disbursing Agent | 46 |
| | 4. | Means of Cash Payment | 46 |
| | 5. | Fractional Distributions | 46 |
| | 6. | De Minimis Distributions | 47 |
| | 7. | Delivery of Distributions | 47 |
| | 8. | Application of Distribution Record Date | 47 |
| | 9. | Withholding, Payment and Reporting Requirements | 48 |
| | 10. | Setoffs | 48 |
| | 11. | Pre-Payment | 48 |
| | 12. | No Distribution in Excess of Allowed Amounts | 49 |
| | 13. | Allocation of Distributions | 49 |
| | 14. | Prosecution of Objections to Claims | 49 |

|  |  | a. | Objections to Claims; Estimation Proceedings | 49 |
|--|--|----|----------------------------------------------|----|
|  |  | b. | Authority to Prosecute Objections | 50 |
|  | 15. | | Treatment of Disputed Claims | 50 |
|  |  | a. | No Distribution Pending Allowance | 50 |
|  |  | b. | Distributions on Accounts of Disputed Claims Once They are Allowed | 50 |
|  | 16. | | Accounts; Escrows; Reserves | 50 |
|  |  | a. | Administrative Claims Reserve | 51 |
|  |  | b. | Professional Fee Reserve | 51 |
|  |  | c. | Disputed Claims Reserve | 51 |
|  | 17. | | Administrative Claims | 52 |
|  | 18. | | Professional Fee Claims | 53 |
| G. | | | Disposition of Executory Contracts and Unexpired Leases | 53 |
|  | 1. | | Executory Contracts and Unexpired Leases Deemed Assumed | 53 |
|  | 2. | | Rejection of Executory Contracts and Unexpired Leases | 53 |
|  | 3. | | Assignment of Executory Contracts and Unexpired Leases | 54 |
|  | 4. | | Cure Rights for Executory Contracts and Unexpired Lease Assumed Under the Plan | 54 |
|  | 5. | | Rejection Damages Bar Date for Rejections Pursuant to the Plan | 55 |
|  | 6. | | Indemnification Obligations | 55 |
|  | 7. | | Continuing Obligations Owed to Debtor | 55 |
|  | 8. | | Limited Extension of Time to Assume or Reject | 56 |
|  | 9. | | Postpetition Contracts and Leases | 56 |
|  | 10. | | Treatment of Claims Arising From Assumption or Rejection | 57 |
| H. | | | Revesting of Assets; Preservation of Causes of Action, Litigation Rights and Avoidance Actions; Release of Liens; Resulting Claim Treatment | 57 |
| I. | | | Restructuring Transactions | 58 |
| J. | | | Authorization and Issuance of New Common LLC Interests, New MIG Notes and New Warrants | 58 |
| K. | | | Post-Confirmation Corporate Structure, Management and Operation | 59 |
|  | 1. | | Continued Corporate Existence | 59 |
|  | 2. | | Corporate Governance | 59 |
|  | 3. | | New Management Incentive Plan | 60 |
|  | 4. | | New Board of Managers of the Reorganized Debtor | 60 |
|  | 5. | | Officers of Reorganized Debtor | 60 |
|  | 6. | | Exemption from Certain Transfer Taxes | 60 |
|  | 7. | | Corporate Action | 61 |
|  | 8. | | Effectuating Documents; Further Transactions | 61 |
|  | 9. | | Cancellation of Common Equity Interests and Agreements | 61 |
| L. | | | Settlement, Releases, Discharge, Injunctions, Exculpation and Indemnification | 62 |
|  | 1. | | Debtor Parent, Debtor Parent Affiliates and Releasee Obligations Under the Plan | 62 |
|  | 2. | | Releases by Debtor in Favor of Third Parties | 62 |
|  | 3. | | Releases by Creditors of Claims Against Third Parties | 64 |

| | 4. | Discharge and Discharge Injunction | 65 |
| | 5. | Exculpation Relating to the Chapter 11 Case | 66 |
| | 6. | Term of Injunctions or Stays | 67 |
| | 7. | Post-Effective Date Indemnification | 68 |
| | 8. | Compromise and Settlement Under the Plan | 68 |
| M. | | Causes of Action and Avoidance Actions | 69 |
| | 1. | Preservation of Malpractice Action | 69 |
| N. | | Retention of Jurisdiction | 70 |
| O. | | Amendment, Alteration and Revocation of Plan | 72 |
| P. | | Plan Supplement | 73 |
| Q. | | Confirmation and/or Consummation | 73 |
| | 1. | Requirements for Confirmation of the Plan | 74 |
| | 2. | Conditions to Confirmation and Effective Date | 75 |
| | 3. | Anticipated Effective Date and Notice Thereof | 76 |

VII. CERTAIN RISK FACTORS TO BE CONSIDERED .................. 76

| A. | | Certain Business Considerations | 77 |
| | 1. | Continuing Global Economic Crisis Could Adversely Affect the Debtor's Business | 77 |
| | 2. | Fluctuating Foreign Currencies Could Have an Adverse Impact on Operations | 77 |
| | 3. | The Reorganized Debtor Will Be Exposed to Changing Regulations | 77 |
| | 4. | Foreign Country Risks | 78 |
| | 5. | Triggering of Certain Non-Alienation Provisions | 78 |
| | 6. | Projected Financial Information | 78 |
| | 7. | Historical Financial Information May Not Be Comparable | 79 |
| | 8. | Competition | 79 |
| | 9. | Litigation | 79 |
| B. | | Certain Bankruptcy Considerations | 79 |
| | 1. | Non-Confirmation or Delay of Confirmation of the Plan | 79 |
| | 2. | Classification and Treatment of Claims and Equity Interests | 81 |
| | 3. | Claims Estimation | 81 |
| C. | | Risks to Creditors Who Will Receive Securities | 82 |
| | 1. | Lack of Market for Securities Issued Pursuant to the Plan | 82 |
| | 2. | Lack of Dividends on Securities May Adversely Affect Liquidity | 82 |
| D. | | Certain Tax Considerations | 82 |

VIII. APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS .................. 83

| A. | | Offer and Sale of New Securities; Bankruptcy Code Exemption | 83 |
| B. | | Subsequent Transfers of New Securities | 83 |

IX. CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN .................. 85

| A. | | U.S. Federal Income Tax Consequences to the Debtor | 86 |
| | 1. | Conversion of the Debtor | 86 |

        2.      Cancellation of Indebtedness Income ....................................................... 87

B.    U.S. Federal Income Tax Consequences to the Holders of Claims and
       Interests ...................................................................................................... 88
       1.      Accrued but Unpaid Interest ...................................................... 88
       2.      Exchange ..................................................................................... 89
            A.   Holders of Secured Workers' Compensation Obligations Claims
                (Class 2) ........................................................................... 89
            B.   Holders of General Unsecured Claims (Class 3) .............................. 89
            c.   Holders of Supplemental Employee Retirement Claims (Class 4) .... 89
            d.   Holders of Preferred Shareholder Claims (Class 5) .......................... 89
            E.   Holders of Common Equity Interests (Class 6) ................................ 90
       3.      Ordinary Income ........................................................................ 90

C.    Information Reporting and Backup Withholding .................................... 90
D.    Importance of Obtaining Your Own Professional Tax Assistance ...................... 90

X.    FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS ................ 91

A.    Feasibility of the Plan .............................................................................. 91
B.    Acceptance of the Plan ............................................................................ 92
C.    Best Interests Test .................................................................................... 93
D.    Liquidation Analysis ............................................................................... 93
E.    Valuation of the Reorganized Debtor ..................................................... 94
       1.      Overview ..................................................................................... 94
F.    Application of the "Best Interests" of Creditors Test to the Liquidation
       Analysis and the Valuation .................................................................... 96
G.    Confirmation Without Acceptance of All Impaired Classes ................................ 96

XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATIONS OF
       THE PLAN ........................................................................................................ 97

A.    Alternative Plan(s) of Reorganization .................................................... 97
B.    Liquidation under Chapter 7 or Chapter 11 .......................................... 97

XII.    THE SOLICITATION; VOTING PROCEDURES ......................................... 98

A.    Parties-in-Interest Entitled to Vote ......................................................... 98
B.    Classes Entitled to Vote to Accept or Reject the Plan ........................... 99
C.    Waivers of Defects, Irregularities, Etc. .................................................. 99
D.    Withdrawal of Ballots; Revocation ........................................................ 99
E.    Voting Objection Deadline ................................................................... 100
F.    Further Information; Additional Copies ................................................ 100

Second Amended Disclosure Statement

## **TABLE OF EXHIBITS**

Exhibit A      Second Amended Chapter 11 Plan of Reorganization for MIG, Inc.

Exhibit B      Pro Forma Financial Projections

Exhibit C      Liquidation Analysis

Exhibit D      Management Discussion and Analysis of Magticom (2009)

Exhibit E      Five Year Business Plan of Magticom

Exhibit F      Settlement Agreement

Second Amended Disclosure Statement

**SECOND AMENDED DISCLOSURE STATEMENT**
**WITH RESPECT TO THE JOINT SECOND AMENDED**
**CHAPTER 11 PLAN OF REORGANIZATION FOR MIG, INC.**

## I.     INTRODUCTION

MIG, Inc., the debtor and debtor-in-possession (the "<u>Debtor</u>" or "<u>MIG</u>") and the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case (the "<u>Committee</u>") submit this second amended disclosure statement (the "<u>Disclosure Statement</u>") pursuant to section 1125 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), for use in the solicitation of votes on the Joint Second Amended Chapter 11 Plan of Reorganization for MIG, Inc. dated August 15, 2010 (the "<u>Plan</u>") proposed jointly by the Debtor and the Committee. **A copy of the Plan is attached as Exhibit A to this Disclosure Statement. All capitalized terms used in this Disclosure Statement but not otherwise defined herein have the meanings ascribed to such terms in Article I of the Plan.**

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, its reasons for seeking protection and reorganization under chapter 11, significant events that have occurred during the Chapter 11 Case and the anticipated organization, operations, and financing of the Debtor upon its successful emergence from chapter 11. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan and the securities to be issued under the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the Confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims or Interests that are (i) "Impaired" by a plan of reorganization and (ii) entitled to receive a Distribution under such plan are entitled to vote on such Plan. In the Debtor's case, Claims and Interests in **Classes 5 and 6** are Impaired by, and entitled to receive a Distribution under, the Plan, and only the Holders of Claims and Interests in those Classes are entitled to vote to accept or reject the Plan. Claims in **Classes 1 through 4** are Unimpaired by the Plan, and such Holders are conclusively presumed to have accepted the Plan.

**THE DEBTOR AND THE COMMITTEE BELIEVE THAT THE PLAN WILL ENABLE THE DEBTOR TO SUCCESSFULLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS AND EQUITY HOLDERS, INCLUDING THE HOLDERS OF CLAIMS AND INTERESTS IN CLASSES 5 AND 6. THE DEBTOR AND THE COMMITTEE URGE SUCH HOLDERS TO VOTE TO ACCEPT THE PLAN.**

## II.    OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description

of the terms and provisions of the Plan, see Article VI of this Disclosure Statement, entitled "Summary of the Plan of Reorganization."

The Plan designates five (5) Classes of Claims and one (1) Class of Interests in the Debtor. These Classes take into account the differing nature and priority of the various Claims and Interests under the Bankruptcy Code.

The Debtor and the Committee believe that the Plan provides the best means currently available for the Debtor's emergence from chapter 11.

## A. General Structure of the Plan

Claims are treated generally in accordance with the priorities established under the Bankruptcy Code. Claims that have priority status under the Bankruptcy Code or that are secured by valid Liens on Collateral are to be paid in full, Reinstated or otherwise treated as provided in the Plan.

The following is an overview of certain material terms of the Plan:

- The Debtor will be reorganized pursuant to the Plan, converted into a Delaware limited liability company and continue in operation.

- Allowed Administrative Claims and Priority Tax Claims will be paid in full as required by the Bankruptcy Code, unless otherwise agreed to by the Debtor and the Holders of such Claims.

- Allowed Other Class 1 Priority Claims will be paid in full in Cash on the Distribution Date, unless otherwise agreed to by the Debtors and the Holders of such Claims.

- Holders of Allowed Class 2 Secured Workers' Compensation Obligations Claims will continue to receive Cash payments in the ordinary course as set forth in the Order Authorizing the Debtor to Pay Certain Prepetition Workers' Compensation Obligations in the Ordinary Course of Business Pursuant to Sections 105(a) and 363 of the Bankruptcy Code [Docket No. 97].

- Each Holder of an Allowed Class 3 General Unsecured Claim shall be paid in Cash on the Distribution Date, one hundred percent (100%) of the Allowed amount of its Class 3 Claim plus interest from the Petition Date to the Effective Date, in full, final and complete satisfaction, settlement, release, and discharge of such Allowed Class 3 Claim.

- Each Holder of an Allowed Class 4 Claim shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Allowed Class 4 Claim, (i) its SERP Catch-up Payment, and (ii) monthly Cash

payments on account of the Supplemental Employee Retirement Benefits due in the ordinary course after the Effective Date.

- Each Holder of an Allowed Class 5 Claim shall be entitled to receive, in full, final and complete satisfaction, settlement, release, and discharge of such Allowed Class 5 Claim, their Pro Rata share of: (i) the New MIG Notes, (ii) the New Warrants; (iii) Beneficial Interests in the Class 5 Trust; (iv) the Excess Cash less Withheld Excess Cash; and (v) any Withheld Excess Cash as provided in Section 3.03(a)(iv) of the Plan.

- The Holder of the Allowed Class 6 Common Equity Interests shall receive 100% of the New Common LLC Interests subject to dilution by the New Warrants.

**B.      Summary of Treatment of Claims and Interests under the Plan**

The table below summarizes the classification and treatment of the Claims and Interests under the Plan.  Estimated Claim amounts assume a calculation date of October 15, 2010, except that General Unsecured Claims are calculated as of the Petition Date.  Estimated percentage recoveries are also set forth below for certain Classes of Claims.  Estimated percentage recoveries have been calculated based upon a number of assumptions, including the estimated amount of Allowed Claims in each Class.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows.  The Plan Proponents have not yet fully reviewed and analyzed all Claims and Interests. Estimated Claim amounts for each Class set forth below are based upon the Debtor's review of its books and records and Filed Proofs of Claim, and include estimates of a number of Claims that are contingent, disputed, and/or unliquidated.

The valuation of the Reorganized Debtor will be based on a number of assumptions and conditions, which are more fully set forth in Section X.E of this Disclosure Statement entitled "Feasibility of the Plan and Best Interests of Creditors—Valuation of the Reorganized Debtor."

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| Class 1: Other Priority Claims<br><br>Estimated Aggregate Allowed amount of Class 1 Claims: $0 | • Unimpaired<br><br>• Class 1 consists of Other Priority Claims against the Debtor.<br><br>• Unless otherwise agreed to by the Holders of the Allowed Class 1 Claims and the Debtor, each Holder of an Allowed Class 1 Claim shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Allowed Class 1 Claim, payment of the Allowed Class 1 Claim in full in Cash on the Distribution Date.<br><br>• Class 1 Claims are Unimpaired and are therefore not entitled to vote on the Plan.<br><br>• Estimated Recovery: 100% |
| Class 2: Secured Workers' Compensation Obligations Claims<br><br>Estimated Aggregate Allowed amount of Class 2 Claims: Unknown | • Unimpaired<br><br>• Class 2 consists of Secured Workers' Compensation Obligations Claims against the Debtor.<br><br>• Each Holder of an Allowed Class 2 Claim shall have its Claim Reinstated and shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Allowed Class 2 Claim and on account of its Allowed Class 2 Claim, Cash payments in the ordinary course as set forth in the Order Authorizing the Debtor to Pay Certain Prepetition Workers' Compensation Obligations in the Ordinary Course of Business Pursuant to Sections 105(a) and 363 of the Bankruptcy Code [Docket No. 97].<br><br>• Class 2 Claims are Unimpaired and are therefore not entitled to vote on the Plan.<br><br>• Estimated Recovery: 100% |
| Class 3: General Unsecured Claims<br><br>Estimated Aggregate Allowed amount of Class 3 Claims: $1,180,384.96 million. | • Unimpaired<br><br>• Each Holder of an Allowed Class 3 Claim shall be paid in Cash on the Distribution Date, one hundred percent (100%) of the Allowed amount of its Claim, in full, final and compete satisfaction, settlement, release, and discharge of such Allowed Class 3 Claim, plus simple interest at the post-judgment interest rate provided for in |

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| | 28 U.S.C. 1961 (on the Petition Date) on the unpaid principal amount of such Allowed Claim from the Petition Date to and including the Effective Date.<br><br>• Class 3 Claims are Unimpaired, and therefore are not entitled to vote on the Plan.<br><br>• Estimated Recovery: 100% |
| Class 4:  Supplemental Employee Retirement Claims<br><br>Estimated Aggregate Allowed amount of Class 4 Claims: $460,819.52 plus $28,801.22 a month. | • Unimpaired<br><br>• Class 4 consists of the Supplemental Employee Retirement Claims against the Debtor.<br><br>• On the Distribution Date, each Holder of an Allowed Class 4 Claim shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Allowed Class 4 Claim (i) its SERP Catch-up Payment, and (ii) monthly Cash payments on account of the Supplemental Employee Retirement Benefits due in the ordinary course after the Effective Date, plus simple interest on the SERP Catch-Up Payment from the Petition Date, or such later date that such payment was originally due, to and including the Effective Date, at the post-judgment interest rate provided for in 28 U.S.C. 1961 (on the Petition Date) on the unpaid principal amount of such Allowed Claim.<br><br>• Class 4 Claims are Unimpaired, and therefore are not entitled to vote on the Plan.<br><br>• Estimated Recovery: 100% |
| Class 5:  Preferred Shareholder Claims<br><br>Estimated Aggregate Allowed amount of Class 5 Claims: Approximately $224,717,235.34 plus interest to and including the Effective Date. | • Impaired<br><br>• Class 5 consists of all Preferred Shareholder Claims against the Debtor.<br><br>• On the Effective Date, each Holder of an Allowed Class 5 Claim shall be entitled to receive, in full, final and complete satisfaction, settlement, release, and discharge of such Allowed Class 5 Claim, subject to the provisions of Section 11.10 of the Plan, its Pro Rata share of:<br><br>(i) the New MIG Notes to be issued pursuant to Section 5.04 of the Plan and secured by the Class 5 Collateral as provided in the New MIG Notes Indenture, the Stock |

- 5 -

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| | Pledge Agreement(s), the Stock Escrow Agreement(s), the Deposit Account Control Agreement and the Blanket Lien, |
| | (ii) the New Warrants to be issued pursuant to Section 5.04 of the Plan, |
| | (iii) Beneficial Interests in the Class 5 Trust to be established pursuant to Section 5.08 of the Plan; and |
| | (iv) the Excess Cash not including any Withheld Excess Cash, provided, however, that any Withheld Excess Cash shall be paid to the Holders of Allowed Class 5 Claims as follows: |
| | (a) Effective as of the Effective Date, the principal amount of the New MIG Notes shall be increased by the amount of the Withheld Excess Cash; and |
| | (b) The amount of the Withheld Excess Cash shall be transferred to the Indenture Trustee by not later than fifteen (15) days after received by the Reorganized Debtor and in any event by not later than one (1) year after the Effective Date pursuant to the Mandatory Redemption Provisions of the New MIG Notes and New MIG Notes Indenture. The Indenture Trustee shall use such Withheld Excess Cash to redeem New MIG Notes Pro Rata at the next scheduled Interest Payment Date under the New MIG Notes Indenture. |
| | • The Reorganized Debtor shall exercise its best efforts to cause the Withheld Excess Cash to be distributed from Magticom to ITCL, from ITCL to ITC, and from ITC to the Reorganized Debtor as soon as practicable after the Effective Date, and to the fullest extent permitted by law, shall not take any actions, or permit the New Board to take any actions, to delay the distribution of such Withheld Excess Cash to the Indenture Trustee to fund the Mandatory Redemption Provisions of the New MIG Notes and the New MIG Indenture. |
| | • Class 5 is Impaired, and Holders of Class 5 Claims will be entitled to vote to accept or reject the Plan. |
| | • Estimated Recovery: 100% |

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| Class 6: Common Equity Interests | • Impaired<br><br>• Class 6 consists of all Common Equity Interests in the Debtor held by CaucusCom as of the Petition Date.<br><br>• The Holder of the Allowed Class 6 Interest shall receive 100% of the New Common LLC Interests in the Reorganized Debtor subject to the New Warrants.<br><br>• Class 6 is Impaired, and the Holders of Class 6 Interests will be entitled to vote to accept or reject the Plan. |

As set forth above, estimated Claim amounts assume a calculation date of October 15, 2010, except that Unsecured Claims are calculated as of the Petition Date. The calculation date is not necessarily the Effective Date of the Plan or the Distribution Date. The Effective Date will occur after the Confirmation Date, when the conditions precedent to the occurrence of the Effective Date are satisfied. The Reorganized Debtor will File a notice of the occurrence of the Effective Date within five (5) business days thereafter.

THE DEBTOR AND THE COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AND INTERESTS IN THE DEBTOR AND THUS **STRONGLY RECOMMEND** THAT YOU VOTE TO **ACCEPT** THE PLAN.

## III. PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A. Notice to Holders of Claims and Interests in the Debtor

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims entitled to vote on the Plan to make an informed judgment about whether to accept or reject the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.

THUS ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES, SUPPLEMENTS AND EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor other than the information contained herein or therein. No such information should be relied upon in making a determination to vote to accept or reject the Plan.

### B.    Voting Rights

Pursuant to the provisions of the Bankruptcy Code, only holders of claims and interests in classes that are (a) treated as "impaired" by a plan of reorganization and (b) entitled to receive a distribution under such plan are entitled to vote on such plan. Under the Plan, Holders of Claims and Interests in Classes 5 and 6 are entitled to vote on the Plan. Claims in other Classes are Unimpaired and their Holders are deemed to have accepted the Plan.

Pursuant to Bankruptcy Code section 105(a) and Bankruptcy Rule 3003(c)(2), any Holder of a Claim or Holder of an Interest (a) that is either (i) not scheduled or (ii) scheduled at zero, as unknown or as disputed, contingent or unliquidated, and (b) that is not the subject of a Proof of Claim or Proof of Interest Filed by the applicable Bar Date set by the Court will not be treated by the Plan Proponents as a creditor with respect to such Claim or an Interest Holder with respect to such Interest for purposes of voting on or objecting to the Plan.

In terms of calculating the amount of Claims for voting purposes, (a) Claims will be counted in the amount listed on the Schedules if (i) the Claim is not scheduled as unliquidated, contingent, disputed or undetermined, and (ii) no Proof of Claim or Proof of Interest has been timely filed; (b) Claims will be counted in the amount listed in a timely filed Proof of Claim or Proof of Interest if (i) the Claim amount is not contingent and unliquidated, and (ii) the Claim is not subject to an objection; or (iii) Claims will be counted in the amount temporarily allowed by the Bankruptcy Court pursuant to a Bankruptcy Rule 3018(a) motion for such relief filed no later than September 10, 2010 if a hearing on such motion is held before the Confirmation Hearing.

With respect to alleged Creditors who have timely Filed Proofs of Claim in wholly unliquidated, unknown or uncertain amounts that are not the subject of an objection, such ballots shall be counted in determining whether the numerosity requirement of section 1126(c) of the Bankruptcy Code has been met, but shall be ascribed a value of one dollar ($1.00) for voting purposes only in determining whether the aggregate Claim Amount requirement has been met.

## C. Solicitation Materials

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtor, through its voting agent, The Garden City Group, Inc. (the "Voting Agent"), will send to Holders of Claims who are entitled to vote copies of (a) this Disclosure Statement and the Plan, (b) the notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice"), (c) one or more ballots (and return envelopes) to be used in voting to accept or to reject the Plan, and (d) other materials as authorized by the Bankruptcy Court, as more fully set forth in the Solicitation Procedures Order.

If you are the Holder of a Claim or Interest who believes you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent:

> Attn: MIG Bankruptcy Administration
> c/o THE GARDEN CITY GROUP, INC.
> 5151 Blazer Parkway, Suite A
> Dublin, Ohio 43017
> Telephone: (800) 327-3664

## D. Voting Procedures, Ballots, and Voting Deadline

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

Each Ballot has been coded to reflect the Class of Claims or Interest it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot(s) sent to you with this Disclosure Statement.

All votes to accept or reject the Plan must be cast by using the Ballot enclosed with this Disclosure Statement.  IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN **[******], 2010, AT 5:00 P.M.** EASTERN TIME (THE "VOTING DEADLINE") AT THE FOLLOWING ADDRESS:

> Attn: MIG Bankruptcy Administration
> c/o THE GARDEN CITY GROUP, INC.
> 5151 Blazer Parkway, Suite A
> Dublin, Ohio 43017

UNLESS OTHERWISE PROVIDED IN THE INSTRUCTIONS ACCOMPANYING THE BALLOTS, BALLOTS CAST BY FACSIMILE, E-MAIL OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED.  BALLOTS THAT ARE

- 9 -

RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS, OR OTHER EVIDENCES OF YOUR CLAIM WITH YOUR BALLOT.

If you have any questions about (a) the procedure for voting your Claim or Interest, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact:

> MIG Bankruptcy Administration
> c/o THE GARDEN CITY GROUP, INC.
> 5151 Blazer Parkway, Suite A
> Dublin, Ohio 43017
> Telephone: (800) 327-3664

For further information and general instructions on voting to accept or reject the Plan, see Article XII of this Disclosure Statement and the instructions accompanying your Ballot.

THE DEBTOR AND COMMITTEE URGE ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE TO ACCEPT THE PLAN BY COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE VOTING DEADLINE.

### E.     Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled a Confirmation Hearing for **[*****], 2010, at [**]:00 [_].m. Eastern Time**. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequently adjourned Confirmation Hearing. Objections to Confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection, and the amount and Class of the Claim or Interest held by such objector. Any such objection must be Filed with the Bankruptcy Court on or before **[*****], 2010, at 4:00 p.m. Eastern Time**. Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

## IV.    GENERAL INFORMATION CONCERNING THE DEBTOR

### A.     Overview of Debtor's Corporate History and Management

The Debtor[1] was organized in 1929 under the laws of the Commonwealth of Pennsylvania and was reincorporated in 1968 under the laws of the State of Delaware. Through its nondebtor affiliates, the Debtor holds interests in leading and innovative telecommunications

---

[1]    Prior to January 2009, the Debtor operated under the name "Metromedia International Group, Inc." and prior to 1995, it operated under the names "The Actava Group Inc." and "Fuqua Industries, Inc."

providers in the Republic of Georgia ("<u>Georgia</u>"), a country in the Caucasus region between Russia, Turkey and Azerbaijan.  Since 2005, all of the telecommunications providers in which the Debtor has an interest have been located in Georgia.  The Debtor's corporate office is located in Charlotte, North Carolina.

Currently, all of the common shares of the Debtor are owned by CaucusCom Ventures, L.P. ("<u>CaucusCom</u>"), which acquired all of MIG's outstanding common shares at $1.80 per share through a tender offer followed by a back-end short-form merger (the "<u>Merger</u>"). CaucusCom is a joint venture created between Salford Capital Partners, Inc. ("<u>Salford</u>") and Sun Capital Partners Ltd. ("<u>Sun</u>"), on or about May 10, 2007, to pursue a transaction with MIG.

The Debtor operates pursuant to the Restated Bylaws of Metromedia International Group, Inc. (the "<u>Bylaws</u>"), which provides the terms of the Debtor's governance and the respective rights, duties and powers of the stockholders and the board of directors (the "<u>Board</u>"). Currently, there are eight directors (each a "<u>Director</u>") on the Board.  There are seven officers (each an "<u>Officer</u>") of the Debtor, including a Chief Executive Officer, a Chief Financial Officer, a President, three Vice-Presidents, and a Corporate Secretary.

At the time of the acquisition by CaucusCom, Wayne Henderson and David Gale were appointed by the preferred shareholders of MIG to MIG's Board pursuant to a Certificate of Designation.  Mr. Henderson was appointed to the Board in 2004.  Mr. Gale also was appointed to the Board in 2004 and served on the Board until his resignation in August 2008.  No member was appointed by the preferred shareholders to replace Mr. Gale.

Subsequent to its acquisition of MIG, CaucusCom appointed six directors.  Three of those directors are affiliated with Sun:  Edward Spencer-Churchill, Graydon Bellingan, and Alan McIntosh.  The other three of those directors are affiliated with Salford:  Peter Nagle, Irakli Rukhadze, and Jamal Khan.  After Mr. Gale's resignation from the Board, the Board appointed another director, Alan Greene, in May 2009.  Mr. Greene previously had served as a Director of MIG from 1998 until the acquisition of MIG by CaucusCom in August 2007.

The following table lists the names, title, and a description of the position for all of the Debtor's Directors and Officers as of the Petition Date.

| Name | Title | Description of position |
| --- | --- | --- |
| Alan Greene | Director | Director |
| Wayne Henderson | Director | Director |
| Alan McIntosh | Director | Director |
| Edward Spencer Churchill | CEO, Director, Chairman of the Board | Chief Executive Officer |
| Peter Nagle | CFO, Director | Chief Financial Officer |

| Name | Title | Description of position |
|------|-------|-------------------------|
| Andrew Bradshaw | President | President; Financial Affairs |
| Irakli Rukhadze | Vice President, Director | Business Development |
| Jamal Khan | Vice President, Director | International Legal Affairs |
| Graydon Bellingan | Vice President, Director | International Legal Affairs |
| Natasha Alexeeva | General Counsel, Corporate Secretary | Domestic Legal Affairs |

After assuming control of the Board, the Board members appointed by CaucusCom reduced the number of employees based in the United States - relying instead on CaucusCom representatives to manage MIG's interest in Magticom. MIG's management has been successful in turning a negative cash position on the date of the Merger to a positive cash position in 2009 and cutting overhead from a normalized level in 2007 of approximately $15 million to a normalized level in 2009 of $4.5 million.

**B.     The Debtor's Assets**

The Debtor holds its investments in its Georgian assets through its direct and indirect wholly-owned subsidiaries, MIG Telecommunications, Inc. ("MITI"), a Delaware corporation, MIG Georgia Holdings, Inc., a Delaware Corporation, and ITC Cellular LLC, a Delaware limited liability company ("ITCC"). MIG holds 100% ownership in ITCC, which, in turn, currently owns a 46% interest in International Telcell Cellular LLC ("ITCL").

**1.     *Magticom Ltd*.**

ITCL owns all the issued and outstanding equity interests of Magticom Ltd. ("Magticom"). Dr. George Jokhtaberidze ("Dr. Jokhtaberidze"), a Georgian national who co-founded Magticom in 1997, owns 51% of ITCL, and Gemstone Partners, an entity affiliated with Dr. Jokhtaberidze, owns 3% of ITCL. Magticom is the largest telephony operator (mobile or fixed) operating in Georgia, as measured by revenues and traffic volumes. Magticom is headquartered in Tbilisi, Georgia and provides services to businesses and consumers nationwide. Magticom's network covers essentially all of Georgia's populated territories, enabling country-wide wireless access to the company's mobile telephony, roaming services and related information services.

Since it began commercial operations in 1997, Magticom has created an excellent brand name synonymous with delivering quality, high-technology products throughout Georgia. Magticom commenced operating on the 900 MHz frequency band. In 1999, Magticom became the first GSM operator in Georgia to move to the dual band system – GSM 900/1800 MHz. In 2005, Magticom started to build the first Third Generation network in Georgia to offer 3G services. As a result, in 2006, the Company was the first in Georgia to launch Third Generation services along with the full range of GSM services.

Since 2005, Magticom has invested approximately US$250 million in its business; including approximately US$130 million expanding its network infrastructure and an additional US$60 million for several 10-year licenses. Magticom currently operates approximately 700 base stations throughout Georgia. Magticom has a number of licenses including 3G, Code Division Multiple Access (CDMA) 800, GSM 1800, GSM 900, Wimax, and CDMA 450. The next license renewal comes due in 2016. Magticom has superior licenses and the ability to lever existing brands in the implementation into other product lines. It is the only company in Georgia to have a CDMA 450 license that provides the ability to offer MagtiFix nationwide as well as high speed internet through Evolution-Data Optimized (EVDO: mobile internet). EVDO is superior in many respects to 3G: it suffers less 'blackspots' and the signal travels further (3G does not conduct well through thick walls, hills or poor line of sight). In addition, Magticom is the only company with an EVDO dongle, which is not compatible with a 3G dongle (it can only be used in Magticom network as opposed to a 3G dongle which can be used by all networks). As a result, with a drop in the price point for an EVDO dongle, the subscriber demand solely on the Magticom network is likely to increase.

Magticom currently serves 1.4 million subscribers with a network that covers 97% of the populated regions in Georgia. 95% of Magticom's retail customers use pre-pay cash accounts, which significantly reduces the credit risk to Magticom. Magticom is well-known for high quality products, superior coverage, leading technology, and excellent customer service. It has a history of being first in market with new products and technologies, has the best distribution network, and continuously provides its customers with best-in-class products. Magticom offers services under three main brands - Magti, Bali and Magtifix:

- Magti is Magticom's cellular phone service focused on both individual and corporate users. The brand differentiates itself based on quality, coverage and technology. It is the premium mobile brand in the country and has recognized attributes of high quality, the latest technology and good customer care. The brand slogan is "Connecting to Your World." Magti is the market leader in the business sector and is the brand of choice for major corporations, embassies and higher-income segments. Currently, Magti has approximately 875,000 subscribers and is the cellular service provider to the Georgian government.

- Bali is Magticom's cellular phone service focused on the youth market. Introduced in 2005, the Bali product is positioned as a "value" brand. The Bali brand slogan is "Bali is Different" and it enjoys a reputation for good quality and coverage as it shares the same network as Magti and offers better coverage than other value brand competitors. Bali has excellent brand recognition and is associated with a unique advertising strategy built around Bali Boy, a cartoon character. Currently, there are approximately 425,000 Bali subscribers.

- MagtiFix is Magticom's fixed wireless telephone and internet service introduced in 2008. It provides fixed wireless services, which allows for the operation of wireless devices in fixed locations such as homes and

offices. The product is currently growing at over 1,000 new subscribers per day with minimal churn. The service is available across the entire country and customer numbers now exceed 100,000. The brand slogan is "Communications for Everyone." MagtiFix enjoys better quality, better customer care and wider distribution networks than its competitors and also presents opportunities for tactical pricing to leverage Magticom's existing 1.5 million mobile subscribers. MagtiFix telephones come equipped with 1x internet connection and a high speed EVDO dongle released this year. Currently, there are approximately 100,000 MagtiFix subscribers.

Magticom plans to commercially launch several new products in the near-term that will complement its wireless and fixed-wireless service to allow for the bundling of multiple products to a single customer, including:

- MagtiNet: high-speed internet service.

- MagtiTV: cable television via the internet - similar to Tivo, but no scheduled recording is necessary; the customer simply chooses which program to watch regardless of the originally scheduled play time. This product will piggy-back on the MagtiNet IP network; the technology is functional, but still in development phase.

- MagtiBank: a payment processing mechanism allowing customers to transfer funds via SMS message. This product acts as a mobile banking service that does not require users to have bank accounts which is key in a country like Georgia where many people do not have bank accounts. This system is remotely comparable to Safaricom's M-PESA or services like Western Union. This product is fully-functioning, but will not be commercially marketed until 2010.

- Blackberry: a premium service to complement MagtiMobile. Blackberry is a line of wireless handheld devices that was introduced in 1999 as a two-way pager. In 2002, the more commonly known smartphone BlackBerry was released, which supports push e-mail, mobile telephone, text messaging, internet faxing, web browsing and other wireless information services. BlackBerry is the world's second most popular smartphone platform, capturing 21% of worldwide smartphone sales in Q2, 2009; the number of BlackBerry subscribers has reached approximately 28.5 million. This premium product will be marketed to MagtiMobil customers and specifically those currently under the Magti brand. Target customer include: government, corporate, and wealthier individual customers.

Attached as Exhibit D is a detailed Management Discussion and Analysis of Magticom's 2009 results of operations. Attached as Exhibit E is a Five Year Business Plan for Magticom. The largest operational risk for Magticom to achieve its business plan is successful implementation of the suite of products to the market in a timely manner. Other risks include

(i) Government regime change, which is not anticipated until at least the next presidential election; (ii) currency volatility and convertibility, which is expected to remain under control as the anticipated large amounts of foreign direct investment should continue to provide currency stability; (iii) the impact of regulatory initiatives, which is not currently expected as the government has taken a very pro-business stance; and (iv) increased competition, which is also not expected for the reasons previously stated herein (high barriers to entry, small population, market already dominated by two large players, etc. …).

As discussed in greater detail below, on January 15, 2009, ITC and Dr. Jokhtaberidze executed a Purchase and Sale Agreement ("PSA") and the Second Amended and Restated Limited Liability Company Agreement of International Telcell Cellular, LLC (the "ITCL LLC Agreement"). MIG receives dividends from Magticom pursuant to the formula set forth in the PSA and ITCL LLC Agreement. Specifically, section 2.7 of the ITCL LLC Agreement provides that ITCL shall cause Magticom to pay, on a quarterly basis, an annual dividend of not less than US$40,000,000 in the aggregate (net of all withholding taxes) to its shareholders until the date of the IPO, as discussed in section 5.3 of the PSA. However, Magticom will only distribute dividends in excess of operating and capital expenditures and tax payments. ITCL will distribute all dividends received by subsidiaries to the Members (as defined in the ITCL LLC Agreement, which include ITC, Dr. Jokhtaberidze, and Gemstone Management Limited) in accordance with their Membership Interests (as defined in the ITCL LLC Agreement).

Pursuant to the ITCL LLC Agreement, Dr. Jokhtaberidze and the Debtor exercise joint management control with all key decisions related to the management of Magticom made on a 50/50 basis as provided in the ITCL LLC Agreement. The Debtor's management is active in the operations and management of Magticom. As part of the ITCL LLC Agreement, both the Debtor and Dr. Jokhtaberidze are bound by non-alienation and change of control provisions regarding their interests in Magticom. These provisions provide that if there is any change of voting or economic interests at ITCL or Magticom by either party or certain of their affiliates, including the Debtor, the breaching party shall lose certain rights under the ITCL LLC Agreement.

### a.      ITCL LLC Agreement and Change of Control Provisions

On or about January 15, 2009, MIG's subsidiary ITCC, the parent entity of ITCL, and Dr. Jokhtaberidze entered into the PSA dated as of January 15, 2009 by and among ITC and Dr. Jokhtaberidze and the ITCL LLC Agreement. As a result, Dr. Jokhtaberidze became the majority shareholder in Magticom with a 50.1% stake, and MIG became a minority shareholder with a 46% stake. All key decisions related to the management of Magticom, however, are made on a 50/50 basis as provided in the ITCL LLC Agreement.

Together, the PSA and the ITCL LLC Agreement provide for the governance of ITCL, which in turn governs and controls the Debtor's prime operating asset, Magticom. Under the terms of the ITCL LLC Agreement, the Change of Control Provisions are triggered by the occurrence of any one of eight events with respect to certain non-debtor entities in MIG's ownership chain – namely, CaucusCom (a joint venture between Sun and Salford that owns

- 15 -

100% of the equity of MIG), Caucus Carry (the general partner of CaucusCom), Yola Investments SARL ("Yola") (a substantial limited partner of and/or equity owner in, CaucusCom, Caucus Telecom and Caucus Carry), Caucus Telecom (general partner of Caucus Carry) and Gtel (substantial limited partner of, and/or equity owner in, CaucusCom, Caucus Telecom and Caucus Carry) (together, the "CaucusCom Entities"). The occurrence of any of the following eight conditions would effect an ITC Cellular Change of Control,[2] which is defined in the PSA as follows:

(a)     CaucusCom ceasing to beneficially own in the aggregate, directly or indirectly at least 46% of the Equity Securities of the Company, *provided* that the transfer of Equity Securities in Metromedia International Group, Inc. ("MIG") to holders of preferred shares in MIG in connection with the settlement of the current appraisal action with MIG preferred shareholders shall not constitute an "ITC Cellular Change of Control" if following such transfer CaucusCom beneficially owns in the aggregate, directly or indirectly at least 39% of the Equity Securities of the Company; *provided further* that following the transfer, if any, of Equity Securities in MIG to preferred shareholders as contemplated by the foregoing proviso, the reference to 46% in this subsection (a) shall be replaced by the applicable percentage (39% or greater) that results from the transfer of Equity Securities in MIG to preferred shareholders in MIG;

(b)     Caucus Carry ceasing to be the general partner of CaucusCom;

(c)     Yola and Gtel ceasing to hold 100% of limited partner interests in Caucus Carry;

(d)     Caucus Telecom ceasing to be the general partner of Caucus Carry;

(e)     Yola and Gtel ceasing to hold 100% of the Equity Securities of Caucus Telecom;

(f)     Yola and Gtel ceasing to hold at least 35% of the limited partnership interests in CaucusCom Ventures;

(g)     Yola and Gtel (acting jointly through their direct and indirect Subsidiaries) ceasing to (i) direct or cause direction of management and policies of ITC or any Affiliate of ITC's that holds 46% of the total Membership Interests in the Company or (ii) direct or cause the direction of the exercise and performance of ITC Cellular's (or any Affiliate of ITC that holds ITC's 46% of the total Membership Interests in the Company's) rights and obligations under the New LLC Agreement; and

---

[2]     Capitalized terms used but not otherwise defined in this section only shall have the meanings ascribed to them in the PSA or the ITCL LLC Agreement, as applicable.

(h)    any Change of Control of Yola, Gtel, Caucus Telecom, Caucus Carry or CaucusCom.  For purposes of this definition, "Control" means, in relation to any Person (other than an individual), the possession, directly or indirectly, whether or not in conjunction with any other Person, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of securities or other ownership interests, by contract or otherwise (it being understood that a Person will be deemed to Control another Person if the first Person has the right to elect a majority of the board or equivalent governing body of such second Person); and a "Change of Control" occurs if a Person who Controls any Person (other than an individual) ceases to do so or if another Person acquires Control of it.

*See* PSA, Art. I, pg. 4.

If triggered prior to the completion of an initial public offering of a corporate vehicle (the "Listing Vehicle") that will either directly or indirectly hold 100% of the equity capital of Magticom (an "IPO"), the Change of Control Provisions would have the following effects:

(i) Section 2.1(e) of the ITCL LLC Agreement shall take effect immediately and automatically upon the occurrence of such ITC Change of Control, and as a result the ITC directors shall no longer be permitted to vote on matters presented to the Board and a quorum of the Board will consist of only two Directors, one of whom must be a Dr. Jokhtaberidze Director;

(ii) Dr. Jokhtaberidze's obligations under 5.3 (IPO Support Covenants), 5.5 (Dividends), 5.6 (Post-IPO Governance) and 5.7 (Loan to ITC Cellular) of the PSA shall immediately and irrevocably terminate.

In other words, the Change of Control Provisions would eliminate, inter alia:  (i) ITC's voting rights on the ITCL Board; (ii) the right of MIG to IPO Magticom itself as opposed to a separate MIG vehicle; and (iii) express covenants by Dr. Jokhtaberidze to support MIG in an IPO of Magticom.  The Debtor believes that the PSA and ITCL LLC Agreement provide significant measurable benefits.  The Committee has disputed the nature and extent of benefits alleged by the Debtor; however, any Claims and Litigation Rights related to the validity of the Change of Control Provisions and the alleged benefits of the PSA and January 2009 amendments to the ITCL LLC Agreement have been preserved and deferred as provided in the Settlement Agreement detailed in Article V, Section I of this Disclosure Statement.

As set forth in the Plan, the transactions contemplated by the Plan and the consequences of the Plan's implementation of such transactions as of the Effective Date shall not trigger any ITC Cellular Change of Control under the terms of the ITCL LLC Agreement or the PSA.  Further, the CaucusCom Entities are covenanting pursuant to the Acknowledgment Agreement not to take any action to trigger the ITC Cellular Change of Control provisions for so long as the New MIG Notes remain outstanding.

## 2.    *MIG's Other Interests*

In addition to its indirect ownership interest in Magticom, the Debtor also holds indirect interests in:  Ayety LLC, a/k/a Ayety TV Ltd. ("Ayety"), a Georgian television station;[3] Telecom Georgia,[4] a long-distance transit operator; and Telenet, a high-speed data communication and internet access service provider in Georgia.[5]  The Debtor's wholly-owned subsidiary Tag Holdings, Inc. also owns a parcel of land in Alabama.  There is no guarantee that the Debtor will receive any value from these entities.

## 3.    *Debtor's Cash*

As of June 10, 2009, the Debtor had approximately $49 million in cash split between its own accounts and those of its 100% owned subsidiaries.  Since the Petition Date, the cash held by the Debtor and its wholly-owned subsidiaries has been moved into debtor-in-possession bank accounts in the United States.   As of July 31, 2010, the Debtor had $48,591,809.12 in its accounts.

---

[3]    MIG's indirect interest in Ayety arises from MIG's 100% ownership of International Telcell SPS, Inc. ("ITI"), which in turn owns 85% of the membership interests of Ayety.  Mtatsminda TV & Broadcasting Co. Ltd. ("Mtatsminda") holds the remaining 15% of the membership interests of Ayety.  On March 26, 2003, without ITI's knowledge or approval, the chief executive officer of Ayety obtained approval of an amendment to the charter of Ayety providing that partner-level decisions may be made without the vote of ITI.  This amendment was  registered with the Tbilisi City Court on March 31, 2003.  On December 17, 2004, ITI filed a lawsuit in Georgia against Ayety and Mtatsminda requesting, among other things, invalidation of this amendment to Ayety's charter.  ITI's lawsuit was rejected as untimely by an order of the Tbilisi City Court dated April 25, 2006.  On July 2, 2009, the Tbilisi Court of Appeal upheld this decision, and the Supreme Court of Georgia has declined to consider further appeal.  On November 28, 2007, the chief executive officer of Ayety convened a partners' meeting during which he and Mtatsminda purported to terminate ITI's interest in the partnership and determine that ITI's 85% share in the partnership was to be distributed to Mtatsminda as the sole remaining partner and thereafter, on December 4, 2007, commenced an action in the Tbilisi City Court to approve these actions.  ITI submitted a response and, on April 8, 2009, the Tbilisi City Court dismissed the lawsuit, stating that there was no factual or legal basis for the relief requested therein.  The City Court's ruling was upheld on appeal to the Tbilisi Court of Appeal.  Accordingly, there is no guarantee that MIG will receive any recovery based on its indirect interest in Ayety.

[4]    Telecom Georgia is currently the subject of an investigation by the Georgian financial police with respect to certain assets sold by Telecom Georgia to Magticom.  Specifically, the Georgian financial police have assessed tax-related charges against Telecom Georgia on the grounds that (i) Magticom and Telecom Georgia are related parties and as such, the sale of such assets was below market price and (ii) Telecom Georgia wrongly wrote off accounts receivable from its books.  Telecom Georgia strongly disputes such charges and has filed a case in the Georgian court seeking appropriate relief, on the grounds that Telecom Georgia and Magticom are not related parties according to the Georgian tax code and even if they were related, the transaction price was fair; and in accordance with the Georgian tax code, Telecom Georgia had the right to write off its accounts receivable from its books.  A hearing in this matter is expected in approximately two (2) months.

[5]    MIG also holds an indirect ownership interest in MIG Georgia Services Representation Office, but this entity is inactive.

- 18 -

### C. Events Leading to the Filing of the Chapter 11 Case

#### 1. *The Appraisal Action*

At the time of the Merger, MIG had 4,140,000 shares of preferred stock outstanding (the "Preferred Shares"). The terms of the Certificate of Designation governing the Preferred Shares determined the rights of the preferred shareholders in relation to the Merger. Accordingly, the Merger gave rise to appraisal rights for dissenting preferred shareholders and certain of them (the "Petitioners") commenced litigation to bring an appraisal action against MIG in the Court of Chancery of the State of Delaware (the "Chancery Court") in the matter captioned *In re: Appraisal of Metromedia International Group, Inc.*, Civil Action No. 3351-CC (the "Appraisal Action"), to determine the value of their preferred shares.[6]  The Appraisal Action was filed by the Petitioners on November 14, 2007.

#### 2. *The Appraisal Judgment*

On April 16, 2009, the Chancery Court issued an opinion (the "Opinion"), finding that the value of each preferred share was $38.93 on August 22, 2007 (the "Appraisal Date"). Subsequently, on May 5, 2009, the Petitioners made a motion for reconsideration to the Chancery Court. After considering the motion for reconsideration, the Chancery Court revised its Opinion on May 28, 2009, finding that the value of each preferred share was $47.47 on August 22, 2007. The Chancery Court entered judgment in the Appraisal Action on June 5, 2009, in the total amount of $188,367,736.47 (the "Judgment") representing principal and pre-judgment interest for the appraisal of the 3,533,203 preferred shares that were the subject of the Appraisal Action, including 3,198,742 held by the Petitioners and 334,461 held by preferred shareholders that filed a demand for appraisal but were not Petitioners in the Appraisal Action. The Delaware Supreme Court affirmed the Chancery Court's decision on November 2, 2009. The Debtor's management alleges that the Judgment was substantially higher than MIG had anticipated, and that given the size of the Judgment, the lack of liquidity in the financial markets, the illiquid nature of MIG's primary assets, and the death of Badri Patarkashvili, a Georgian billionaire that had previously expressed a willingness to provide liquidity to MIG, MIG's Board voted in favor of seeking chapter 11 protection in order to pursue an appeal of the Judgment (the "Appeal").

## V. THE CHAPTER 11 CASE

### A. Commencement of the Case

On June 18, 2009, the Debtor commenced the Chapter 11 Case by filing a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Since the Petition Date, the Debtor has continued to operate as debtor in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtor is authorized to operate its business and manage its properties in

---

[6]  The petitioning preferred shareholders include Committee members Farallon Capital Offshore Investors II, LP, Black Horse Capital, and Zazove Associates, LLC.

the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtor's bankruptcy petition was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtor, and the continuation of litigation against the Debtor. The relief provides the Debtor with the "breathing room" necessary to assess and reorganize its business and prevents creditors from obtaining an unfair recovery advantage while the Chapter 11 Case are ongoing. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until the entry of a final decree closing the Chapter 11 Case.

**B.      Modification of the Stay to Pursue the Appeal**

Immediately upon the commencement of this case, the Debtor Filed a motion for relief from the stay to continue with the Appeal, which the Bankruptcy Court granted on a final basis on July 30, 2009 [Docket No. 98]. The Debtor filed its brief in support of the Appeal on July 30, 2009, and the Petitioners filed their answering brief on September 29, 2009. The Debtor's reply brief in further support of its appeal was filed on October 19, 2009, and the Supreme Court heard oral argument on the Appeal for October 28, 2009. On November 2, 2009, the Supreme Court affirmed the Judgment which has now become final and non-appealable.

**C.      Other First Day Orders**

The first day hearing (the "First Day Hearing") was held in the Chapter 11 Case before the Bankruptcy Court on June 26, 2009. At the First Day Hearing, the Bankruptcy Court heard certain requests for immediate relief Filed by the Debtor to facilitate the transition between the Debtor's prepetition and postpetition business operations, and related objections including:

- *Cash Management Order*:  This order authorized the Debtor to (i) continue to use its existing cash management system, (ii) maintain its existing bank accounts, and (iii) continue to use its existing business forms and checks and also ordered the Debtor to transfer cash held on ITC accounts to the Debtor's accounts.  [Interim Order, Docket No. 31; Final Order, Docket No. 94; Committee Objection, Docket No. 76; and Debtor's Response, Docket No. 80]

- *Workers' Compensation Order*:  This order authorized the Debtor to pay certain prepetition workers' compensation obligations, in connection with the Debtor's past practice of self-insuring workers' compensation in various states and in connection with the Debtor's former insurance captive in the state of Georgia, in the ordinary course of business. [Interim Order, Docket No. 30; Final Order, Docket No. 97]

- 20 -

### D. Retention of Professionals

During the Chapter 11 Case, the Bankruptcy Court has authorized the retention of various professionals by the Debtor, including:

Greenberg Traurig, LLP as bankruptcy counsel [Docket No. 91];

Potter Anderson Corroon LLP, as special Delaware litigation counsel, [Docket No. 95];

Debevoise & Plimpton LLP, as special corporate and litigation counsel [Docket No. 148];

Aaron Richard Golub, Esq., P.C., as special litigation counsel [Docket No. 149];

Proctor Heyman, LLP, as special conflicts counsel [Docket No. 140];

Lazard Frères & Co. LLC ("Lazard") as financial advisors [Docket No. 185];

Ernst & Young LLP as tax advisors [Docket No. 556]

The Garden City Group, Inc. as claims and noticing agent [Docket No. 62];

Ordinary Course Professionals  [Docket No. 150].

The fees and expenses of the professionals retained by the Debtor are entitled to be paid by the Debtor subject to approval by the Bankruptcy Court.

### E. The Committee

On June 30, 2009, the U.S. Trustee, pursuant to its authority under section 1102(a) of the Bankruptcy Code, appointed the following members to the Committee, see Docket No. 36:

Farallon Capital Offshore Investors II, LP;

Black Horse Capital;

Lawrence P. Klamon;

Palogic Value Fund, LP; and

Zazove Associates, LLC.

During the Chapter 11 Case, the Bankruptcy Court has authorized the retention of various professionals by the Committee, including (i) Baker & McKenzie LLP, as Committee counsel [Docket No. 96], (ii) Bifferato LLC, as Delaware counsel to the Committee [Docket No. 140], and (iii) Rothschild Inc., as financial advisor to the Committee [Docket No. 176].   The expenses of members of the Committee, and the fees and expenses of the Professionals serving

on behalf of the Committee, are entitled to be paid by the Debtor, subject to approval by the Bankruptcy Court.

**F.      Other Matters Addressed During the Chapter 11 Case**

In addition to the first day relief sought in the Chapter 11 Case, the Debtor has sought authority with respect to matters designed to assist in the administration of the Chapter 11 Case, maximize the value of the Debtor's Estate, and provide the foundation for the Debtor's emergence from Chapter 11.   Set forth below is a brief summary of certain of the principal motions the Debtor has Filed during the pendency of the Chapter 11 Case.

**1.      *Motion to Extend Exclusivity Periods***

On October 16, 2009, the Debtor Filed its motion for entry of an order extending the period during which the Debtor has the exclusive right to file a chapter 11 plan through and including February 16, 2010, and extending the period during which the Debtor has the exclusive right to solicit acceptances thereof through and including April 16, 2010.   After an evidentiary hearing on November 18, 2009 and over the objection of the Committee, the Bankruptcy Court granted the Debtor's requested extension of these exclusivity periods.   By order dated February 20, 2010, the Bankruptcy Court further extended the Debtor's exclusive period to file a chapter 11 plan through and including May 17, 2010, and the period during which the Debtor has the exclusive right to solicit acceptances thereof through and including July 12, 2010.   Thereafter, in furtherance of the "Standstill Period" (described below), the Bankruptcy Court further extended the Debtor's exclusive period to file a chapter 11 plan through and including August 16, 2010, and the period during which the Debtor has the exclusive right to solicit acceptances thereof through and including October 12, 2010.

**2.      *Claims Process***

**a.      Schedules and Statements of Financial Affairs**

The Debtor Filed its Schedules and Statement of Financial Affairs on July 17, 2009 [Docket No. 67] and Amended Schedules and Statement of Financial Affairs on August 6, 2009 [Docket No. 107] that, among other things, set forth the Claims of known creditors against the Debtor as of the Petition Date, based upon the Debtor's books and records.

**b.      Bar Date**

By orders dated December 17, 2009 and February 18, 2010, the Bankruptcy Court entered orders (the "Bar Date Orders") in accordance with Rule 3003(c) of the Federal Rules of Bankruptcy Procedure fixing March 10, 2010, at 4:00 p.m. (prevailing Eastern time) (the "Bar Date") as the last day for filing proofs of claim in this chapter 11 case for all claims or interests in the Debtor arising prior to the Petition Date, including those of governmental units, as defined in section 101(27) of the Bankruptcy Code.

### c.     **First Omnibus Objection to Claims**

The Debtor filed the First Omnibus (Non-Substantive) Objection to Claims Pursuant to Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3003 and 3007 and Local Rule 3007-1 on June 4, 2010 [Docket No. 781], asserting objections to certain disputed claims and interests in the Bankruptcy Case.

### d.     **Ayety Claims Objection**

On July 20, 2010, the Debtor filed an objection to proofs of claim nos. 379, filed by Ayety LLC a/k/a Ayety TV Ltd. ("Ayety") on March 9, 2010, and 378, filed by Mtatsminda TV and Broadcasting Co. Ltd. ("Mtatsminda") also on March 9, 2010 (the "Ayety Claims Objection") [Docket No. 850]. Ayety asserts an unliquidated claim against the Debtor in an amount of at least $150 million based on the Debtor's alleged breach of a provision of Ayety's charter that precludes parties to the charter from acting in a manner detrimental to Ayety. According to Ayety, the Debtor breached this charter provision by engaging in direct competition with Ayety by virtue of the Debtor's 46% ownership interest in Magticom. That is, Ayety claims that Magticom is a direct competitor of Ayety. Ayety asserts that, as a result of this alleged breach, Ayety suffered substantial injury and damages including a substantial decline in its market share, subscriber base, revenues and long-term contracts with subscribers. Mtatsminda also asserts an unliquidated claim against the Debtor in an amount of at least $22.5 million based on grounds similar to those asserted by Ayety. Mtatsminda further claims that it was damaged by the Debtor's alleged failure to afford it a right of first refusal for ITI's interests in Ayety.

In the Ayety Claims Objection, the Debtor argues, among other things, that it is not a party to Ayety's charter, is not bound by that charter and, therefore, neither Ayety nor Mtatsminda have a claim against MIG. Even if it were bound by the charter, the Debtor, a Delaware holding company, could not have breached the charter because it does not compete with Ayety, a Georgian television company. Moreover, the Debtor argues that neither Ayety nor Mtatsminda have explained, as they must, the bases for their claims for damages. Further, the Debtor objects to Mtatsminda's argument that the Debtor breached Ayety's charter by not affording it a right of first refusal for ITI's interest in Ayety because ITI has never transferred or sold the interests it has held in Ayety since 2000.

Accordingly, the Debtor has requested in the Ayety Claims Objection that both claim nos. 379 and 378 should be disallowed in their entirety and expunged. On July 20, 2010, the Committee filed a joinder to the Ayety Claims Objection [Docket No. 853]. The deadline for counsel to Ayety and Mtatsminda to respond to the Ayety Claims Objection has been extended to September 3, 2010, and the hearing on the Ayety Claims Objection is scheduled for September 13, 2010 at 10:00 a.m.

### e.     **Babunashvili Claim Objection**

On July 20, 2010, the Debtor filed an objection to proof of claim no. 302 (the "Babunashvili Objection"), filed by Konrad Babunashvili (the "Babunashvili Claim") [Docket

No. 849]. In the Babunashvili Claim, filed on February 18 2010, the claimant seeks damages of $1.4 million from the Debtor based on the Debtor's alleged breach of an agreement (the "Agreement") between the claimant and International Telcell LLC ("ITLLC"), dated as of April 10, 1997. Pursuant to the Agreement, the claimant argues he is entitled to a 5% interest in all dividends or distributions that ITLLC receives on account of its 30% interest in Telecom Georgia (formerly known as Georgian Communications Company - Geocom).

In its objection to the Babunashvili Claim, the Debtor asserts, among other things, that the Debtor is not liable for any alleged breach of the Agreement because the Debtor is not a party to the Agreement. Moreover, even if the Debtor, and not ITLLC, was a party to the Agreement, the claimant cannot make out a claim for breach of contract under the applicable law governing the Agreement (that of Connecticut) because no contract was ever formed and the claimant failed to demonstrate any breach of the Agreement or any resultant damages.

Accordingly, the Debtor has requested that the Babunashvili Claim be disallowed in its entirety and expunged. On July 20, 2010, the Committee filed a joinder to the Debtor's objection to the Babunashvili Claim [Docket No. 852]. The deadline for Babunashvili's counsel to respond to the Babunashvili Objection has been extended to August 13, 2010, and the hearing on such objection is scheduled for August 19, 2010 at 2:00 p.m.

### f.     **Late Claim Motions**

#### i.     *Motion of QVT Financial LP*

On June 21, 2010, QVT Financial LP ("QVT") filed a motion to have its late filed proofs of claims deemed timely filed [Docket No. 805] (the "QVT Motion"). QVT asserts that the Bankruptcy Court should permit the filing of its untimely claims because it was not provided actual notice of the Bar Date and therefore was not afforded procedural due process. QVT also asserts that its claims should be deemed timely filed because that it meets the "excusable neglect" test under Rule 9006(b)(1). Specifically, QVT argues that (i) there is no danger of prejudice to the Debtor because the Debtor was aware, or should have been aware, of the number of outstanding shares of Preferred Equity Interests before it filed its Plan and before the Bar Date, and the Court has not yet approved this Disclosure Statement or confirmed the Plan, (ii) the 152,300 shares held by the QVT funds represent a small percentage of the total Preferred Equity Interests, (iii) deeming the QVT claims timely filed will not impact the judicial administration of the case because it will not affect the Plan confirmation process or delay distributions. Finally, QVT asserts that it failed to file a timely proof of claim because, by no fault of its own, it did not receive notice of the Bar Date prior to the Bar Date.

On July 12, 2010, the Debtor filed its objection to the QVT Motion [Docket No. 833] and argues that the publication notice of the Bar Date satisfied the requirements of due process because QVT was an unknown creditor. Further, the Debtor argues that QVT's failure to timely file its proofs of claim does not constitute excusable neglect because allowance of the claim would prejudice the Debtor. Specifically, the claims QVT seeks to assert represent one-quarter of the outstanding Preferred Equity Interests and would have a profound negative impact on the judicial administration of the Chapter 11 Case, and increase distributions under the Plan

by over $7 million for QVT's claim alone and over $14 million in the event other holders seek to file late claims. Further, the Debtors asserted that allowing QVT's claim could reduce anticipated distributions to other Creditors because the current Plan, negotiated with the Committee, does not anticipate (and could not have anticipated) QVT's claim. Finally, the Debtor argues that allowing QVT's claim could potentially "open the floodgates" to additional claims brought by other creditors and QVT's reasons for delay are not reasonable given that QVT is a sophisticated investor.

A hearing with respect to the QVT Motion and the Debtor's objection thereto is scheduled for August 19, 2010.

### ii. *Motion of Michael B. Targoff*

On July 30, 2010, Michael B. Targoff filed his motion to have its proof of claim deemed timely filed [Docket No. 877] (the "Targoff Motion"). Mr. Targoff asserts that his failure to timely file his proof of claim satisfies the "excusable neglect" standard under Rule 9006(b)(1). Specifically, Mr. Targoff argues that deeming his claim timely filed would not prejudice the Debtor because (i) the Debtor had actual knowledge of the existence of Mr. Targoff's claim long before filing the First Amended Plan and the Bar Date, (ii) Mr. Targoff's claim is relatively insignificant compared to the total number of issued Preferred Equity Interests, (iii) his claim will not jeopardize the success of the Debtor's reorganization and would only have a negligible impact on other holders of Interests, and (iv) a hearing on the First Amended Disclosure Statement has not yet occurred and the Debtor is preparing another amended plan. Further, Mr. Targoff asserts he acted in good faith because he did not receive any notice, including the Debtor's publication notice, and therefore did not know that he was required to file a proof of claim to protect his holdings. On August 12, 2010, the Debtor filed its objection to the Targoff Motion [Docket No. 904]. The hearing with respect to such motion is scheduled for August 19, 2010 at 2:00 p.m.

### iii. *Motion of Jeffery F. and Iris Smith*

On August 2, 2010, Jeffery F. and Iris Smith (together, the "Smith Movants") filed their motion (the "Smith Motion") requesting that the Bankruptcy Court allow their late filed proofs, or in the alternative, vacate the order establishing the Bar Date for holders of the Non-Appraised Preferred Shares (as such term is defined in the Smith Motion). The Smith Movants assert that their failure to file their proofs of claim by the Bar Date meets the "excusable neglect" test under Rule 9006(b)(1). The Smith Movants argue that the Debtor would not be prejudiced by their claims because (i) it was well aware of the claims and actually provided for them in the Plan, as evidenced by the fact that the Debtor knew how many Preferred Equity Interests were issued, including Non-Appraised Preferred Shares, (ii) the Debtor knew the Smith Movants held a portion of the Non-Appraised Preferred Shares, (iii) the Plan has not yet been confirmed, and (iv) the Smith Movants claims represent a small portion of the total Preferred Equity Interests and the total Non-Appraised Preferred Shares. On August 12, 2010, the Debtor filed its objection to the Smith Motion [Docket No. 903]. The hearing with respect to such motion is scheduled for August 19, 2010.

### iv. *Motion for Authority to Abandon Personal Property*

On March 29, 2010, the Debtor Filed its motion for entry of an order authorizing the Debtor to abandon certain dissembled furniture stored at a warehouse in North Carolina. By order dated April 22, 2010, the Bankruptcy Court granted the Debtor's request and authorized the abandonment of certain property in exchange for the payment of a removal fee to the warehouse.

## G. The Committee's Motions

### 1. Motion for Trustee, Termination of Exclusivity or Dismissal of the Chapter 11 Case

On July 23, 2009, the Committee filed its Motion for Order Pursuant to Sections 105(a), 1104(a), 1121(c)(1) and (d)(1) and 1112(b), Appointing a Chapter 11 Trustee and Terminating the Debtor's Exclusivity to File a Plan or, in the Alternative, Dismissing Chapter 11 Case for Cause (the "Trustee Motion") [Docket No. 78]. The litigation related to the Trustee Motion was extensive, involving months of protracted discovery and litigation disputes between the Debtor and the Committee on complex factual, legal and valuation issues and multiple hearings during the time from July 2009 through the date of the Standstill Order described below.

### 2. The "Standing" Motion

On November 17, 2009, the Committee filed its Motion for Order Granting the Committee Standing to: (i) Prosecute Actions on Behalf of the Debtor's Estate; and (ii) Seek a Temporary Restraining Order, Preliminary Injunction and Other Related Relief (the "Standing Motion") [Docket No. 310]. In the Standing Motion, the Committee makes various allegations, including that, among other things:

- ITCC's entry into certain agreements dated January 15, 2009 with Dr. Jokhataberize that contain various "poison pill provisions" were intended solely to entrench CaucusCom in the management of ITCC in contemplation of a bankruptcy filing by MIG;

- certain transactions related to the Merger were not properly disclosed; and

- the Debtor should pursue avoidance and recovery, or otherwise unwind, certain alleged fraudulent transfers and insider transactions (together, the "Alleged Voidable Transactions").

The Committee attached to the Standing Motion a draft complaint (the "Draft Complaint") whereby it sought to pursue (derivatively on behalf of the Debtor) the Alleged Voidable Transactions against CaucusCom and members of the Debtor's Board (the "Putative Defendants"). The Draft Complaint asserted that the Putative Defendants are liable to the Debtor for the losses the Debtor allegedly suffered as a result of the Alleged Voidable Transactions.

The Debtor, however, believes that there is no liability on the part of MIG, the Debtor or the other Putative Defendants in connection with the Alleged Voidable Transactions.

The Debtor objected to the Standing Motion and, on or about November 12, 2009, the Debtor's Board authorized the formation of a special committee (the "Special Litigation Committee") to investigate and analyze the claims asserted in the Committee's proposed derivative complaint. The Special Litigation Committee was authorized to determine what action, if any, is in the best interest of the Debtor, its creditors and other parties-in-interest. The Special Litigation Committee consists of Alan Greene and Wayne Henderson. The Special Litigation Committee retained the law firm of Young Conaway Stargatt & Taylor, LLP ("Young Conaway") as its counsel in this matter.

On December 2, 2009, the Committee filed its Emergency Motion to Bar and Void Special Litigation Committee Pursuant to Sections 105(a), 363(c)(1), 549(a)(2)(B), 1107(a), 1106(a)(3), 1106(a)(4), 1104 (c) and (d) and 101(14)(B) of the Bankruptcy Code and Other Related Relief (the "Special Committee Motion") [Docket No. 470], claiming that the Debtor could not appoint the Special Committee. The Committee also objected to the retention of Young Conaway as counsel to the Special Committee [Docket No. 471]. After a hearing held on December 16, 2009, the Bankruptcy Court issued two separate orders on December 18, 2009 denying the Special Committee Motion and approving the retention of Young Conaway (the "Special Committee Orders") [Docket Nos. 470-71]. The Committee filed an appeal of the Special Committee Orders on December 30, 2009. The Committee also filed a Request for Certification of Direct Appeal to the United States Court of Appeals for the Third Circuit. On January 7, 2010, the Bankruptcy Court issued a Supplement to Order Denying Motion of the Official Committee of Unsecured Creditors to Bar and Void Special Litigation Committee.

During the Chapter 11 Case, the Special Litigation Committee, with assistance from Young Conaway, began investigating whether any claims exist that the Debtor should pursue. Under the terms of the Plan, effective as of June 27, 2010, the Special Litigation Committee shall be deemed stayed from any further investigation or any other activity through the Effective Date and shall further be deemed terminated and disbanded as of the Effective Date.

### H.     The Standstill Order

On the eve of trial on these matters, the Debtor and the Committee decided to reschedule the trial on the Committee's Motions until a later date so as to engage in settlement discussions. On May 19, 2010, the Bankruptcy Court entered an Order (the "Standstill Order") approving a "Standstill Period" from the date of the entry of the Standstill Order through June 30, 2010 and scheduling the evidentiary hearings on the Trustee Motion, the Standing Motion, and the Committee's related Motion *in Limine* for Evidentiary Rulings that, as a Matter of Law, the Valuation of the Debtor's Assets Should Incorporate (a) Lack of Marketability Discount and (b) A Minority Discount attached as exhibits to the Pretrial Order (Docket No. 564, Exhibit D, Filed February 5, 2010) to begin on June 30, 2010.

- 27 -

## I.     Settlement

During the Standstill Period, the Debtor and Committee negotiated and ultimately reached agreement in good faith over the terms of a settlement of the Committee's Motions, as set forth in the Settlement Agreement attached as Exhibit F to the Disclosure Statement. The Settlement Agreement was approved by the MIG board of directors at a duly called meeting of the board on June 30, 2010 by Resolution of the Board which also authorized the Debtor to negotiate, execute and file the Plan and take any other actions necessary to perform under the Settlement Agreement  The Plan is the product of the Settlement Agreement. If the Plan, as it may be amended, is not confirmed, the Settlement Agreement shall have no force or effect. Pursuant to the Plan, any appeals related to the Committee Motions or Special Litigation Committee will be deemed dismissed as of the Effective Date and the Plan Proponents will file a joint notice of such dismissal as soon as practicable after the Effective Date.  The Plan Proponents believe the Settlement Agreement is fair, equitable and reasonable and in the best interests of creditors and the Debtor's estate.  Accordingly, as set forth in Article VI, Section L, the Plan Proponents seek court approval of the Settlement Agreement as incorporated in the Plan and the Confirmation Order.

## VI.     SUMMARY OF THE PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR, THE REORGANIZED DEBTOR, AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

## A.    Overall Structure of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and interest holders.  Upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of a chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in, the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The terms of the Plan are based upon, among other things, the Debtor's assessment of its ability to achieve the goals of its business plan, make the Distributions contemplated under the Plan, and pay its continuing obligations in the ordinary course of its business.  Under the Plan, Claims against and Interests in the Debtor are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated, (i) the Claims in certain Classes will be Reinstated or modified and receive Distributions equal to the full amount of such Claims and (ii) the Claims and Interests in certain other Classes will be modified and receive Distributions constituting a partial recovery on such Claims and Interests.  On the Initial Distribution Date, and at certain times thereafter, the Reorganized Debtor will distribute Cash, New MIG Notes, New Warrants, New Common LLC Interests, and other property in respect of certain Classes of Claims and Interests as provided in the Plan.  The Classes of Claims against and Interests in the Debtor created under the Plan, the treatment of those Classes under the Plan, and the other property to be distributed under the Plan, are described below.

## B.    Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims against and Interests in the Debtor into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims, which, pursuant to section 1123(a)(1), do not need to be classified). The Debtor also is required, under section 1122 of the Bankruptcy Code, to classify Claims

against and Interests in the Debtor into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a Holder of a Claim or Interest may challenge the Debtor's classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Debtor intends, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications to the classifications under the Plan to permit Confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such Holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the value of the property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely (or favorably) affected by the aggregate amount of Claims ultimately Allowed in the applicable Class.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized below.  The Debtor believes that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtor's assets.  The Debtor may seek Confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, if necessary.  Specifically, section 1129(b) of the Bankruptcy Code permits Confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all Impaired classes of Claims and interests.  See Section X.G below.  Although the Debtor believes that the Plan can be confirmed under section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

## 1. *Treatment of Unclassified Claims under the Plan*

### a. <u>Administrative Claims</u>

Except to the extent that an Allowed Administrative Claim has been paid prior to such Distribution Date, except as otherwise provided for in the Plan or unless otherwise agreed to by the Debtor and the Holder of an Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall be entitled to receive in full and complete settlement, release, and

discharge of such Claim, payment in full in Cash of the unpaid portion of an Allowed Administrative Claim on the Distribution Date.

### b. **Priority Tax Claims**

Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Initial Distribution Date or unless otherwise agreed to by the Debtor and the Holder of an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall be entitled to receive in full and complete settlement, release, and discharge of such Claim, payment in Cash of the unpaid portion of an Allowed Priority Tax Claim on the Distribution Date.

### 2. *Treatment of Classified Claims and Interests under the Plan*

#### a. **Class 1**: Other Priority Claims

Classification: Class 1 consists of Other Priority Claims against the Debtor.

Treatment: The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims will be unaltered by the Plan. Unless otherwise agreed to by the Holders of the Allowed Class 1 Claims and the Debtor, each Holder of an Allowed Class 1 Claim shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Allowed Class 1 Claim, payment of the Allowed Class 1 Claim in full in Cash on the Distribution Date.

Voting: Class 1 is Unimpaired, and the Holders of Class 1 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan.

#### b. **Class 2**: Secured Workers' Compensation Obligations Claims

Classification: Class 2 consists of Secured Workers' Compensation Obligations Claims against the Debtor.

Treatment: Each Holder of an Allowed Class 2 Claim shall have its Claim Reinstated and shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Allowed Class 2 Claim and on account of its Allowed Class 2 Claim, Cash payments in the ordinary course as set forth in the Order Authorizing the Debtor to Pay Certain Prepetition Workers' Compensation Obligation in the Ordinary Course of Business Pursuant to Sections 105(a) and 363 of the Bankruptcy Code [Docket No. 97].

Voting: Class 2 is Unimpaired, and the Holders of Class 2 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims will not be entitled to vote to accept or reject the Plan.

      **c.**    **Class 3**: General Unsecured Claims

    Classification: Class 3 consists of General Unsecured Claims against the Debtor.

    Treatment:  Each Holder of an Allowed Class 3 Claim shall be paid in Cash on the Distribution Date, one hundred percent (100%) of the Allowed amount of its Class 3 Claim in full, final and complete satisfaction, settlement, release, and discharge of such Allowed Class 3 Claim, plus simple interest at the post-judgment interest rate provided for in 28 U.S.C. 1961 (on the Petition Date) on the unpaid principal amount of such Allowed Claim from the Petition Date to and including the Effective Date.

    Voting: Class 3 is Unimpaired, and the Holders of Class 3 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims will not be entitled to vote to accept or reject the Plan.

      **d.**    **Class 4**: Supplemental Employment Retirement Claims

    Classification: Class 4 consists of Supplemental Employee Retirement Claims against the Debtor.

    Treatment:  Each Holder of an Allowed Class 4 Claim shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Allowed Class 4 Claim and on account of its Allowed Class 4 Claim, (i) its SERP Catch-up Payment, and (ii) monthly Cash payments on account of the Supplemental Employee Retirement Benefits due in the ordinary course after the Effective Date, plus simple interest on the SERP Catch-Up Payment from the Petition Date, or such later date that such payment was originally due, to and including the Effective Date, at the post-judgment interest rate provided for in 28 U.S.C. 1961 (on the Petition Date) on the unpaid principal amount of such Allowed Claim.

    Voting: Class 4 is Unimpaired, and the Holders of Class 4 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims will not be entitled to vote to accept or reject the Plan.

      **e.**    **Class 5**: Preferred Shareholder Claims

    Classification: Class 5 consists of all Allowed Preferred Shareholder Claims against the Debtor.

    Treatment:  On the Effective Date, each Holder of an Allowed Class 5 Claim shall be entitled to receive, in full, final and complete satisfaction, settlement, release, and discharge of such Allowed Class 5 Claim, subject to the provisions of Section 11.10 of the Plan, its Pro Rata share of:

(i)     the New MIG Notes to be issued pursuant to Section 5.04 of the Plan and secured by the Class 5 Collateral as  provided in the New MIG Notes Indenture, the Stock Pledge(s), the Stock Escrow Agreement, the Control Deposit Agreement and the Blanket Lien,

(ii)     the New Warrants to be issued pursuant to Section 5.04 of the Plan,

(iii)     Beneficial Interests in the Class 5 Trust to be established pursuant to Section 5.08 of the Plan; and

(iv)     the Excess Cash not including any Withheld Excess Cash, _provided however_, that any Withheld Excess Cash shall be paid to the Holders of Allowed Class 5 Claims as follows:

(a)     Effective as of the Distribution Date, the principal amount of the New MIG Notes shall be increased by the amount of the Withheld Excess Cash; and

(b)     The amount of the Withheld Excess Cash shall be transferred to the New Indenture Trustee by not later than fifteen (15) days after it is received by the Reorganized Debtor and in any event by not later than one (1) year after the Effective Date pursuant to the Mandatory Redemption Provisions of the New MIG Notes and New MIG Notes Indenture.  The New Indenture Trustee shall use such Withheld Excess Cash to redeem New MIG Notes Pro Rata at the next scheduled Interest Payment Date under the New MIG Notes Indenture.

The Reorganized Debtor shall exercise its best efforts to cause the Withheld Excess Cash to be distributed from Magticom to ITCL, from ITCL to ITC, and from ITC to the Reorganized Debtor as soon as practicable after the Effective Date, and shall not take any actions, or permit its directors to take any actions, to delay the distribution of such Withheld Excess Cash to the New Indenture Trustee to fund the Mandatory Redemption Provisions of the New MIG Notes and the New MIG Indenture.

Voting: Class 5 is Impaired, and Holders of Class 5 Claims will be entitled to vote to accept or reject the Plan.

**f.     Class 6: Common Equity Interests**

Classification: Class 6 consists all Common Equity Interests in the Debtor held by CaucusCom as of the Petition Date.

Treatment:  The Holder of the Allowed Class 6 Interest shall receive 100% of the New Common LLC Interests in the Reorganized Debtor subject to dilution by the New Warrants.

Voting: Class 6 is Impaired, and the Holders of Class 6 Interests will be entitled to vote to accept or reject the Plan.

### 3. *Special Provisions Regarding Insured Claims*

Under the Plan, an Insured Claim is any Allowed Claim or portion of an Allowed Claim (other than a Secured Workers' Compensation Obligation Claim) that is insured under the Debtor's insurance policies, but only to the extent of such coverage. Distributions under the Plan to each Holder of an Allowed Insured Claim shall be in accordance with the treatment provided under the Plan for General Unsecured Claims; provided, however, that the maximum amount of any Distribution under the Plan on account of an Allowed Insured Claim shall be limited to an amount equal to the applicable self-insured retention under the relevant insurance policy; provided further, however, that, to the extent a Holder has an Allowed Insured Claim, the amount of which exceeds the total coverage available from the relevant insurance policies of the Debtor, such Holder shall have an Allowed General Unsecured Claim in the amount by which such Allowed Insured Claim exceeds the coverage available from the Debtor's insurance policies. Nothing in this section shall constitute a waiver of any Litigation Rights the Debtor may hold against any Person, including the Debtor's insurance carriers; and nothing in this section is intended to, shall, or shall be deemed to preclude any Holder of an Allowed Insured Claim from seeking and/or obtaining a Distribution or other recovery from any insurer of the Debtor in addition to (but not in duplication of) any Distribution such Holder may receive under the Plan; provided, however, that the Debtor does not waive, and expressly reserves its rights to assert that any insurance coverage is property of the Estate to which it is entitled.

The Plan does not expand the scope of, or alter in any other way, the rights and obligations of the Debtor's insurers under their policies, and the Debtor's insurers will retain any and all defenses to coverage that such insurers may have, including the right to contest and/or litigate with any party, including the Debtor, the existence, primacy and/or scope of available coverage under any alleged applicable policy. The Plan shall not operate as a waiver of any other Claims the Debtor's insurers have asserted or may assert in any Proof of Claim or the Debtor's rights and defenses to such Proofs of Claim.

### 4. *Reservation of Rights Regarding Claims*

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtor's or the Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

### C. **Reorganized Debtor's Obligations Under the Plan**

From and after the Effective Date, the Reorganized Debtor shall exercise its reasonable discretion and business judgment to perform the corresponding obligations under the Plan of its predecessor or predecessor-in-interest. The Plan will be administered and actions will be taken in the name of the Debtor and the Reorganized Debtor. From and after the Effective Date, the Reorganized Debtor shall conduct, among other things, the following tasks:

- Produce, administer and implement the Agreed Budget from the Effective Date until such time the New MIG Notes are paid in full without changes

or modifications thereto unless such changes, amendments or modifications are approved by the New Board including, for so long as the New MIG Notes remain outstanding, the two Class 5 Directors.

- Administer the Plan and take all steps and execute all instruments and documents necessary to effectuate the terms of the Plan;

- Implement the governance provisions, including without limitation the following which shall be set forth in more detail in the Operating Agreement:

  - For so long as the New MIG Notes remain outstanding, upon resignation of any of the Class 5 Directors appointed to serve on the New Board as of the Effective Date pursuant to Section 5.05 of the Plan, the Class 5 Trustee shall have the right to designate any replacement or successor Class 5 Director to serve on the New Board and any such replacement or successor Class 5 Director shall be reasonably acceptable to the Reorganized Debtor, with such consent not to unreasonably withheld;

  - The Class 5 Directors shall resign when the New Notes are paid in full;

  - For so long as the New MIG Notes remain outstanding, a quorum of the New Board shall not be established unless at least one Class 5 Director is present; provided, however, that after three (3) duly noticed and constituted meetings of the New Board at which at least one Class 5 Director is not present, at the third such meeting, a majority of the total authorized number of managers shall be deemed to constitute a quorum for the transaction of business.

  - As of the Effective Date, ITC shall be deemed to have assigned its right to designate one of its two observers (that do not have voting rights) to the ITCL Board meetings or equivalent meeting of the Partners, under § 2.1(a) of the ITCL LLC Agreement, to the Class 5 Directors. Pursuant to such assignment, and until such time as there is any amount outstanding under the New MIG Notes, the Class 5 Directors shall have the right to appoint a Person to serve as the Designated Class 5 Observer (that does not have voting rights). Such person may be one of the Class 5 Directors or a third party designated by the Class 5 Directors for such purpose with approval of the New Board, such approval not to be unreasonably withheld, provided the reasonable fees and expenses incurred by such designated Person shall be paid by the Reorganized Debtor, with such fees and expenses subject to the approval of the New Board. The New Board shall ensure that the Designated Class 5

- 35 -

Observer is duly noticed of all ITCL Board meetings or Meetings of the Partners.

- ■ The New Board shall provide not less than twenty (20) days prior notice of a meeting of the New Board or equivalent meetings (at ITCL, Magticom and equivalent listing vehicle) to the Class 5 Directors and Designated Class 5 Observer, and such meetings will be conducted with a translator present upon request of the Designated Class 5 Observer.

- • Pursue (including, as it determines through the exercise of its business judgment, prosecuting, enforcing, objecting to, litigating, reconciling, settling, abandoning, and resolving) all of the rights, Claims, Causes of Action, defenses, and counterclaims retained by the Debtor or the Reorganized Debtor;

- • Reconcile Claims and resolve Disputed Claims, and administer the Claims allowance and disallowance processes as set forth in the Plan, including objecting to, prosecuting, litigating, reconciling, settling, and resolving Claims and Disputed Claims in accordance with the Plan;

- • Make decisions regarding the retention, engagement, payment, and replacement of professionals, employees and consultants;

- • Administer the Distributions under the Plan, including (i) making Distributions in accordance with the terms of the Plan, and (ii) Filing with the Bankruptcy Court on each three (3) month anniversary of the Effective Date reports regarding the Distributions made and to be made to the Holders of Allowed Claims as required by the U.S. Trustee;

- • Exercise such other powers as necessary or prudent to carry out the provisions of the Plan;

- • File appropriate tax returns; and

- • Take such other action as may be necessary or appropriate to effectuate the Plan.

**D.  Description of New Securities under the Plan**

The following is a summary of the terms of the New MIG Notes Indenture and Variable Rate Senior Secured Notes Due 2016 to be issued pursuant to the New MIG Notes Indenture. Also the terms of the Operating Agreement, the New Common LLC Interests, and the New Warrants are described below.

- 36 -

## 1.  *Summary Description of New MIG Notes Indenture and the Notes*[7]

| | |
|---|---|
| ***New MIG Notes*** | Variable Rate Senior Secured Notes due 2016 (the "<u>New MIG Notes</u>") |
| ***Issuer*** | New MIG LLC (the "<u>Company</u>") |
| | ITC Cellular LLC |
| ***Initial Principal Amount*** | The aggregate amount of all Allowed Preferred Shareholder Claims <u>less</u> the aggregate amount of Excess Cash (not including any Withheld Excess Cash). |
| ***Issue Date*** | Effective Date of the Plan |
| ***Interest*** | Years 1-3: 15.5% |
| | Year 4: 17.5% |
| | Years 5-6: 20% |
| ***Default Interest*** | 2% |
| ***Payment of Interest, PIK Interest and Additional PIK Interest*** | All Interest is payable in cash semi-annually beginning six months after the Issue Date ("<u>Interest Payment Dates</u>"), provided: |

(1)     the following percentage Interest (the "<u>PIK Interest Election Amount</u>") is payable in PIK Notes, with terms identical (but for the issue date) to those of the original Notes:

Years 1-3: 6.5%

Year 4: 8.5%

Years 5-6: 11%

(2)     if PIK Notes are issued up to the PIK Interest Election Amount, Additional PIK Notes may be issued for up to 3% of the Interest payable ("<u>Additional PIK Notes</u>"); <u>provided, however</u>, that (A) Additional PIK Notes may <u>not</u> be issued (i) on more than three Interest Payment Dates during the life of the New MIG Notes; or

---

[7]     Capitalized terms used in this section describing the New MIG Notes Indenture and New MIG Notes but not otherwise defined herein have the meanings ascribed to such terms in the New MIG Notes Indenture to be filed with the Plan Supplement.  This summary is qualified in its entirety by the Settlement Agreement, the New MIG Notes and New MIG Notes Indenture.

|  |  |
|---|---|
|  | (ii) more than two consecutive Interest Payment Dates; and (B) at any time on which Additional PIK Notes are outstanding, the Interest Rate and the PIK Interest Election Amount shall be increased by 2%. |
| ***Maturity*** | 6 years from the Issue Date |
| ***Ranking*** | The New MIG Notes will be senior to all obligations of the Company. |
| ***Security*** | The New MIG Notes will be secured by : (1) all of the assets of the Company, including the Collateral Accounts (see below) and (2) pledges in favor of the Collateral Agent of all of the following Interests, and the rights to receive dividends thereon, of:  (A) all of the Interests in the Company by CaucusCom Ventures L.P. (the "CaucusCom Pledge"); (B) all of the Interests in ITC by the Company (the "Company Pledge"); and (C) all of the Interests in ITCL owned by ITC (the "ITC Pledge").<br><br>The Interests pledged pursuant to the CaucusCom Pledge, the Company Pledge and the ITC Pledge shall be held in escrow pursuant to Stock Escrow Agreements in a form satisfactory to the Debtor and the Committee. |
| ***Collateral Accounts & Cash Sweep Mechanism*** | The Company shall establish three (and only three) bank accounts, each with the Collateral Agent under the New MIG Notes Indenture, including the (1) Notes Payment Account, (2) Plan Funding Reserve Account and the (3) Operating Account.<br><br>All funds received by the Company by any means shall be deposited in the Notes Payment Account, except for the following: (i) the Plan Funding Reserve Account will be funded with an amount equal to the Plan Funding Reserve, as set forth in the Plan Supplement (to be filed by the Debtor not less than ten (10) days prior to the Confirmation Hearing); and, (ii) on the Issue Date and each anniversary of the Issue Date, the Operating Account will be funded with an amount equal to the Agreed Budget.<br><br>Each Collateral Account will be subject to a Deposit Account Control Agreement by and between the Company and the Collateral Agent. |

| | |
|---|---|
| ***Optional Redemption*** | The New MIG Notes will be redeemable in whole or in part, at any time, and from time to time, at 100% of the principal amount thereof, plus accrued and unpaid interest to the repurchase date without penalty. |
| ***Mandatory Redemption*** | On each Interest Payment Date, all funds in the Notes Payment Account will be used: (1) to pay Interest due on such Interest Payment Date; and (2) to redeem, in the following order, and to the extent of the funds available (less a reserve for the costs of the Indenture Trustee) (A) any Additional PIK Notes outstanding; (B) any PIK Notes outstanding; and (C) any principal amounts due under any New MIG Notes outstanding. |
| | If the Senior Note outstanding is below 75% of the Initial Balance of the New MIG Notes (less the amount of Withheld Excess Cash), any further payments after the foregoing items 1 and 2 must be applied to Senior Note amortization up to at least 75% of the amount of such payment.  Thereafter, any remaining amounts may be distributed to equity (providing Steps 1 and 2 are satisfied).  For the avoidance of doubt, funds shall be deposited in the Notes Payment Account only after funding of payments to the Operating Account in accordance with the Agreed Budget. |
| | Further, the net cash proceeds of any asset sales shall be deposited in the Note Payment Account and used to pay down any balances outstanding under the New MIG Notes as set forth above. |
| ***Governance*** | Holders of the New MIG Notes will have the right to appoint two members to the Board of Directors of New MIG LLC (the "<u>Class 5 Directors</u>") with the consent of the Debtor, which consent shall not be unreasonably withheld. |
| | The Class 5 Directors will select an observer to sit at each meeting of the Board of Directors of ITCL and receive all materials provided to ITCL's directors. |
| | Upon payment in full of the New MIG Notes, the Class 5 Directors will resign. |
| ***Negative Covenants*** | Secured lender negative covenant package with mutually acceptable cure period. |

In addition, for so long as the New MIG Notes are outstanding, neither CaucusCom nor any of the Debtor Parent Affiliates shall take any action or cause any action to be taken that would cause an ITC Cellular Change of Control as defined in the ITCL LLC Agreement.

**Affirmative Covenants**

The following affirmative covenants drafted in a way that the Parties agree would not trigger the ITC Change of Control in the PSA and ITCL LLC Agreement and contain reasonable fiduciary out language acceptable to the Parties:

1. MIG Directors at ITCL shall seek to have any Excess Cash at Magticom paid up to ITCL and ITCL will distribute it to MIG as permitted in clause 2.7(c) of the ITCL LLC Agreement.

2. An Event of Default under the Senior Notes shall occur if the MIG Directors that are directors of ITCL support a merger or acquisition at Magticom above $25 million, unless such support is with the prior written approval of both Class 5 Board Members.

3. One Class 5 MIG Director or its designee shall have observer rights at all ITCL or Magticom Board Meetings or official Meetings of the Partners.

The breach of any of Affirmative Covenant herein, other than the foregoing Affirmative Covenant number 2, shall constitute an Event of Default, regardless of any fiduciary duties that may be alleged by ITCL or MIG Directors.

**Due on Sale Provisions**

Other than as otherwise specifically authorized in the New MIG Notes Indenture, any transaction resulting in a sale, mortgage, pledge, hypothecation, assignment, grant of lien, transfer or conveyance, in one or a series of transactions, to one or more Persons that is not a holder thereof as of the Issue Date, of CaucusCom's Interest in New MIG, LLC, MIG's Interest in ITC or ITC's interest in ITCL, shall trigger their obligation to pay the outstanding amount of the New MIG Notes in full from the proceeds of sale at closing and prior to payment of

- 40 -

any proceeds to themselves or any third parties.

Further, such other restrictions as provided for in the Settlement Agreement and/or the New MIG Indenture.

***IPO Provisions***

Notwithstanding the foregoing Negative Covenants and Events of Default, the Company may permit or cause an "IPO" as defined in the ITCL Purchase and Sale Agreement, provided :

(1)     the ITCL IPO occurs on an exchange approved by the Class 5 Directors;

(2)     no shares are sold to affiliated entities, including all CaucusCom, Sun Capital and Salford entities;

(3)     the market value of shares (over a 45 day average) in the "Listing Vehicle (as such term is used in the PSA) held directly or indirectly by the Company, subsequent to the IPO, is greater than two times (2x) the amount of all principal and accrued interest on the Notes;

(4)     the Company and/or ITC cause all Interests in the Listing Vehicle (or any successor thereof) held by them at any time to be pledged to the Collateral Agent pursuant to a Stock Pledge substantially in the form of the ITC Stock Pledge and held by the Stock Escrow Agent pursuant to a Stock Escrow Agreement in a form satisfactory to the Company, including each Class 5 Director, and the Collateral Agent; and

(5)     all of the net cash proceeds payable to the Company and ITC on account of interests in the Listing Vehicle (or participation in the IPO) are deposited as Collateral Monies in the Note Payments Account; provided, however, on or after thirty (30) days subsequent to the date of the ITCL IPO, and if the number of shares of Interests in the Listing Vehicle have traded on a daily basis at equal to or greater than .5% of float  for each of the thirty days subsequent to the ITCL IPO, and if (i) the   value[8] of Interests in the Listing Vehicle held by the Company or ITC is greater than three times (3x) the amount of all principal and accrued interest outstanding under the New MIG Notes on the

---

[8] Value determined by market price of Magticom (or "Equivalent Listing Vehicle") x number of shares indirectly held by MIG.

date of the ITCL IPO, then 70% of the net cash proceeds deposit in the Note Payments Account from or in connection with the IPO shall be paid to the Indenture Trustee for distribution to Holders of New MIG Notes and the remaining 30% of such proceeds may be released by the Collateral Agent and deposited at the Company's direction for distribution to CaucusCom.

*Events of Default*  Breach of any Affirmative Covenants, Negative Covenants, IPO Provisions or Due on Sale Provisions as set forth in the New MIG Notes Indenture. Additional as customary for securities of this type and as agreed by the Debtor and the Committee.

In addition, and regardless of whether any Covenants are violated, the following shall be Events of Default :

(1)  the ITCL LLC Agreement shall be modified without the consent of at both Class 5 Directors; and,

(2)  the Interests of Yola or Gtel, directly or indirectly, whether by sale, mortgage, pledge, hypothecation, assignment, grant of lien, or other transfer is conveyed or proposed to be conveyed, in one or a series of transactions, to one or more Persons that is not a holder thereof as of the Issue Date, such that a Change of Control occurs or is reasonably threatened to occur.

## 2.  *Description of New Limited Liability Company Operating Agreement*

As part of the Plan, the Debtor will be converted into a Delaware limited liability company. As provided in the Delaware Limited Liability Company Act, the Reorganized Debtor will constitute a continuation of the existence of the Debtor. The affairs of the Reorganized Debtor will be governed by the Operating Agreement.

The Operating Agreement provides that there will be one class of limited liability company interests of the Reorganized Debtor.

The business and affairs of the Reorganized Debtor will be managed by or under the direction of the New Board, initially consisting of six (6) managers, four (4) of whom are elected by the affirmative vote of at least a majority of the "Units" held by Members, voting together as a single class, and two (2) of whom are the Class 5 Directors. The Class 5 Directors are initially designated by the Committee and, until the New MIG Notes are paid in full, any

successors will be designated by the Class 5 Trustee in accordance with the provisions of the Class 5 Trust.

The New Board may appoint officers and agents of the Reorganized Debtor to exercise such powers and perform such duties as may be determined from time to time by the New Board. Pursuant to the Operating Agreement, the Reorganized Debtor is obligated to exculpate, indemnify, and advance expenses to, the managers, officers and key employees of the Reorganized Debtor (acting in such capacity), for any loss, damage or claim incurred or suffered by reason of any act or omission performed or omitted by such manager, officer or key employee. Notwithstanding such exculpation, such individuals remain liable for any such loss, damage or claim incurred or suffered by reason of any act or omission performed or omitted by such individual involving a violation of the implied contractual covenant of good faith and fair dealing. The Reorganized Debtor is also obligated to provide a director and officer liability insurance policy for the former and current directors and officers of the Reorganized Debtor.

### 3. *Description of New Common LLC Interests*

The New Common LLC Interests in the Reorganized Debtor will be issued to the Holder of the Allowed Class 6 Interest subject to dilution by the New Warrants.

The New Common LLC Interests are represented by "Units." Each Unit is represented by a certificate in the form attached to the Operating Agreement. A Unit entitles the holder thereof to share in the profits and losses, and distributions from, and to receive such allocation of income, gain, loss, deduction, credit or similar item of, the Reorganized Debtor. Members are entitled to vote on all matters that require a vote of the members under the Operating Agreement, voting together as a single class. Distributions may be declared and paid on the Units at such times and in such amounts as the New Board in its discretion may determine.

### 4. *Summary Description of New Warrants*[9]

| | |
|---|---|
| ***Notional Amount of Warrants*** | 5% of the total authorized New Common LLC Interests on the Effective Date. |
| ***Exercise Price*** | $225 Million |
| ***Other Terms*** | The Warrants shall be redeemable by cash settlement. |
| | The Warrants shall be detachable. |
| ***Additional Warrants*** | Warrants on identical terms to those issued on the Issue Date (except for the date of issue) (the "Initial Warrants") in a notional amount equal to 2.5% of the total authorized New |

---

[9] Capitalized terms used in this section describing the New Warrants but not otherwise defined herein have the meanings ascribed to such terms in the Form of Warrant Agreement substantially in the form set forth in Appendix F to the Plan Supplement.

Common LLC Interests on the Effective Date shall be issued on the third anniversary of the Issue Date *parri passu* to the then current holders of the Initial Warrants.

E. **Establishment of the Class 5 Trust, Appointment of the Class 5 Trustee; Funding of the Class 5 Trust; Termination of the Class 5 Trust; Exculpation and Indemnification; International Recognition**

On the Effective Date, the Debtor and the Class 5 Trustee shall execute the Class 5 Trust Agreement and shall take all other steps necessary to establish the Class 5 Trust in accordance with the Plan. Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date the Debtor shall be deemed to have automatically transferred to the Class 5 Trust all of its right, title, and interest in and to all of the Class 5 Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such assets shall automatically vest in the Class 5 Trust free and clear of all Claims and Liens.

The Class 5 Trust Assets shall include the Class 5 Trust Funding Amount and any Claims, Causes of Action and Litigation Rights related to the Change of Control Litigation, including standing to bring the Change of Control Litigation on behalf of the Debtor and its subsidiaries at any time after the Effective Date of the Plan, and standing to assert any Claims, Causes of Action and Litigation Rights in connection therewith, if in the sole discretion of such Class 5 Trustee there is an Event of Default (as defined in the New MIG Notes) or threat of an Event of Default under the New MIG Notes; provided, however, that the Class 5 Trustee may commence such a proceeding anytime after November 1, 2011 regardless of the existence or threat of an Event of Default, unless the Reorganized Debtor has delivered a tolling agreement in form acceptable to the Class 5 Trustee tolling the statute of limitations on behalf of all affected parties for commencement of such an action.

The Change of Control Litigation includes any Claim, Cause of Action or Litigation Rights related to or arising from the "Change of Control Provisions," in the ITCL LLC Agreement, including any claims challenging the validity or enforceability thereof on any grounds, under any applicable law, in any forum including without limitation before the Bankruptcy Court or the London Court of Arbitration. Should the Class 5 Trustee seek to and succeed in avoiding or otherwise unwinding the adoption of the Change of Control Provisions, this could permit disposition of the Reorganized Debtor's interest in ITCL without ITC losing management rights and voting and other protections (as discussed above in Article IV.B.a). If the Change of Control Provisions are not avoided or otherwise unwound (and under certain defined circumstances more fully set forth in the Class 5 Trust Agreement), the Class 5 Trustee may permit the foreclosure of ITC's interest in ITCL by the Indenture Trustee whether or not such foreclosure would trigger a Change of Control under the ITCL LLC Agreement.

From and after the Effective Date, the Class 5 Trustee shall serve as trustee of the Class 5 Trust, and shall have all powers, rights and duties of a trustee, as set forth in the Class 5 Trust Agreement. In the event the Class 5 Trustee is no longer willing or able to serve as trustee, then the successor shall be appointed by the mutual agreement of the Class 5 Board Members (as

set forth in the Class 5 Trust Agreement), or as otherwise determined by the Bankruptcy Court, and notice of the appointment of such Class 5 Trustee shall be filed with the Bankruptcy Court.

The Class 5 Trust Funding Amount shall be provided by the Debtor on the Effective Date in the amount of $750,000. The Reorganized Debtor shall have no further obligation to fund the Class 5 Trust. Upon full repayment of the New MIG Notes, any remaining portion of the Class 5 Trust Funding Amount shall be returned to the Reorganized Debtor and the Class 5 Trust shall be terminated.

The Class 5 Trust and the duties, responsibilities and powers of the Class 5 Trustee shall terminate in accordance with the terms of the Class 5 Trust Agreement, including the right to bring the Change of Control Litigation and standing to bring the Change of Control Litigation on behalf of the Debtor and its subsidiaries at any time after the Effective Date of the Plan, if in the sole discretion of such Class 5 Trustee there is an Event of Default or threat of an Event of Default under the New MIG Notes; provided, however, that the Class 5 Trustee may commence such a proceeding anytime after November 1, 2011 regardless of the existence or threat of an Event of Default unless the Reorganized Debtor has delivered a tolling agreement in form acceptable to the Class 5 Trustee tolling the statute of limitations on behalf of all affected parties for commencement of such an action.

The Class 5 Trustee, and the Class 5 Trustee's Counsel, shall be exculpated and indemnified pursuant to and in accordance with the terms of the Class 5 Trust Agreement.

The Class 5 Trustee shall be: (i) recognized by foreign courts, tribunals and jurisdictions, (ii) the subject of the recognition of comity of such foreign courts, tribunals and jurisdictions and (iii) vested with the authority of a statutory trustee pursuant to the Class 5 Trust Agreement.

F.    **Claims, Distribution Rights and Objections**

1.    *Distributions for Allowed Claims*

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Claims as of the applicable Distribution Date shall be made on or as soon as practicable after the applicable Distribution Date. Distributions on account of Claims that first become Allowed Claims after the applicable Distribution Date shall be made pursuant to Section 8.02 of the Plan and on such day as selected by the Reorganized Debtor, in its sole discretion.

The Reorganized Debtor shall have the right, in its sole and absolute discretion, to accelerate any Distribution Date occurring after the Effective Date if the facts and circumstances so warrant.

2.    *Interest on Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be

entitled to interest accruing on or after the Petition Date on any Claim. Unless otherwise specifically provided for in the Plan or the Confirmation Order, interest shall not accrue or be paid upon any Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Claim becomes an Allowed Claim.

### 3. *Designation; Distributions by Disbursing Agent*

The Reorganized Debtor or the Disbursing Agent on its behalf shall make all Distributions required to be made to Holders of Class 3, 4, and 5 Claims and Class 6 Interests, on the respective Distribution Dates under the Plan and such other Distributions to other Holders of Claims or Interests in the Debtor as are required to be made or delegated to the Disbursing Agent by the Reorganized Debtor.

If the Disbursing Agent is an independent third party designated to serve in such capacity, such Disbursing Agent shall receive, without further approval from the Bankruptcy Court, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out of pocket expenses incurred in connection with such services from the Reorganized Debtor. No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### 4. *Means of Cash Payment*

Cash payments under the Plan shall be in U.S. funds, and shall be made, at the option, and in the sole discretion, of the Reorganized Debtor, by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Reorganized Debtor. Cash payments to foreign Creditors may be made, at the option, and in the sole discretion, of the Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. Cash payments made pursuant to the Plan in the form of checks issued by the Reorganized Debtor shall be null and void if not cashed within 120 days of the date of the issuance thereof. Requests for reissuance of any check shall be made directly to the Reorganized Debtor.

For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency shall be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

### 5. *Fractional Distributions*

Notwithstanding any other provision of the Plan to the contrary, no fractional units of New Common LLC Interests will be issued or distributed and no cash payments of fractions of cents will be made. Fractional cents shall be rounded to the nearest whole cent (with .5 cent or less to be rounded down). Fractional New Common LLC Interests shall be rounded to the nearest whole unit (with .5 unit or less to be rounded down). No cash will be paid in lieu of such fractional New Common LLC Interests in increments of less than $1,000.

### 6. De Minimis Distributions

Notwithstanding anything to the contrary contained in the Plan, the Disbursing Agent shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $50. Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than such amount shall have such Claim discharged and shall be forever barred from asserting such Claim against the Debtor, the Reorganized Debtor or their respective property. Any Cash or other property not distributed pursuant to this provision shall be the property of the Reorganized Debtor, free of any restrictions thereon, other than those contained in the New MIG Indenture, New MIG Notes and related documents.

### 7. Delivery of Distributions

Distributions to Holders of Allowed Claims shall be made by the Disbursing Agent (a) at the addresses set forth on the Proofs of Claim Filed by such Holders, (b) at the addresses reflected in the Schedules if no Proof of Claim has been Filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Debtor, the Reorganized Debtor or the Disbursing Agent after the date of any related Proof of Claim or after the date of the Schedules if no Proof of Claim was Filed. If any Holder's Distribution is returned as undeliverable, a reasonable effort shall be made to determine the current address of such Holder, but no further Distributions to such Holder shall be made unless and until the Disbursing Agent is notified of such Holder's then current address, at which time all missed Distributions shall be made to such Holder without interest. Unless otherwise agreed between the Reorganized Debtor and the Disbursing Agent, amounts in respect of undeliverable Distributions made by the Disbursing Agent shall be returned to the Reorganized Debtor, and held in trust by the Reorganized Debtor, until such Distributions are claimed, at which time the applicable amounts shall be returned to the Disbursing Agent for distribution pursuant to the Plan. All claims for undeliverable Distributions must be made on or before the second (2nd) anniversary of the Initial Distribution Date, after which date all unclaimed property shall revert to the Reorganized Debtor free of any restrictions thereon and the claims of any Holder or successor to such Holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan shall require the Debtor, the Reorganized Debtor or any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

### 8. Application of Distribution Record Date

At the close of business on the Distribution Record Date, the claims registers for all Claims shall be closed, and there shall be no further changes in the record Holders of such Claims. Except as provided herein, the Reorganized Debtor, the Disbursing Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of Claims occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record Holders stated on the claims registers

- 47 -

as of the close of business on the Distribution Record Date irrespective of the number of Distributions to be made under the Plan to such Persons or the date of such Distributions.

## 9. *Withholding, Payment and Reporting Requirements*

In connection with the Plan and all Distributions under the Plan, the Disbursing Agent shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding, payment, and reporting requirements. The Disbursing Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed General Unsecured Claim that has become an Allowed General Unsecured Claim, any tax obligation that would be imposed upon the Reorganized Debtor in connection with such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Reorganized Debtor in connection with such Distribution. Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution pursuant to Section 7.06 of the Plan.

## 10. *Setoffs*

The Reorganized Debtor may, but shall not be required to, set off against any Claim or any Allowed Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such claim that the Debtor or the Reorganized Debtor may have against such Holder.

## 11. *Pre-Payment*

Except as otherwise provided in the Plan, any ancillary documents entered into in connection herewith, or the Confirmation Order, the Reorganized Debtor shall have the right to pre-pay, without penalty, all or any portion of an Allowed Claim entitled to payment in Cash at any time; provided, however, that any such pre-payment shall not be contrary to the terms of the New MIG Indenture and related documents, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

## 12. *No Distribution in Excess of Allowed Amounts*

Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim (excluding payments on account of interest due and payable from and after the Petition Date pursuant to the Plan, if any).

## 13. *Allocation of Distributions*

All Distributions received under the Plan by Holders of Claims shall be deemed to be allocated first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim.

## 14. *Prosecution of Objections to Claims*

### a. <u>Objections to Claims; Estimation Proceedings</u>

Except as set forth in the Plan or any applicable Bankruptcy Court order, all objections to Claims must be Filed and served on the Holders of such Claims by the Claims Objection Bar Date, as the same may be extended by the Bankruptcy Court upon motion by the Debtor, the Reorganized Debtor or any other party-in-interest. If a timely objection has not been Filed to a Proof of Claim or the Schedules have not been amended with respect to a Claim that (i) was Scheduled by the Debtor but (ii) was not Scheduled as contingent, unliquidated, and/or disputed, the Claim to which the Proof of Claim or Scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been Allowed earlier. No payments or Distributions shall be made on account of a Claim until such Claim becomes an Allowed Claim. Notice of any motion for an order extending any Claims Objection Bar Date shall be required to be given only to those Persons or Entities that have requested notice in the Chapter 11 Case, or to such Persons as the Bankruptcy Court shall order.

The Debtor (prior to the Effective Date) or Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court, as applicable. If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanisms.

The Reorganized Debtor will have no obligation to review and/or respond to any Claim that is not Filed by the applicable Bar Date unless: (i) the filer has obtained an order from the Bankruptcy Court authorizing it to File such Claim; or (ii) the Reorganized Debtor has consented to the Filing of such Claim in writing.

### b. Authority to Prosecute Objections

After the Effective Date, except with respect to Class 5 Trust Assets, only the Reorganized Debtor shall have the authority to File objections to Claims and to settle, compromise, withdraw, or litigate to judgment objections to Claims, including, without limitation, Claims for reclamation under section 546(c) of the Bankruptcy Code. The Reorganized Debtor may settle or compromise any Disputed Claim without approval of the Bankruptcy Court, subject to approval by each Class 5 Director for any proposed Allowed Claim in excess of $100,000.

### 15. *Treatment of Disputed Claims*

#### a. No Distribution Pending Allowance

Notwithstanding any other provisions of the Plan, no payments or Distributions will be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Disputed Claim becomes an Allowed Claim.

#### b. Distributions on Accounts of Disputed Claims Once They are Allowed

The Disbursing Agent shall, on the applicable Distribution Dates, make Distributions on account of any Disputed Claim that has become an Allowed Claim. Such Distributions shall be made pursuant to the provisions of the Plan governing the applicable Class. Such Distributions shall be based upon the Distributions that would have been made to the Holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

### 16. *Accounts; Escrows; Reserves*

The Debtor and Reorganized Debtor shall, subject to and in accordance with the provisions of the Plan, (a) establish one or more general accounts into which shall be deposited all funds not required to be deposited into any other account, reserve or escrow, (b) create, fund and withdraw funds from, as appropriate, the Administrative Claims Reserve, and the Professional Fee Reserve and (c) if practicable, invest any Cash that is withheld as the applicable claims reserve in an appropriate manner to ensure the safety of the investment. Nothing in the Plan or this Disclosure Statement shall be deemed to entitle the Holder of a Disputed Claim to postpetition interest on such Claim, however.

### a.     Administrative Claims Reserve

On the Effective Date (or as soon thereafter as is practicable), the Debtor or Reorganized Debtor shall create and fund the Administrative Claims Reserve in the amount budgeted to be used by the Reorganized Debtor to pay Distributions on account of Allowed Administrative Claims, including Claims under section 503(b)(9) of the Bankruptcy Code and lease payments under section 365(d)(5) of the Bankruptcy Code.  To the extent necessary to fund payments to Allowed Claims thereunder, the funds in the Administrative Claims Reserve shall be periodically replenished by the Reorganized Debtor in such amounts as may be determined by the Reorganized Debtor in its sole discretion.  The Reorganized Debtor shall be obligated to pay all Allowed Administrative Claims designated to be paid from the proceeds of the Administrative Claims Reserve thereunder in excess of the amounts actually deposited in the Administrative Claims Reserve.  In the event that any Cash remains in the Administrative Claims Reserve after payment of all Allowed Administrative Claims to be paid thereunder, such Cash shall be distributed to the Reorganized Debtor as provided in Section 7.06 of the Plan.

### b.     Professional Fee Reserve

The Debtor or Reorganized Debtor shall create and fund the Professional Fee Reserve on the Effective Date (or as soon thereafter as is practicable) in the amount of the budgeted but unpaid Professional fees projected through the Effective Date, which amount shall be used to pay Allowed Professional Fee Claims held by (i) any professionals working on behalf of the Debtor and (ii) counsel and any advisers to the Committee.  The Reorganized Debtor shall be obligated to pay all Allowed Professional Fee Claims even if in excess of the amounts actually deposited in the Professional Fee Reserve.  In the event that any Cash remains in the Professional Fee Reserve after payment of all Allowed Professional Fee Claims, such Cash will be distributed to the Reorganized Debtor as provided by Section 7.06 of the Plan.

### c.     Disputed Claims Reserve

On the Effective Date and on each subsequent Distribution Date, the Debtor or Reorganized Debtor shall withhold on a Pro Rata basis from property that would otherwise be distributed to Classes of Claims entitled to Distributions under the Plan on such date, in a separate Disputed Claims Reserve, such amounts or property as may be necessary to equal one hundred percent (100%) of Distributions to which Holders of such Disputed Claims would be entitled under the Plan if such Disputed Claims were allowed in their Disputed Claim Amount. The Debtor or Reorganized Debtor may request, if necessary, estimation for any Disputed Claim that is contingent or unliquidated, or for which the Debtor or Reorganized Debtor determine to reserve less than the Face Amount.  The Debtor or Reorganized Debtor shall withhold the applicable portion of the Disputed Claims Reserve with respect to such Claims based upon the estimated amount of each such Claim as estimated by the Bankruptcy Court.  If the Debtor or Reorganized Debtor elect not to request such an estimation from the Bankruptcy Court with respect to a Disputed Claim that is contingent or unliquidated, the Debtor or Reorganized Debtor shall withhold the applicable Disputed Claims Amount based upon the good faith estimate of the

amount of such Claim by the Debtor with the consent of the Committee, or the Reorganized Debtor with the consent of each Class 5 Director after the Effective Date.  If practicable, the Debtor or Reorganized Debtor will invest any Cash that is withheld as the applicable Disputed Claims Reserve in an appropriate manner to ensure the safety of the investment.  Nothing in the Plan or this Disclosure Statement shall be deemed to entitle the Holder of a Disputed Claim to postpetition interest on such Claim, however, except as otherwise provided in the Plan.  The Reorganized Debtor shall conduct an audit and review of the amount held in the Disputed Claims Reserve by not later than 90 days after the Effective Date and every three  months thereafter, after which audit any funds in the Disputed Claims Reserve in excess of the Disputed Claims Amount shall be distributed to the Indenture Trustee for distribution to Holders of New MIG Notes on the next distribution date under the New MIG Notes Indenture.

### 17. *Administrative Claims*

All Administrative Expense Requests (other than as set forth in Sections 3.01(a), 11.02 or this Section 11.01 of the Plan) must be made by application Filed with the Bankruptcy Court and served on counsel for the Reorganized Debtor **no later than forty-five (45) days after the Effective Date** or their Administrative Claims shall be forever barred.  In the event that the Reorganized Debtor objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim; provided, however no Administrative Expense Request by an Insider shall be Allowed without the written consent of the Class 5 Board Members.  Notwithstanding the foregoing, (a) no application seeking payment of an Administrative Claim need be Filed with respect to an undisputed postpetition obligation which was paid or is payable by the Debtor in the ordinary course of business, including obligations to Insiders as set forth in the monthly budgets attached to the Debtor's monthly operating reports or in the Agreed Budget; provided, however, that in no event shall a postpetition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; and (b) no application seeking payment of an Administrative Claim need be Filed with respect to Cure owing under an Executory Contract or Unexpired Lease if the amount of Cure is fixed or proposed to be fixed by order of the Bankruptcy Court pursuant to a motion to assume and fix the amount of Cure Filed by the Debtor and a timely objection asserting an increased amount of Cure Filed by the non-Debtor party to the subject contract or lease; provided further, however, that postpetition statutory tax claims shall not be subject to the Administrative Claims Bar Date.

With respect to Administrative Claims, the last day for Filing an objection to any Administrative Expense Claim will be the later of (a) 180 days after the Effective Date, (b) 90 days after the filing of such Administrative Claim or (c) such other date specified in the Plan or ordered by the Bankruptcy Court.

### 18. *Professional Fee Claims*

All final requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code must be made by application Filed with the Bankruptcy Court and served on the Reorganized Debtor, their counsel, counsel to the Committee, and other necessary parties-in-interest **no later than sixty (60) days after the Effective Date**, unless otherwise ordered by the Bankruptcy Court.  Objections to such applications must be Filed and served on the Reorganized Debtor, its counsel, counsel to the Committee and the requesting Professional or other Entity on or before the date that is thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application was served.

The Reorganized Debtor may, without application to or approval by the Bankruptcy Court, retain professionals and pay reasonable professional fees and expenses in connection with services rendered to it after the Effective Date.

## G.     Disposition of Executory Contracts and Unexpired Leases

### 1.     *Executory Contracts and Unexpired Leases Deemed Assumed*

The Plan Supplement shall set forth a Schedule of Unexpired Executory Contracts and Unexpired Leases To Be Assumed as of the Effective Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or assumption and assignment, of such contracts as contemplated herein pursuant to section 365 of the Bankruptcy Code.

Notwithstanding anything to the contrary in the Plan, the Debtor and the Reorganized Debtor reserve the right to assert that any license, franchise and partially performed contract is a property right and not an Executory Contract.  Contracts or leases entered into after the Petition Date will be performed by the Reorganized Debtor in the ordinary course of business.

Notwithstanding anything to the contrary in any contract, agreement or lease to which the Reorganized Debtor is a party, (a) the transactions contemplated by the Plan and (b) the consequences of the Plan's implementation shall not trigger any change of control or similar provisions and shall not be voided by any restraints against assignment in any contract, agreement or lease governed by the Plan.

### 2.     *Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into by the Debtor in connection with the Plan, as of the Effective Date, the Debtor shall be deemed to have rejected each prepetition written Executory Contract and Unexpired Lease to which it is a party unless such Executory Contract or Unexpired Lease (a) is expressly assumed or rejected pursuant to a Final Order prior to the Confirmation Date, (b) previously expired or terminated pursuant to its own terms, (c) is

listed on the Schedule of Unexpired Executory Contracts and Unexpired Leases To Be Assumed filed with the Plan Supplement, (d) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition Filed by the Debtor on or before ten (10) days prior to the Confirmation Date.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejection of executory contracts as contemplated herein pursuant to section 365 of the Bankruptcy Code.

### 3.	*Assignment of Executory Contracts and Unexpired Leases*

To the extent provided under the Bankruptcy Code or other applicable law, any Executory Contract or Unexpired Lease transferred and assigned pursuant to the Plan shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such Executory Contract or Unexpired Lease (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts or conditions such transfer or assignment. To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts or conditions the assignment or transfer of any such Executory Contract or Unexpired Lease or that terminates or modifies such Executory Contract or Unexpired Lease or allows the counterparty to such Executory Contract or Unexpired Lease to terminate, modify, recapture, impose any penalty, condition renewal or extension or modify any term or condition upon any such transfer and assignment constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

### 4.	*Cure Rights for Executory Contracts and Unexpired Lease Assumed Under the Plan*

Any monetary amounts by which each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order by the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, that the Debtor or Reorganized Debtor, as applicable, shall be authorized to reject any Executory Contract or Unexpired Lease to the extent the Debtor or Reorganized Debtor, in the exercise of its sound business judgment, concludes that the amount of the Cure obligation as determined by such Final Order, renders assumption of such Executory Contract or Unexpired Lease unfavorable to the Debtor or Reorganized Debtor. Cure amounts are listed in the Plan Supplement, which shall be Filed at least ten (10) days prior to the Confirmation Hearing as part of the Plan Supplement. If no Cure amount for an assumed Executory Contract or Unexpired Lease is listed in the Plan Supplement, the Cure amount shall be deemed to be $0.

### 5.    *Rejection Damages Bar Date for Rejections Pursuant to the Plan*

If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtor, its Estate, the Reorganized Debtor or any of its properties unless a Proof of Claim is Filed with the claims agent and served upon counsel to the Reorganized Debtor within thirty (30) days after entry of the Confirmation Order.  The foregoing applies only to Claims arising from the rejection of an Executory Contract or Unexpired Lease; any other Claims held by a party to a rejected contract or lease shall have been evidenced by a Proof of Claim Filed by earlier applicable Bar Dates or shall be barred and unenforceable.  Notwithstanding the foregoing, any management agreement between the Debtor and CaucusCom or any Insider of the Debtor shall be deemed rejected as of the Effective Date and no rejection claim shall be allowed on account of such rejection.  Any management fees after the Effective Date shall be payable only as permitted in the Agreed Budget.

### 6.    *Indemnification Obligations*

Indemnification Obligations owed to directors, officers, and employees of the Debtor (or the Estate) who served or were employed by the Debtor as of and after the Petition Date, shall be deemed to be, and shall be treated as though they are, Executory Contracts that are assumed pursuant to section 365 of the Bankruptcy Code and Section 6.01 of the Plan.  Notwithstanding the foregoing, the Reorganized Debtor shall not assume any claim for liability, reimbursement obligations, contributions or indemnity concerning the contractual obligations of directors or officers of the Debtor, including, without limitation, the contractual guaranties

All Indemnification Obligations owed to directors, officers, and employees of the Debtor who served or were employed by the Debtor on or prior to, but not after, the Petition Date shall be deemed to be, and shall be treated as though they are, Executory Contracts that are rejected pursuant to section 365 of the Bankruptcy Code under the Plan.

Indemnification Obligations owed to any Professionals retained pursuant to sections 327 or 328 of the Bankruptcy Code and order of the Bankruptcy Court, to the extent that such Indemnification Obligations relate to the period after the Petition Date, excluding claims resulting from gross negligence, willful misconduct, breach of fiduciary duty, self-interested transactions or intentional tort, shall be deemed to be, and shall be treated as though they are, Executory Contracts that are assumed pursuant to section 365 of the Bankruptcy Code and Section 6.01 of the Plan.

### 7.    *Continuing Obligations Owed to Debtor*

Any confidentiality agreement entered into between the Debtor and any other Person requiring the parties to maintain the confidentiality of each other's proprietary information shall be deemed to be, and shall be treated as though it is, an Executory Contract that is assumed and assigned pursuant to section 365 of the Bankruptcy Code and Section 6.01 of the Plan, except as otherwise provided in the Plan.

Any indemnity agreement entered into between the Debtor and any other Person requiring the supplier to provide insurance in favor of the Debtor, to warrant or guarantee such supplier's goods or services, or to indemnify the Debtor for claims arising from the goods or services shall be deemed to be, and shall be treated as though it is, an Executory Contract that is assumed and assigned pursuant to section 365 of the Bankruptcy Code and Section 6.01 of the Plan; provided, however, that if any party thereto asserts any Cure, at the election of the Debtor such agreement shall not be deemed assumed, and shall instead be rejected pursuant to section 365 of the Bankruptcy Code under the Plan.

Continuing obligations of third parties to the Debtor under insurance policies, contracts, or leases that have otherwise ceased to be executory or have otherwise expired on or prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, to provide indemnification, contribution or reimbursement, to grant rights of first refusal, to maintain confidentiality, or to honor releases, shall continue and shall be binding on such third parties notwithstanding any provision to the contrary in the Plan, unless otherwise specifically terminated by the Debtor or by order of Bankruptcy Court.

To the extent any insurance policy under which the insurer has a continuing obligation to pay the Debtor or a third party on behalf of the Debtor is held by the Bankruptcy Court to be an Executory Contract, such insurance policy shall be treated as though it is an Executory Contract that is assumed pursuant to section 365 of the Bankruptcy Code and Section 6.01 of the Plan. To the extent permitted in the Agreed Budget, any and all Claims (including Cure) arising under or related to any insurance policies or related insurance agreements that are assumed by the Debtor prior to or as of the Effective Date: (i) shall not be discharged; (ii) shall be Allowed Administrative Claims; and (iii) shall be paid in full in the ordinary course of business of the Reorganized Debtor as set forth in Section 3.01(a) of the Plan.

### 8. *Limited Extension of Time to Assume or Reject*

In the event of a dispute as to whether a contract or lease between the Debtor and a Person that is not an Insider is executory or unexpired, the right of the Debtor or the Reorganized Debtor to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract or lease is executory or unexpired, provided such dispute is pending as of the Confirmation Date.

### 9. *Postpetition Contracts and Leases*

The Debtor shall not be required to assume or reject any contract or lease entered into by the Debtor after the Petition Date. Any such contract or lease shall continue in effect in accordance with its terms after the Effective Date, unless the Reorganized Debtor has obtained a Final Order of the Bankruptcy Court approving termination of such contract or lease. Contracts or leases entered into after the Petition Date will be performed by the Reorganized Debtor in the ordinary course of its business.

**10.**    *Treatment of Claims Arising From Assumption or Rejection*

All Allowed Claims for Cure arising from the assumption of any Executory Contract or Unexpired Lease shall be treated as Administrative Claims pursuant to Section 2.02 of the Plan; all Allowed Claims arising from the rejection of an Executory Contract or Unexpired Lease shall be treated, to the extent applicable, as General Unsecured Claims, unless otherwise ordered by Final Order of the Bankruptcy Court; and all other Allowed Claims relating to an Executory Contract or Unexpired Lease shall have such status as they may be entitled to under the Bankruptcy Code as determined by Final Order of the Bankruptcy Court.

**H.**    **Revesting of Assets; Preservation of Causes of Action, Litigation Rights and Avoidance Actions; Release of Liens; Resulting Claim Treatment**

Except as otherwise provided in the Plan, or in the Confirmation Order, and pursuant to section 1123(b)(3) and section 1141(b) and (c) of the Bankruptcy Code, on the Effective Date, all of the property and assets of the Debtor and all Causes of Action and Litigation Rights, including the Avoidance Actions and the Malpractice Action, shall automatically revest in the Reorganized Debtor, free and clear of all Claims, Liens and Interests, <u>except for the Class 5 Trust Assets which shall automatically vest in the Class 5 Trust on the Effective Date</u>. The Reorganized Debtor (directly or through the Disbursing Agent) shall make all Distributions under the Plan. Thereafter, each Reorganized Debtor may operate its business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all such property of each Reorganized Debtor shall be free and clear of all Claims, Liens and Interests, except as specifically provided in the Plan or the Confirmation Order and the Reorganized Debtor shall receive the benefit of any and all discharges under the Plan. For the avoidance of doubt, the foregoing is subject and without prejudice to the Claims, Causes of Action, Litigation Rights, property and assets vested in the Class 5 Trust pursuant to the Plan.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code and to the fullest extent possible under applicable law, on the Effective Date, the Reorganized Debtor shall retain and may enforce, and shall have the sole right to enforce or prosecute, any claims, demands, rights, and Causes of Action that the Debtor may hold against any Entity, including, without limitation, all Avoidance Actions and the Malpractice Action, except with respect to the Class 5 Trust Assets (including the Change of Control Litigation). The Reorganized Debtor or its successor may pursue such retained claims, demands, rights or Causes of Action or Litigation Rights, including, without limitation, Avoidance Actions or the Malpractice Action, as appropriate, in accordance with the best interests of the Reorganized Debtor or its successor holding such claims, demands, rights, Causes of Action or Litigation Rights. For the avoidance of doubt, the foregoing is subject and without prejudice to the rights of the Class 5 Trustee in the Class 5 Trust Assets.

If, as a result of the pursuit of any Litigation Rights or Avoidance Actions, a Claim would arise from a recovery pursuant to section 550 of the Bankruptcy Code after Distributions under the Plan have commenced, making it impracticable to treat the Claim in

accordance with the applicable provisions of Article VII of the Plan, the Reorganized Debtor shall be permitted to reduce the recovery by an amount that reflects the value of the treatment that would have been accorded to the Claim under the Plan, thereby effectively treating the Claim through the reduction, provided however that this provision shall not apply to the Holders of Allowed Appraisal Claims or Allowed Non-Appraisal Claims.

## I. Restructuring Transactions

On, as of, or after the Effective Date, the Reorganized Debtor may enter into such transactions and may take such actions as may be necessary or appropriate, in accordance with any applicable state law, to effect a corporate or operational restructuring of its business, to otherwise simplify the overall corporate or operational structure of the Reorganized Debtor, to achieve corporate or operational efficiencies, or to otherwise improve financial results; provided that such transactions or actions are not otherwise inconsistent with the Plan, the Distributions to be made under the Plan, the New Corporate Governance Documents, the New MIG Notes or the New MIG Notes Indenture.

Specifically, on the Effective Date, the Debtor shall execute such documents and make such filings, as necessary under applicable law, to effectuate the following transactions:

- The Reorganized Debtor will convert from a Delaware corporation to a Delaware limited liability company to be known as "MIG LLC" by the filing of a Certificate of Conversion and a Certificate of Formation with the Secretary of State of the State of Delaware.

- The Reorganized Debtor will issue and deliver the: (a) New MIG Notes; (b) New Warrants; (c) New MIG Indenture; (d) the Class 5 Trust Agreement; and (e) the New Common LLC Interests, in accordance with Sections 3.03(c) and 3.03(d) of the Plan.

- The Debtor, prior to the Effective Date, shall cause the dissolution of MIG International Telecommunications, Inc. and MIG Georgia Holdings, Inc. such that the Reorganized Debtor will directly own 100% of the Interests in ITC. Thereafter, the Debtor shall exercise good faith best efforts to seek to dissolve Telcell Wireless LLC.

- Certain entities owned by the Debtor (i) may be merged with and into the Reorganized Debtor or (ii) may be dissolved.

## J. Authorization and Issuance of New Common LLC Interests, New MIG Notes and New Warrants

On the Effective Date, the Reorganized Debtor shall be authorized to issue, execute, deliver and perform under: (i) the New Common LLC Interests; (ii) the New MIG Notes; (iii) the New Warrants; (iv) the Class 5 Trust Agreement and the Beneficial Interests in the Class 5 Trust; (v) the New MIG Notes Indenture; (vi) the Collateral Documents; (vii) all

- 58 -

documents evidencing a security interest in the Class 5 Collateral in favor of the holders of the New MIG Notes; and (vi) any documents incidental thereto as necessary to implement the terms of the Plan.

The issuance of the New Common LLC Interests, New MIG Notes and New Warrants and all other instruments, certificates and other documents required to be issued or distributed pursuant to the Plan shall be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action, except as may be required by the New Corporate Governance Documents, or applicable law, regulation, order or rule; and all documents evidencing same shall be executed and delivered as provided for in the Plan or the Plan Supplement.

With respect to the ITC Pledge: (i) ITC shall be a co-obligor of the New MIG Notes as provided in the New MIG Notes Indenture; (ii) the ITC Pledge shall secure solely ITC's obligations to the holders of the New MIG Notes pursuant to the New MIG Notes Indenture and the New MIG Notes; (iii) ITC's Interests in ITCL shall be pledged to the Collateral Agent for the benefit of the holders of New MIG Notes and such holders shall be deemed to be "banks, financial institutions or institutional investors" within the meaning of Section 4.1(c) of the ITCL LLC Agreement; and (iv) the holders of the New MIG Notes and Collateral Agent, as applicable, may acquire only a security interest in the Equity Securities (as defined in the ITCL LLC Agreement) owned by ITC in ITCL entitling them to the proceeds from any sale of such Equity Securities pursuant to a sale conducted in compliance with the terms of the ITCL LLC Agreement and not title to such Equity Securities or any other rights incidental thereto. The foregoing shall be deemed to comply with the requirements of section 4.1(c) of the ITCL LLC Agreement.

## K.  Post-Confirmation Corporate Structure, Management and Operation

### 1.  *Continued Corporate Existence*

The Plan provides that, on the Effective Date, the Reorganized Debtor shall convert from a corporation to a limited liability company. After the Effective Date, the Reorganized Debtor may operate its business and use, acquire, dispose of property and settle and compromise claims or interests without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules subject to the terms of the Plan and the Plan Supplement and all documents and exhibits thereto implementing the provisions of the Plan.

### 2.  *Corporate Governance*

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, on the Effective Date, the New Board will be constituted in the manner set forth in Section 5.05 below and the managers and officers of the Reorganized Debtor will be as set forth in Section 5.06 below. Each such manager and officer will serve from and after the Effective Date in accordance with the terms of the Operating Agreement and/or other governance policies of the Reorganized Debtor, as the same may be amended from time to time, pursuant to applicable state law.

The New Corporate Governance Documents will be deemed to satisfy the provisions of the Plan and the Bankruptcy Code and will include, among other things, (a) pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code and (b) manager liability exculpation, indemnity and advancement provisions to the fullest extent permitted by Delaware law.  After the Effective Date, the Reorganized Debtor may amend and restate the New Corporate Governance Documents and any other certificates or articles of incorporation, by-laws, limited liability company agreements, certificates of formation, partnership agreements and certificates of partnership, as applicable, as permitted by applicable law.

### 3.  *New Management Incentive Plan*

To the extent authorized in the Agreed Budget and subject to approval of the Class 5 Directors, for so long as the New MIG Notes remain outstanding, on or after the Effective Date, the New Board shall develop, approve and implement the terms and the conditions of the Management Incentive Plan (including the identity of the participants); provided, however, any Management Incentive Plan that does not contemplate any payment until after the payment in full of the New MIG Notes may be adopted without the consent of either the Committee or the Class 5 Directors.  On and after the Effective Date, eligible persons who receive awards under such Management Incentive Plan shall be entitled to the benefits thereof on the terms and conditions provided for therein.  As of the Effective Date, all equity-based awards granted by the Debtor prior to the Petition Date shall terminate and cease to be binding on the Debtor.

### 4.  *New Board of Managers of the Reorganized Debtor*

Pursuant to the Operating Agreement, the New Board shall initially consist of six (6) members on the Effective Date as follows: (a) four (4) of the members of the New Board shall be designated by the Debtor and (b) two (2) of the members of the New Board shall be designated by the Committee as the Class 5 Directors and acceptable to the Debtor.  The identity of all members of the New Board shall be set forth in the Plan Supplement.  The initial members of the New Board shall serve from the Effective Date and thereafter in accordance with the New Corporate Governance Documents.

### 5.  *Officers of Reorganized Debtor*

The initial officers of the Reorganized Debtor shall be set forth in the Plan Supplement.

### 6.  *Exemption from Certain Transfer Taxes*

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer from the Debtor to the Reorganized Debtor or any other Person or Entity pursuant to the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax,

- 60 -

stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment and State or local governmental officials or agents are directed to forego the collection of any such tax or governmental assessment and to accept for Filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 7. *Corporate Action*

On the Effective Date, the adoption and/or filing of the New Corporate Governance Documents, as applicable, the appointment of managers and/or officers of the Reorganized Debtor, and all actions contemplated thereby shall be authorized and approved in all respects pursuant to the Plan. All matters provided for herein involving the corporate structure of the Debtor or Reorganized Debtor, and any corporate action required by the Debtor or Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors, stockholders, members or managers of the Debtor or Reorganized Debtor, except that the Debtor shall take affirmative steps to file the documents necessary to implement the Restructuring Transactions set forth in Section 5.12 (b) of the Plan. On the Effective Date, and pursuant to Section 303 of the General Corporation Law of the State of Delaware, the appropriate officers or managers of the Reorganized Debtor are authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtor without the need for any required approvals, authorizations, or consents, except for any express consents required under the Plan.

### 8. *Effectuating Documents; Further Transactions*

The Chief Executive Officer, the Chief Financial Officer, or any other appropriate officer of the Reorganized Debtor, as the case may be, will be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Secretary or Assistant Secretary of the Reorganized Debtor, as the case may be, will be authorized to certify or attest to any of the foregoing actions.

### 9. *Cancellation of Common Equity Interests and Agreements*

Except as otherwise provided for in the Plan, or in any contract, instrument or other agreement or document created in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article III of the Plan, the Common Equity Interests, the Preferred Equity Interests and any other promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims or Interests in the Debtor, other than a Claim that is being Reinstated and rendered Unimpaired, and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such Interests in the Debtor shall be deemed canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the Debtor under the notes, share certificates and other agreements and instruments governing such Claims and

Interests in the Debtor shall be discharged subject to the provisions of the Plan. The Holders of or parties to such canceled notes, shares, share certificates and other agreements and instruments shall have no rights arising from or relating to such notes, shares, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.

**L.** **Settlement, Releases, Discharge, Injunctions, Exculpation and Indemnification**

**1.** *Debtor Parent, Debtor Parent Affiliates and Releasee Obligations Under the Plan*

Pursuant to Section 5.10 of the Plan, in consideration of the direct and indirect economic benefits under the Plan, as a condition precedent to the effectiveness of the Releases set forth in Section 11.10 of the Plan, for so long as any amounts remain due and outstanding under the New MIG Notes, Debtor Parent, the Debtor Parent Affiliates and other Releasees shall: (i) agree to be bound by and comply with the terms of the Plan, including without limitation Section 11.12 of the Plan; and (ii) not take any action directly or indirectly that would have the effect of triggering an ITC Cellular Change of Control, as defined in the ITCL LLC Agreement.

As a condition precedent to the Releases set forth in Section 11.10 of the Plan, each of the Debtor Parent, Debtor Parent Affiliates and Releasees under Section 11.10 of the Plan shall deliver duly executed (i) Acknowledgement Agreements, in form acceptable to the Committee evidencing their consent and agreement to Section 5.10 of the Plan; and (ii) executed Collateral Documents to the extent the Committee determines such entities are required parties to the Collateral Documents in the Plan Supplement or other documents necessary to implement the Plan (e.g., CaucusCom as to the Stock Pledge Agreement and Stock Escrow Agreement related to the granting of a security interest to the holders of New MIG Notes in the Interests in the Reorganized Debtor).

**2.** *Releases by Debtor in Favor of Third Parties*

**As of the Effective Date, for good and valuable consideration, the adequacy of which will be deemed sufficient as of Confirmation of the Plan, the Debtor, the Reorganized Debtor and any Person or Entity seeking to exercise the rights of the Debtor's estate, including, without limitation, any successor to the Debtor or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to forever release, waive, and discharge each of the Exculpated Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Avoidance Actions), and liabilities whatsoever in connection with or related to the Debtor, the conduct of the Debtor's business, the Chapter 11 Case, or the Plan (other than the rights of the Debtor, the Reorganized Debtor, the Indenture Trustee, the Class 5 Trustee or a Creditor holding an Allowed Claim to enforce the obligations under the Confirmation Order and the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or**

- 62 -

unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the conduct of the Debtor's business, the Reorganized Debtor, the Chapter 11 Case, this Disclosure Statement or the Plan, and that may be asserted by or on behalf of the Debtor, the Estate, or the Reorganized Debtor against any of the shareholders, directors, officers, employees or advisors of the Debtor as of the Petition Date and through the Effective Date, excluding claims resulting from gross negligence, willful misconduct, breach of fiduciary duty, self-interested transactions or intentional tort, any Professionals of the Debtor, and (iii) the Committee, its members, and its advisors, respectively (but not its members in their individual capacities); <u>provided</u>, <u>however</u>, that nothing in Section 11.10(a) of the Plan:

      a.      shall be deemed to prohibit the Reorganized Debtor from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any employee (including directors and officers) for alleged breach of confidentiality, or any other contractual obligations owed to the Debtor or the Reorganized Debtor, including non-compete and related agreements or obligations;

      b.      constitutes a waiver of any right of the Reorganized Debtor to: (x) enforce all rights and claims concerning any and all intellectual property (including, without limitation, trademarks, copyrights, patents, customer lists, trade secrets and confidential or proprietary business information), all of which rights are expressly reserved and not released and (y) assert any defense based on whether or not applicable standards have been met;

      c.      shall be deemed to prohibit any party from asserting or enforcing any direct contractual obligation against any Releasee, with all rights and defenses to such claims being reserved by the Releasees; or

      d.      shall constitute a release of any rights, Claims, Intercompany Claims or Causes of Action related to or arising from the validity or enforceability of the Change of Control Provisions in the ITCL LLC Agreement and PSA.

THE FOREGOING RELEASE IN FAVOR OF ANY RELEASEE IS CONDITIONED UPON AND IN CONSIDERATION OF SUCH ENTITIES' WRITTEN AGREEMENT TO BE BOUND TO THE TERMS OF THE PLAN, INCLUDING WITHOUT LIMITATION THEIR AGREEMENT TO COMPLY WITH THE PROVISIONS OF SECTIONS 5.10 AND 11.12 OF THE PLAN AND TO SUBJECT THEMSELVES TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR PURPOSES OF ENFORCEMENT OF THE TERMS OF THE PLAN, AS SET FORTH IN THE ACKNOWLEDGEMENT AND AGREEMENT OF RELEASEES TO BE DELIVERED AS PART OF THE PLAN SUPPLEMENT. For the avoidance of doubt, nothing herein constitutes or shall constitute a waiver, release, discharge or compromise by the Debtor, its Estate or the Reorganized Debtor with respect to the Malpractice Action.

The releases being provided by the Debtor relate to Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Claims or Causes of Action arising under Chapter 5 of the Bankruptcy Code), and liabilities held by the Debtor or that may be asserted on behalf of the Debtor (the "Debtor Claims"). The Debtor does not believe that there are any valid Debtor Claims against any of their present or former directors, officers, and employees, any of its Professionals, or the Committee and its advisors. Moreover, any action brought to enforce a potential Debtor Claim would involve significant costs to the Debtor, including legal expenses and the distraction of the Debtor's key personnel from the demands of the Debtor's ongoing businesses. In light of these considerations, and given the contributions made by the recipients of the releases to the Debtor's businesses and reorganization efforts, the releases of the Debtor Claims are appropriate and in the best interests of the Debtor's Estate.

### 3.   *Releases by Creditors of Claims Against Third Parties*

**As of the Effective Date and to the extent permitted under Delaware law, Holders of Claims and Interests shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Debtor, Debtor Parent, the Debtor Parent Affiliates, the Reorganized Debtor, and the directors, officers, employees or advisors of the Debtor as of the Petition Date and through the Effective Date (the "Releasees") from any and all Claims (including Intercompany Claims and the Alleged Fraudulent Transfer Claims), Interests, Causes of Action or Avoidance Actions that such Entity would have been legally entitled to assert (whether individually or collectively or directly, indirectly or derivatively, at law, in equity or otherwise), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's restructuring, the conduct of the Debtor's business, the Chapter 11 Case, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Releasee and the Debtor, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of the Debtor, the Reorganized Debtor, or a Releasee that constitutes a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the Debtor, the Reorganized Debtor, or the Releasee reasonably believed to be in the best interests of the Debtor (to the extent such duty is imposed by applicable non-bankruptcy law) where such failure to perform constitutes willful misconduct or gross negligence AND other than the rights of the Debtor, the Reorganized Debtor, the Indenture Trustee, the Class 5 Trustee or a Creditor holding an Allowed Claim to enforce the obligations under the Confirmation Order and the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder); provided, however, that nothing in Section 11.10(b) of the Plan:**

> **a.   shall be deemed to prohibit any party from asserting or enforcing any direct contractual obligation against any Releasee, with all rights and defenses to such claims being reserved by the Releasees; or**

- 64 -

**b.**      shall constitute a release of any rights, Claims, Intercompany Claims or Causes of Action related to or arising from the validity or enforceability of the Change of Control Provisions in the ITCL LLC Agreement and PSA.

**THE FOREGOING RELEASE IN FAVOR OF ANY RELEASEE IS CONDITIONED UPON AND IN CONSIDERATION OF SUCH ENTITIES' WRITTEN AGREEMENT TO BE BOUND TO THE TERMS OF THE PLAN, INCLUDING WITHOUT LIMITATION THEIR AGREEMENT TO COMPLY WITH THE PROVISIONS OF SECTIONS 5.10 AND 11.12 OF THE PLAN AND TO SUBJECT THEMSELVES TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR PURPOSES OF ENFORCEMENT OF THE TERMS OF THE PLAN, AS SET FORTH IN THE ACKNOWLEDGEMENT AND AGREEMENT OF RELEASEES TO BE DELIVERED AS PART OF THE PLAN SUPPLEMENT.**

The Plan Proponents believe that releases by and among the Claim Holders who <u>receive</u> Distributions pursuant to the Plan and the Releasees meet the standards of fairness and necessity to the Debtor's reorganization required to justify Court approval of non-consensual releases.  The Holders of Allowed Claims who will receive Distributions pursuant to the Plan are receiving material, specific and identifiable consideration for such releases consisting of: (a) the services and contributions of the Releasees to the Debtor's business and reorganization, (b) the releases granted by the Releasees to the Claim Holders, and (c) the Acknowledgement Agreements executed by such Releasees.

### 4.      *Discharge and Discharge Injunction*

Confirmation of the Plan effects a discharge of all Claims against the Debtor.  As set forth in the Plan, pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise provided in the Plan or in the Confirmation Order all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release, effective as of the Effective Date, of all Claims, Interests and Causes of Action of any nature whatsoever, including any interest accrued on such Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtor or any of its assets or properties and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (A) a Proof of Claim based upon such debt is Filed or deemed Filed under section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (C) a Claim based upon such debt is or has been Disallowed by order of the Bankruptcy Court, or (D) the Holder of a Claim based upon such debt accepted the Plan.  The Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders votes to accept or reject the Plan.

As of the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order, all Persons shall be precluded from asserting against the Debtor or the Reorganized Debtor or any of their assets or properties, any other or further Claims, debts, rights,

Causes of Action, claims for relief, liabilities, or equity Interests relating to the Debtor based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination, as of the Effective Date, of discharge of all such Claims and other debts and liabilities against the Debtor and termination of all Preferred Equity Interests and Common Equity Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

In furtherance of the discharge of Claims and the termination of Interests, the Plan provides that, except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged pursuant to Section 11.11 of the Plan, released pursuant to Section 11.10 of the Plan, or is subject to exculpation pursuant to Section 11.13 of the Plan are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, and their respective affiliates or their property on account of any such discharged Claims, debts, or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtor, the Reorganized Debtor or its property; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a right of setoff, recoupment or subrogation of any kind against any debt, liability, or obligation due to the Debtor or the Reorganized Debtor; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

Moreover, the Plan provides that, without limiting the effect of the provisions of Section 11.12 of the Plan upon any Person, by accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim receiving Distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in Section 11.12 of the Plan.

The Plan further provides that nothing in Section 11.12 of the Plan will impair (i) the rights of any Holder of a Disputed Claim to establish its Claim in response to an objection Filed by the Debtor or the Reorganized Debtor, (ii) the rights of any defendant in an Avoidance Action Filed by the Debtor to assert defenses in such action, or (iii) the rights of any party to an Executory Contract or Unexpired Lease that has been assumed by the Debtor pursuant to an order of the Bankruptcy Court or the provisions of the Plan to enforce such assumed contract or lease.

### 5. *Exculpation Relating to the Chapter 11 Case*

**The Plan contains standard exculpation provisions applicable to the key parties in interest with respect to their conduct in the Chapter 11 Case. Specifically, the Plan provides that on the Effective Date, the Exculpated Parties shall neither have, nor incur any liability to any Holder of a Claim or an Interest, the Debtor, the Reorganized Debtor, or any other party-in-interest, or any of their respective agents, employees,**

- 66 -

representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any prepetition or postpetition act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that are the result of fraud, gross negligence, or willful misconduct; provided, however, that the foregoing is not intended to limit or otherwise impact any defense of qualified immunity that may be available under applicable law; provided further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; provided still further, that the foregoing Exculpation shall not be deemed to, release, affect, or limit any of the rights and obligations of the Exculpated Parties from, or exculpate the Exculpated Parties with respect to, any of the Exculpated Parties' obligations or covenants arising pursuant to the Plan or the Confirmation Order.

Moreover, the Plan provides that no Holder of a Claim or an Interest, the Debtor, the Reorganized Debtor, the Committee, no other party-in-interest, none of their respective agents, employees, representatives, advisors, attorneys, or affiliates, and none of their respective successors or assigns shall have any right of action against any of the Exculpated Parties for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct.

The Plan Proponents submit that the exculpations contained in the Plan are appropriate and are standard in a Chapter 11 Case. The exculpations are appropriately limited in scope, apply only to acts and omissions occurring after the Petition Date and in connection with the Chapter 11 Case or the Plan and confer only a qualified immunity by excluding acts or omissions which are the result of fraud, gross negligence or willful misconduct. The beneficiaries of the exculpations have made significant contributions to the Debtor's reorganization, which contributions have allowed for the formulation of the Plan which resolves many complicated issues between the Debtor and other interested parties, in the opinion of the Plan Proponents, provides for the best possible recoveries for Claims against the Debtor. In the Debtor's view, the beneficiaries of the exculpations would not have contributed as they did without the prospect of the limited immunity reflected in the exculpations. The Debtor is also unaware of any valid Causes of Action against any of the beneficiaries of the exculpations. In view of the foregoing, the exculpations are appropriate and in the best interests of the Debtor's Estate.

### 6. *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the

Bankruptcy Code or otherwise, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

### 7. *Post-Effective Date Indemnification*

Upon the Effective Date, the New Corporate Governance Documents of the Reorganized Debtor, shall contain provisions which (i) indemnify the Debtor's and the Reorganized Debtor's then present and future managers, directors and officers for post-emergence monetary damages resulting from breaches of their fiduciary duties on or after the Effective Date to the fullest extent permitted by applicable state law; and (ii) require such Reorganized Debtor, subject to appropriate procedures, to indemnify and advance expenses to the Debtor's and the Reorganized Debtor's managers, directors, officers, and other key employees (as such key employees are identified by the Chief Executive Officer of the Reorganized Debtor and the New Board) serving on or after the Effective Date for all claims and actions relating to postpetition service to the fullest extent permitted by applicable state law.

All indemnification provisions currently in place (whether in the by-laws, certificates of incorporation, or advancement, board resolutions, agreements or employment contracts) for the directors of the Debtor who were in place as of the Petition Date and current officers, employees, attorneys, other professionals and agents of the Debtor shall be assumed through the Effective Date, subject to replacement by the foregoing provisions in section 5.06(b) of the Plan for the period on and after the Effective Date. All indemnification or advancement provisions in place on and prior to the Effective Date for current directors and officers of the Debtor and its subsidiaries and such current and former directors' and officers' respective Affiliates shall survive the Effective Date for Claims related to or in connection with any actions, omissions or transactions occurring prior to the Effective Date.

It is the intention of the Debtor that upon and after the Effective Date, and for six (6) years thereafter, the Debtor or Reorganized Debtor, as the case may be, shall obtain and maintain reasonably sufficient tail coverage under a director and officer liability insurance policy for the current and former directors and officers. As of the Effective Date, the Debtor shall assume all obligations owing under the director and officer insurance policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption of each of the director and officer liability insurance policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity or advancement obligations assumed by the foregoing assumption of the director and officer liability insurance policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be Filed.

### 8. *Compromise and Settlement Under the Plan*

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, THE ALLOWANCE, CLASSIFICATION AND TREATMENT OF ALL

ALLOWED CLAIMS AND ALLOWED INTERESTS AND THEIR RESPECTIVE DISTRIBUTIONS AND TREATMENTS HEREUNDER TAKE INTO ACCOUNT FOR AND CONFORM TO THE RELATIVE PRIORITY AND RIGHTS OF THE CLAIMS AND INTERESTS IN EACH CLASS IN CONNECTION WITH ANY CONTRACTUAL, LEGAL AND EQUITABLE SUBORDINATION RIGHTS RELATING THERETO. AS OF THE EFFECTIVE DATE, ANY AND ALL SUCH RIGHTS DESCRIBED IN THE PRECEDING SENTENCE ARE SETTLED, COMPROMISED AND RELEASED PURSUANT THE PLAN. THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING AND DETERMINATION THAT THE SETTLEMENTS REFLECTED IN THE PLAN, INCLUDING ALL ISSUES PERTAINING TO THE STANDING MOTION, ARE (1) IN THE BEST INTERESTS OF THE DEBTOR AND THEIR ESTATE, (2) FAIR, EQUITABLE AND REASONABLE, (3) MADE IN GOOD FAITH AND (4) APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019. IN ADDITION, THE ALLOWANCE, CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS TAKE INTO ACCOUNT ANY CAUSES OF ACTION, CLAIMS OR COUNTERCLAIMS, WHETHER UNDER THE BANKRUPTCY CODE OR OTHERWISE UNDER APPLICABLE LAW, THAT MAY EXIST BETWEEN THE DEBTORS AND THE RELEASING PARTIES; AND AS BETWEEN THE RELEASING PARTIES AND THE RELEASEES. AS OF THE EFFECTIVE DATE, ANY AND ALL SUCH CAUSES OF ACTION, CLAIMS AND COUNTERCLAIMS ARE SETTLED, COMPROMISED AND RELEASED PURSUANT THE PLAN.

### M. Causes of Action and Avoidance Actions

Section 108(a) of the Bankruptcy Code provides that if a statute of limitations under nonbankruptcy law has not expired prior to the filing of a bankruptcy petition, then a debtor may bring a cause of action before the later of (a) the end of such limitations period, including any suspension of such period occurring on or after the commencement of the bankruptcy case and (b) two years after the petition date. As a result, the Debtor has at least two years from the Petition Date to commence various Causes of Action or Avoidance Actions.

#### 1. *Preservation of Malpractice Action*

Prior to the Petition Date, the Debtor also filed a civil action by its attorney Aaron Richard Golub for malpractice (the "Malpractice Action") against Paul, Weiss, Rifkind, Wharton & Garrison, LLP ("PW"), Civil Action No. 1:09-cv-05593 (GEL) in the United States District Court for the Southern District of New York (the "New York District Court"). MIG's claims arise out of PW's legal work for MIG in connection with a "Certificate of Designation of 7.25% Cumulative Convertible Preferred Stock of Metromedia International Group, Inc.," dated September 16, 1997, the interpretation and application of which was the basis of the Judgment entered by the Chancery Court in connection with the Appraisal Action. On March 29, 2010, the New York District Court dismissed the Malpractice Action on the grounds that all claims are either barred by the applicable statute of limitations or fail to state a claim upon which relief can be granted. The Debtor appealed such decision to the United States Court of Appeals for the Second Circuit (the "Second Circuit Court of Appeals"). In that regard, the Debtor filed and served its opening appellate brief on July 14, 2010. PW's opposition brief is due by November

- 69 -

5, 2010 and the Debtor's reply is due on November 19, 2010. The Second Circuit Court of Appeals will likely schedule oral argument within six (6) to twelve (12) weeks after the Debtor files its reply brief. Pursuant to Section 5.11 of the Plan, the Malpractice Action shall automatically revest in and be preserved for the Reorganized Debtor to pursue.

**N.    Retention of Jurisdiction**

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, this Chapter 11 Case and the Plan to the fullest extent permitted by law (provided, however, that notwithstanding the foregoing, with respect to all civil proceedings arising in or related to the Chapter 11 Case and the Plan, the Bankruptcy Court shall have original but not exclusive jurisdiction, in accordance with section 1334(b) of title 28 of the United States Code), including, among other things, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status of any Claim or Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the Holder), including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests in the Debtor;

- hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the Effective Date, the payment of the fees and expenses of the Professionals of the Reorganized Debtor shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

- hear and determine all matters with respect to the assumption or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

- effectuate performance of and payments under the provisions of the Plan and enforce remedies upon any default under the Plan;

- hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case, the Avoidance Actions, the Class 5 Trust Assets, the Change of Control Litigation, the Litigation Rights or the Plan,

including without limitation the enforcement of the injunction provisions contained in Section 11.12 of the Plan;

- enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, this Disclosure Statement or the Confirmation Order;

- hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

- consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

- issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

- enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

- hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the schedules to the Plan, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Plan Supplement, the schedules to the Plan, this Disclosure Statement, or the Confirmation Order;

- enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

- except as otherwise limited in the Plan, recover all assets of the Debtor and property of the Estate, wherever located;

- hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- 71 -

- hear and determine all disputes involving the existence, nature, or scope of the Debtor's discharge;

- hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, the provisions of the Bankruptcy Code; and

- enter a final decree closing the Chapter 11 Case.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, including the matters set forth in Section 10.01 of the Plan, the provisions of Article X of the Plan will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

### O.     Amendment, Alteration and Revocation of Plan

The Plan Proponents may by mutual agreement alter, amend, or modify the Plan or any exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. The Debtor shall provide parties-in-interest with notice of such amendments or modifications as may be required by the Bankruptcy Rules or order of the Bankruptcy Court. A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim or Interest of such Holder. In the event of any dispute as to whether such proposed alteration, amendment, modification, or clarification materially and adversely changes the treatment of the Claim or Interest of any such Holder, the Debtor shall bear the burden of demonstrating that such proposed alteration, amendment, modification, or clarification does not materially adversely change the treatment of the Claim or Interest of such Holder.

After the Confirmation Date and prior to substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of the Plan, the Debtor or Reorganized Debtor, as applicable, may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, this Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims or Interests in the Debtor under the Plan; provided, however, that, to the extent required, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court. A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim or Interest of such Holder. In the event of any dispute as to whether such proposed alteration, amendment, modification, or clarification materially and adversely changes the treatment of the Claim or Interest of any such Holder, the Debtor or Reorganized Debtor, as the

- 72 -

case may be, shall bear the burden of demonstrating that such proposed alteration, amendment, modification, or clarification does not materially adversely change the treatment of the Claim or Interest of such Holder.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

The Plan Proponents reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to File subsequent plans of reorganization. If the Plan Proponents revoke or withdraw the Plan prior to the Confirmation Date, or if Confirmation or the Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Interests in, the Debtor, or any Avoidance Actions, Litigation Rights or other claims by or against the Debtor, the Committee or any Person or Entity, (ii) prejudice in any manner the rights of the Debtor, the Committee, or any Person or Entity in any further proceedings involving the Debtor, or (iii) constitute an admission of any sort by the Debtor, the Committee, or any other Person or Entity.

## P.     Plan Supplement

The Plan Supplement shall be Filed with the Bankruptcy Court at least ten (10) days prior to the Confirmation Hearing or by such later date as may be established by order of the Bankruptcy Court, provided that all documents set forth in the Plan Supplement shall first have been approved by both the Debtor and the Committee. Upon such Filing, all documents set forth in the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal business hours. Holders of Claims or Interests may obtain a copy of any document set forth in the Plan Supplement upon written request to the Debtor in accordance with Section 11.22 of the Plan or by visiting the Voting Agent's website at http://migreorg.com.

## Q.     Confirmation and/or Consummation

Described below are certain important considerations under the Bankruptcy Code in connection with Confirmation of the Plan.

1.     ***Requirements for Confirmation of the Plan***

Before the Plan can be confirmed, the Bankruptcy Court must determine at the Confirmation Hearing that, among others, the following requirements for Confirmation, set forth in section 1129 of the Bankruptcy Code, have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtor or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before Confirmation of the Plan is reasonable, or if such payment is to be fixed after Confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtor has disclosed or will disclose in the Plan Supplement (a) the identity and affiliations of (i) any individual proposed to serve, after Confirmation of the Plan, as a manager, officer, or voting trustee of the Reorganized Debtor, (ii) any affiliate of the Debtor participating in a joint plan with the Debtor, or (iii) any successor to the Debtor under the Plan (and the appointment to, or continuance in, such office of such individual(s) is consistent with the interests of Claim and Interest Holders and with public policy), and (b) the identity of any insider that will be employed or retained by the Debtor and the nature of any compensation for such insider.

- With respect to each Class of Claims or Interests in the Debtor, each Impaired Claim and Impaired Interest Holder either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such Holder, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

- The Plan provides that Administrative Claims and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date, except to the extent that the Holder of any such Claim has agreed to another less favorable treatment.

- If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- The Plan provides for the continuation after the Effective Date of all retiree benefits, if any, at the level established pursuant to sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to Confirmation of the Plan, for the duration of the period the Debtor has obligated themselves to provide such benefits.

The Plan Proponents believe that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy the statutory requirements of chapter 11 of the Bankruptcy Code, that the Plan Proponents have complied or will have complied with all of the requirements of chapter 11, and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

## 2. *Conditions to Confirmation and Effective Date*

The Plan specifies conditions precedent to the Confirmation and the Effective Date.

The following conditions precedent to the occurrence of the Confirmation Date must be satisfied unless any such condition shall have been waived by the Plan Proponents:

a. The Confirmation Order shall have been entered in form and substance satisfactory to the Plan Proponents, and shall, among other things:

i. provide that the Debtor and the Reorganized Debtor are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the Settlement Agreement, Plan and all related contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan or necessary to implement the Plan;

ii. authorize the issuance of the New Common LLC Interests, the New MIG Notes, the New Warrants, the New MIG Notes Indenture, the Class 5 Trust Agreement and the Collateral Documents;

a. The Bankruptcy Court finds that adequate information and sufficient notice of this Disclosure Statement, the Settlement Agreement, the Plan and the Confirmation Hearing, along with all deadlines for voting on or objecting to the Plan have been given to all

- 75 -

relevant parties in accordance with the solicitation procedures governing such service and in substantial compliance with Bankruptcy Rules 2002(b), 3017, 9019, and 3020(b); and

b. The Plan and all Plan Supplement documents, including any exhibits, schedules, amendments, modifications or supplements thereto, are acceptable to the Plan Proponents.

The following conditions precedent to the occurrence of the Effective Date must be satisfied or waived by the Plan Proponents on or prior to the Effective Date in accordance with Section 9.04 of the Plan:

a. Each of the exhibits to the Plan and any other necessary documents shall be fully executed and delivered to the Plan Proponents, shall be in form and substance reasonably acceptable to the Plan Proponents, and shall be fully enforceable in accordance with their terms; and

b. All Non-Appraisal Claims have been Allowed or Disallowed, provided however, that this condition shall be met by the Debtor funding the Disputed Claim Amounts held by entities asserting Non-Appraisal Claims into the Disputed Claims Reserve with : (i) a Pro Rata share of (x) Excess Cash; (y) New MIG Notes, and (z) New Warrants distributable to Holders of Allowed Class 5 Claims, to be held subject to the cancellation of such New MIG Notes and New Warrants and Pro Rata re-distribution of such Excess Cash (as provided in Section 8.03(c) of the Plan) to the Indenture Trustee upon entry of a Final Order providing for the disallowance of such Disputed Non-Appraisal Claims, or the distribution of such Excess Cash, New MIG Notes and New Warrants to the underlying claimants upon entry of a Final Order providing for the Allowance of such claims.

### 3. *Anticipated Effective Date and Notice Thereof*

The length of time between a confirmation date and an effective date varies from case to case and depends upon how long it takes to satisfy each of the conditions precedent to the occurrence of the effective date specified in the particular plan of reorganization. The Reorganized Debtor will File a notice of the occurrence of the Effective Date within five (5) business days thereafter.

## VII. CERTAIN RISK FACTORS TO BE CONSIDERED

THE IMPLEMENTATION OF THE PLAN IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW. IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE

REGARDED AS CONSTITUTING THE ONLY RISKS ASSOCIATED WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.

### A. Certain Business Considerations

#### 1. *Continuing Global Economic Crisis Could Adversely Affect the Debtor's Business*

As noted above, the Debtor's primary asset is its indirect interests in several leading and innovative telecommunications providers in Georgia, including Magticom. Like other developing countries, Georgia's economy has been hit by the global economic crisis. The current global economic crisis and turbulent financial markets could adversely affect the Reorganized Debtor's business, results of operations, and financial condition. Lower consumer spending worldwide could lead to a decline in demand for Magticom's products and services. If the global credit markets do not improve, the Reorganized Debtor could have difficulty in the future refinancing debt and raising capital for operations.

#### 2. *Fluctuating Foreign Currencies Could Have an Adverse Impact on Operations*

The Debtor's net revenue is primarily derived from operations outside of the United States. The local currency of Georgia is the Georgian Lari. After the Effective Date, the Debtor expects that the Reorganized Debtor will continue to derive a significant portion of its value from Magticom, which accrues net revenue and funds operating costs outside the United States, and changes in exchange rates have had and may have a significant, and potentially adverse, effect on the Reorganized Debtor's operating results. Further, strengthening of the U.S. dollar relative to the local currency of entities operating abroad could have an adverse impact on future results of operations.

#### 3. *The Reorganized Debtor Will Be Exposed to Changing Regulations*

The Debtor's operations are subject to constantly changing regulation. There can be no assurance that future regulatory changes will not have a material adverse effect on the Reorganized Debtor, or that regulators or third parties will not raise material issues with regard to the Reorganized Debtor's compliance or noncompliance with applicable regulations, any of which could have a material adverse effect upon the Reorganized Debtor. As an indirect shareholder of multinational telecommunications assets, the Debtor's non-debtor operating affiliates are subject to varying degrees of regulation in each of the jurisdictions in which they provide services. Local laws and regulations, and the interpretation of such laws and regulations, differ significantly among the jurisdictions in which these affiliates operate. Enforcement and interpretations of these laws and regulations can be unpredictable and are often subject to the informal views of government officials. Potential future regulatory, judicial, legislative, and government policy changes in jurisdictions where these affiliates operate could have a material adverse effect the Reorganized Debtor. International regulators or third parties may raise material issues with regard to the compliance or noncompliance with applicable regulations, and therefore may have a material adverse impact on the competitive position, growth and financial

performance of the Reorganized Debtor's non-debtor operating affiliates. Any adverse developments implicating the foregoing could materially adversely affect the Reorganized Debtor's business, financial condition, result of operations and prospects.

### 4. *Foreign Country Risks*

As with other companies in emerging markets, the operations of the Debtor's non-debtor operating affiliates in Georgia are generally subject to greater risk of global economic slowdown, political uncertainty, regulatory pressures, currency devaluation, exchange controls and the ability to enforce and defend legal and contractual rights than are domestic companies. Moreover, political pressure may cause regulators to enact new regulations or to modify or repeal existing regulations that could adversely affect the Reorganized Debtor's operating affiliates in Georgia. The operating affiliates may suffer losses as a result of political instability, civil unrest, and regime change.

### 5. *Triggering of Certain Non-Alienation Provisions*

As described above, as part of the ITCL LLC Agreement, both the Debtor and Dr. Jokhtaberidze are bound by strict non-alienation and change of control provisions regarding their interests in Magticom. Subject to certain limited exceptions, these provisions provide that if there is any change of beneficial ownership of equity securities of ITCL or Magticom by either party or certain of their affiliates, including the Debtor, the breaching party shall lose all voting rights in the joint venture, thereby leaving that breaching party in the position as a minority shareholder with no management or voting rights and protections. Triggering these provisions could cause deterioration in the value of the Reorganized Debtor's investment in its non-debtor operating affiliates.

### 6. *Projected Financial Information*

The Projections annexed as Exhibit B to this Disclosure Statement are dependent upon the successful implementation of the business plan and the validity of the other assumptions contained therein. These Projections prepared by the Debtor's management reflect numerous assumptions, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of Magticom, the Debtor's primary asset, industry performance, expected market pricing for Magticom's key products, results of cost savings programs, technical process improvements, certain assumptions with respect to competitors of Magticom, general business and economic conditions, and other matters, many of which will be beyond the control of the Reorganized Debtor. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of the Reorganized Debtor. Although the Debtor believes that the Projections are reasonably attainable, variations between the actual financial results and those projected may occur and may be material.

Finally, the Projections were not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information. Rather, the

Projections were developed in connection with the planning, negotiation and development of the Plan. Neither the Debtor nor the Reorganized Debtor undertakes any obligation to update or otherwise revise the Projections to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events. In management's view, however, the Projections were prepared on a reasonable basis and represent a reasonable view of the expected future financial performance of the Reorganized Debtor after the Effective Date. Nevertheless, the Projections should not be regarded as a representation, guaranty or other assurance by the Debtor, the Reorganized Debtor, the Committee, or any other person that the Projections will be achieved and Holders are therefore cautioned not to place undue reliance on the projected financial information contained in this Disclosure Statement. Although the Projections will not be updated, ongoing financial disclosures will be provided to Holders of the New MIG Notes pursuant to the terms thereof and related New MIG Indenture.

### 7.    *Historical Financial Information May Not Be Comparable*

The financial condition and results of operations of the Reorganized Debtor from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtor's historical financial statements.

### 8.    *Competition*

Many of the businesses owned by the Debtor currently face competition in their respective markets. If existing competitors expand their market share or enter into new markets, competition will intensify. Such increased competition may result in a loss of market share and could have a material adverse effect the Reorganized Debtor's business, results of operations, and financial condition.

### 9.    *Litigation*

The Reorganized Debtor will be subject to various Claims and legal actions arising in the ordinary course of its business. The Debtor is not able to predict the nature and extent of any such Claims and actions and cannot guarantee that the ultimate resolution of such Claims and legal actions will not have a material adverse effect on the Reorganized Debtor.

### B.    **Certain Bankruptcy Considerations**

The Reorganized Debtor's future results are dependent upon the successful Confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtor's operating results, as the Debtor's ability to obtain financing to fund its operations may be harmed by protracted bankruptcy proceedings. Furthermore, the Debtor cannot predict the ultimate amount of all settlement terms for its liabilities that will be subject to a plan of reorganization.

### 1.    *Non-Confirmation or Delay of Confirmation of the Plan*

The Bankruptcy Court, which sits as a court of equity, may exercise substantial discretion. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation

and requires, among other things, that the confirmation of the Plan not be followed by a need for further financial reorganization and that the value of Distributions to dissenting creditors and interest holders not be less than the value of Distributions such creditors and interest holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

Although the Plan Proponents believe that the Plan will satisfy all requirements for Confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not be sufficiently material as to necessitate the resolicitation of votes on the Plan.

In the event that any Class of Claims entitled to vote fails to accept the Plan in accordance with section 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Debtor reserves the right: (a) to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code; and/or (b) to modify the Plan in accordance with Section 11.04 thereof. While the Debtor believes that the Plan satisfies the requirements for non-consensual Confirmation under section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes that reject or are deemed to reject the Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can be no assurance that any such challenge to the requirements for non-consensual Confirmation will not delay the Debtor's emergence from chapter 11 or prevent Confirmation of the Plan.

If the Plan is not confirmed, there can be no assurance that the Chapter 11 Case will continue rather than be converted to a chapter 7 liquidation case or that any alternative plan of reorganization would be on terms as favorable to the Holders of Claims against and Interests in the Debtor as the terms of the Plan. If a liquidation or protracted reorganization of the Debtor's Estate were to occur, there is a substantial risk that the Debtor's going concern value would be substantially eroded to the detriment of all stakeholders.

Moreover, there can be no assurance with respect to timing of the Effective Date. The occurrence of the Effective Date is also subject to certain conditions precedent as described in Section 9.02 of the Plan. Failure to meet any of these conditions could result in the Plan not being consummated.

If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for in the Plan shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtor may assume and assign or reject all Executory Contracts and Unexpired Leases shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

If the Effective Date of the Plan does not occur, there can be no assurance that the Chapter 11 Case will continue rather than be converted to a chapter 7 liquidation case or that any alternative plan of reorganization would be on terms as favorable to the Holders of Claims against the Debtor as the terms of the Plan. If a liquidation or protracted reorganization of the

Debtor's Estate were to occur, there is a substantial risk that the Debtor's going concern value would be eroded to the detriment of all stakeholders.

### 2. Classification and Treatment of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires that a plan classify claims against, and interests in, a debtor. The Bankruptcy Code also provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Plan Proponents believe that all Claims and Interests in the Debtor have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor presently anticipates that it would seek (i) to modify the Plan to provide for whatever classification might be required for confirmation and (ii) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtor will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan of any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member. The Plan Proponents believe that under the Federal Rules of Bankruptcy Procedure the Debtor would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the claim of any creditor or equity Holder.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest. The Plan Proponents believe that the Plan meets this requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny Confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### 3. Claims Estimation

The Debtor reserves the right to object to the amount or classification of any Claim or Interest except any such Claim or Interest that is deemed Allowed under the Plan or

except as otherwise provided in the Plan. There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

### C.     Risks to Creditors Who Will Receive Securities

The ultimate recoveries under the Plan to Holders of Claims in Class 5 that will receive New MIG Notes and New Warrants, and Holders of Interests in Class 6 that will receive New Common LLC Interests will depend on the realizable value of the these securities. The securities to be issued pursuant to the Plan are subject to a number of material risks, including, but not limited to, those specified below. Prior to voting on the Plan, each Holder of a Claim in Class 5 or Interest in Class 6 should carefully consider the risk factors specified or referred to below, as well as all of the information contained in the Plan.

#### 1.     *Lack of Market for Securities Issued Pursuant to the Plan*

There is no currently existing market for the New MIG Notes, New Warrants or the New Common LLC Interests and there can be no assurance that an active trading market will develop. There can also be no assurance as to the degree of price volatility in any such particular market and no assurance as to the prices at which such securities might be traded. Accordingly, no assurance can be given that a Holder of securities issued pursuant to the Plan will be able to sell such securities in the future or the price at which any such sale may occur. If such market were to exist, the liquidity of the market for such securities and the prices at which such securities will trade will depend upon many factors, including the number of holders, investor expectations for the Reorganized Debtor, and other factors beyond the Reorganized Debtor's control.

#### 2.     *Lack of Dividends on Securities May Adversely Affect Liquidity*

The Debtor does not anticipate that cash dividends or other distributions will be made by the Reorganized Debtor with respect to the New Common LLC Interests in the foreseeable future. In addition, covenants in the New MIG Indenture to which the Reorganized Debtor will be a party will significantly restrict the ability of the Reorganized Debtor to pay dividends and make certain other payments for as long as the New MIG Notes are outstanding. Such restrictions on dividends may have an adverse impact on the market demand for New Common LLC Interests and New Warrants as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Plan.

### D.     Certain Tax Considerations

There are a number of income tax considerations, risks, and uncertainties associated with consummation of the Plan. Interested parties should read carefully the

discussions set forth in Section IX of this Disclosure Statement regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtor and the Reorganized Debtor and to certain Holders of Claims and Interests in the Debtor who are entitled to vote to accept or reject the Plan.

## VIII.  APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

Except as noted above, the Debtor believes that, subject to certain exceptions described below, various provisions of the Securities Act, the Bankruptcy Code and state securities laws exempt from federal and state securities registration requirements (a) the offer and the sale of such securities pursuant to the Plan and (b) subsequent transfers of such securities.

### A.  Offer and Sale of New Securities; Bankruptcy Code Exemption

Holders of Allowed Claims in Class 5 and Interests in Class 6 will receive New MIG Notes, New Warrants, and/or New Common LLC Interests pursuant to the Plan.  Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied:  (1) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (2) the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (3) the securities must be issued entirely in exchange for the recipient's Claim against or Interest in the debtor, or "principally" in such exchange and "partly" for cash or property.  In reliance upon this exemption, the Debtor believes that the exchange of the New MIG Notes, New Warrants, and New Common LLC Interests under the Plan will be exempt from registration under the Securities Act and state securities laws.

In addition, the Debtor will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption.  Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined under the Bankruptcy Code.  In addition, such securities generally may be resold without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states.  Recipients of securities issued under the Plan, however, are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirement or conditions to such availability.

### B.  Subsequent Transfers of New Securities

Section 1145(b) of the Bankruptcy Code defines the term "underwriter" for purposes of the Securities Act as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (1) purchases a claim against, interest in, or claim for an

administrative expense in the case concerning the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under the Plan from the holders of such securities, if the offer to buy is: (a) with a view to distribution of such securities and (b) under an agreement made in connection with the Plan, with the consummation of the Plan, or with the offer or sale of securities under the Plan; or (4) is an "issuer" with respect to the securities, as the term "issuer" is defined in Section 2(11) of the Securities Act.

The term "issuer" is defined in Section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to Section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a reorganized debtor (or its successor) under a plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a significant percentage of the Debtor's (or successor's) voting securities. Mere ownership of securities of a reorganized debtor could result in a person being considered to be a "control person."

To the extent that persons deemed to be "underwriters" receive New MIG Notes or New Common LLC Interests pursuant to the Plan, resales by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such persons would not be permitted to resell such New MIG Notes or New Common LLC Interests unless such securities were registered under the Securities Act or an exemption from such registration requirements were available. Entities deemed to be statutory underwriters for purposes of section 1145 of the Bankruptcy Code may, however, be able, at a future time and under certain conditions, to sell securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act.

Pursuant to the Plan, certificates evidencing the New MIG Notes and the New Common LLC Interests will bear a legend substantially in the form below:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE, OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE REORGANIZED DEBTOR RECEIVES AN OPINION OF COUNSEL, REASONABLY SATISFACTORY TO IT, THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New MIG Notes or New Common LLC Interests to be issued pursuant to the

Plan, or an "affiliate" of the Reorganized Debtor, would depend upon various facts and circumstances applicable to that person. Accordingly, the Plan Proponents express no view as to whether any such person would be such an "underwriter" or "affiliate." PERSONS WHO RECEIVE NEW MIG NOTES OR NEW COMMON LLC INTERESTS UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER RULE 144 AND THE CIRCUMSTANCES UNDER WHICH SHARES MAY BE SOLD IN RELIANCE UPON SUCH RULE.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTOR MAKES NO REPRESENTATIONS CONCERNING, AND DOES NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE NEW MIG NOTES, NEW WARRANTS OR NEW COMMON LLC INTERESTS OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTOR ENCOURAGES EACH CREDITOR, INTEREST HOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTOR MAKES NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE NEW MIG NOTES, NEW WARRANTS OR NEW COMMON LLC INTERESTS.

## IX. CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Plan to the Debtor and Holders of Claims in Classes 2, 3, 4, 5 and 6. This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof, and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. federal income tax consequences described below.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder of a Claim in light of its particular facts and circumstances or to certain types of Holders of Claims subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, grantor trusts, persons holding a Claim as part of a "hedging," "integrated," or "constructive" sale or straddle transaction, persons holding claims through a partnership or other pass through entity, persons that have a "functional currency" other than the U.S. dollar, and persons who acquired or expect to acquire either an equity interest or other security in a Debtor or a Claim in connection with the performance of services). In addition, this summary does not discuss any aspects of state, local, or non-U.S. taxation and does not address the U.S. federal income tax consequences

to Holders of Claims that are Unimpaired under the Plan or Holders of Claims that are not entitled to receive or retain any property under the Plan.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final Distribution under the Plan. Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below. No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtor with respect thereto.

Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim. All Holders of Claims are urged to consult their own tax advisors for the federal, state, local and other tax consequences applicable to them under the Plan.

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.      **U.S. Federal Income Tax Consequences to the Debtor**

1.      ***Conversion of the Debtor***

The formation of the Reorganized Debtor as a limited liability company organized under Delaware law on or before the Effective Date is a taxable event for both the Debtor and its shareholders. In general, the Debtor recognizes gain or loss (subject to certain limitations) in an amount equal to the difference, if any, between the fair market value of the Debtor's assets and the adjusted basis of such assets. In general, if the Debtor has net operating loss ("NOL") carryforwards, those carryforwards may be used against any recognized gains. Unlike subchapter C corporations, which may be subject to two levels of tax (once at the corporate level and then again when distributions are made to the shareholders), a limited liability company that is treated as a partnership for federal income tax purposes is not subject to federal income tax. Instead, items of income, gain, loss, deduction and credit of the limited liability company are allocated to the members, who report such items on their respective tax returns.

- 86 -

## 2.    *Cancellation of Indebtedness Income*

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness ("<u>COD</u>") income recognized during the taxable year. In the present case, all creditors are paid in full under the Plan and the Plan likely will not discharge any material indebtedness of the Debtor. Therefore, the Debtor does not believe any material COD income will arise pursuant to the Plan. COD income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash and (ii) the fair market value of any property (including equity interests) transferred by the debtor in satisfaction of such discharged indebtedness. COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

The Tax Code permits a debtor in bankruptcy to exclude its COD income from gross income, but requires the debtor to reduce its tax attributes – such as NOL carryforwards, current year NOLs, tax credits, and tax basis in assets (collectively, "<u>Tax Attributes</u>") – by the amount of the excluded COD income. Treasury regulations address the application of the rules for the reduction of tax attributes to situations where a member of a U.S. consolidated group recognizes excluded COD income. Under the ordering rules of the Treasury regulations, generally, the Tax Attributes of the debtor corporation are reduced first (including its NOLs and the stock basis of its subsidiaries). In this regard, the Treasury regulations adopt a "tier-down" approach such that if the debtor reduces its basis in its stock in a subsidiary, corresponding reductions must be made to the Tax Attributes of that subsidiary. To the extent that the excluded COD exceeds the Tax Attributes of the debtor member, the Treasury regulations require the reduction of certain Tax Attributes (NOLs, but not tax basis in assets) of other members of the consolidated group. To the extent the amount of excluded COD income exceeds the Tax Attributes available for reduction after reduction of certain Tax Attributes of other consolidated group members, the remaining COD income generally, has no adverse federal income tax consequences. The reduction in Tax Attributes generally occurs after the calculation of a Debtor's tax for the year in which the debt is discharged.

Under the Tax Code, a debtor that recognizes excluded COD income may elect to reduce its basis in depreciable assets prior to the reduction of other Tax Attributes, with any excess COD income applied next to reduce NOLs and other Tax Attributes in the prescribed statutory order.

The Debtor will not be required to include COD income in gross income if the indebtedness will be discharged while the Debtor is under the jurisdiction of the Bankruptcy Court. Instead, the Debtor will be required to reduce Tax Attributes by the amount of the COD income recognized in the manner described above. The Debtor has not yet determined whether it would be beneficial to elect to reduce the basis of their depreciable property prior to any reduction of NOLs or other Tax Attributes. The extent to which NOLs and other Tax Attributes remain following Tax Attribute reduction will depend upon the amount of the COD income.

### B. U.S. Federal Income Tax Consequences to the Holders of Claims and Interests

The U.S. federal income tax consequences to Holders of Allowed Claims arising from the Distributions to be made in satisfaction of their Claims pursuant to the Plan may vary, depending upon, among other things: (a) the type of consideration received by the Holder of a Claim in exchange for such Claim; (b) the nature of such Claim; (c) whether the Holder has previously claimed a bad debt or worthless security deduction in respect of such Claim; (d) whether such Claim constitutes a security; (e) whether the Holder of such Claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis; (f) whether the Holder of such Claim reports income on the accrual or cash basis; and (g) whether the Holder of such Claim receives Distributions under the Plan in more than one taxable year. For tax purposes, the modification of a Claim may represent an exchange of the Claim for a new Claim, even though no actual transfer takes place. In addition, where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held or is treated as having been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder previously claimed a bad debt deduction with respect to the underlying Claim. A Holder who purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

#### 1. *Accrued but Unpaid Interest*

In general, to the extent a Holder of a Claim or Interest receives property in satisfaction of interest accrued during the holding period of such instrument, if any, such amount will be taxable to the Holder as interest income (if not previously included in the holder's gross income). Conversely, such a Holder generally recognizes a deductible loss to the extent that any accrued interest claimed or amortized original issue discount ("OID") was previously included in its gross income and is not paid in full.

The extent to which property received by a Holder of a Claim or Interest will be attributable to accrued but unpaid interest is unclear. Pursuant to the Plan, all Distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter to accrued but unpaid interest, if any. There is no assurance, however, that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Each Holder of an Allowed Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of previously included unpaid interest and OID for tax purposes.

2.      *Exchange*

a.      **Holders of Secured Workers' Compensation Obligations Claims (Class 2)**

A Holder of a Class 2 Claim who receives the collateral securing such Claim or who receives Cash with respect to such Claim pursuant to the Plan generally will be required to recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between the fair market value of the collateral or the amount of Cash, as the case may be, received in exchange therefor (other than any money or property received in respect of accrued interest) and such Holder's adjusted tax basis in the Claim (other than any portion of the Claim attributable to accrued interest).

The Debtor intends to take the position that the consummation of the Plan should not be a taxable event for a Holder of a Class 2 Claim whose legal, equitable, and contractual rights are Reinstated pursuant to the Plan. The law regarding the tax consequences associated with the Reinstatement of a Class 2 Claim is complex and unclear. No assurance can be given that the IRS will agree with Debtor's intended treatment of such a Reinstated Claim. Holders of Class 2 Claims are urged to consult their tax advisors concerning the tax treatment of such a Reinstatement transaction.

b.      **Holders of General Unsecured Claims (Class 3)**

A Holder of a Class 3 Claim who receives Cash with respect to such Claim pursuant to the Plan generally will be required to recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between the amount of Cash received in exchange therefor (other than any money or property received in respect of accrued interest) and such Holder's adjusted tax basis in the Claim (other than any portion of the Claim attributable to accrued interest).

c.      **Holders of Supplemental Employee Retirement Claims (Class 4)**

A Holder of a Class 3 Claim who receives Cash with respect to such Claim pursuant to the Plan generally will be required to recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between the amount of Cash received in exchange therefor (other than any money or property received in respect of accrued interest) and such Holder's adjusted tax basis in the Claim (other than any portion of the Claim attributable to accrued interest).

d.      **Holders of Preferred Shareholder Claims (Class 5)**

A Holder of a Class 5 Claim who receives Cash, New Warrants and New MIG Notes with respect to such Claim pursuant to the Plan generally will be required to recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between the amount of Excess Cash (less Withheld Excess Cash) and the fair market value

- 89 -

(determined on the Distribution Date) of the New MIG Notes, New Warrants and Class 5 Trust Interests received in exchange therefor (other than any money or property received in respect of accrued interest) and such Holder's adjusted tax basis in the Claim (other than any portion of the Claim attributable to accrued interest).

### e.     Holders of Common Equity Interests (Class 6)

The Holder of a Class 6 Interest who receives New Common LLC Interests with respect to such Interest pursuant to the Plan generally will be required to recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between the fair market value (determined on the Effective Date) of the New Common LLC Interests received in exchange therefor and such Holder's adjusted tax basis in such Class 6 Interest.

### 3.     *Ordinary Income*

The market discount provisions of the Tax Code may apply to Holders of certain Claims. Gain recognized by a Claim Holder with respect to a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the Claim Holder's period of ownership, unless the Claim Holder elected to include accrued market discount in taxable income currently. Additionally, to the extent that a Holder of a Claim receives consideration in exchange for such Claim, such consideration may be characterized as a fee taxable as ordinary income without reduction for such Holder's adjusted tax basis in such Claim.

### C.     Information Reporting and Backup Withholding

Certain payments, including certain payments of Claims pursuant to the Plan, payments of interest, and the proceeds from the sale or other taxable disposition of the Claims and Interests may be subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding unless the taxpayer: (i) comes within certain exempt categories (which generally include corporations) or (ii) provides a correct taxpayer identification number and otherwise complies with applicable backup withholding provisions. In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

### D.     Importance of Obtaining Your Own Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ASSOCIATED WITH THE PLAN ARE IN MANY

CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## X.     FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

### A.     Feasibility of the Plan

In connection with Confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

To support its belief in the feasibility of the Plan, the Debtor has relied upon the Projections, which are annexed to this Disclosure Statement as Exhibit B.

The Projections indicate that the Reorganized Debtor should have sufficient cash flow to fund its operations and fund Distributions.  Accordingly, the Debtor believes that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Projections are based on numerous assumptions, including Confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtor; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtor's retention of key management and other key employees; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtor and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change.  In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtor, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtor.  Accordingly, the Projections are only estimates and are necessarily speculative in nature.  It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time.  In light of the foregoing, Holders of Claims and Interests are cautioned not to place undue reliance on the Projections. The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts.  The Projections have not been audited, reviewed, or compiled by the Debtor's independent public accountants.  The

- 91 -

Debtor will be required to adopt "fresh start" accounting upon their emergence from chapter 11. The actual adjustments for "fresh start" accounting that the Debtor may be required to adopt upon emergence, may differ substantially from those "fresh start" adjustments in the Projections. The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtor, the Debtor's advisors, or any other Person that the Projections can or will be achieved.

The Projections should be read together with the information in Article VII of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Projections.

The Debtor does not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtor does not intend to update or revise the Projections to reflect changes in general economic or industry conditions.

The Reorganized Debtor will face a number of risks with respect to their continuing business operations upon emergence from chapter 11, including but not limited to those described in Article VII.

### B. Acceptance of the Plan

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually timely and properly vote to accept or to reject the Plan. Thus, Holders of Claims in Class 5 will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds (2/3) of the number of shares in that class, but for that purpose counts only those who actually timely and properly vote to accept or to reject the Plan. Thus, Holders of Interests in Class 6 will have voted to accept the Plan only if two-thirds (2/3) of the number of shares in that class actually voting cast their ballots in favor of acceptance. Holders of Interests who fail to vote or who vote on an untimely or improper basis are not counted as either accepting or rejecting a plan.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## C.     Best Interests Test

As noted above, even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such Holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable Distribution to Holders of each impaired class of claims and interests if a debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced first, by the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the Chapter 11 Case.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 cases, litigation costs, and Claims arising from the operations of the debtor during the pendency of the chapter 11 case.  The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business.  Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests.  The liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages Claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable Distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation.  If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

## D.     Liquidation Analysis

To support its belief that the Plan satisfies the best interests test, and in order to determine the amount of liquidation value that would be available to Creditors, the Debtor

prepared a liquidation analysis (the "Liquidation Analysis"), which concludes that in a chapter 7 liquidation, Holders of prepetition Unsecured Claims would receive less of a recovery than the recovery they would receive under the Plan. This conclusion is premised upon the assumptions set forth in the Liquidation Analysis, which the Debtor believes are reasonable.

Notwithstanding the foregoing, the Debtor believes that any liquidation analysis with respect to the Debtor is inherently speculative. The Liquidation Analysis for the Debtor necessarily contains estimates of the net proceeds that would be received from a forced sale of assets, as well as the amount of Claims that would ultimately become Allowed Claims. Claims estimates are based solely upon the Debtor's review of the Claims Filed and the Debtor's books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtor has projected an amount of Allowed Claims that represents their best estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any Distribution to be made on account of Allowed Claims under the Plan.

The full Liquidation Analysis is annexed as Exhibit C to this Disclosure Statement.

### E.      Valuation of the Reorganized Debtor

THE VALUATION INFORMATION CONTAINED IN THIS SECTION WITH REGARD TO THE REORGANIZED DEBTOR IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED PURSUANT TO THE PLAN.

#### 1.      *Overview*

Lazard, the Debtor's investment banker and financial advisor, has evaluated each of MIG's businesses, assets, and investments on a going-concern basis to estimate its Reorganization Value. The Reorganization Value for MIG is comprised of MIG's interests in the following: (i) 46% ownership interest in Magticom; (ii) other operating assets; (iii) 85% interest in Ayety TV; (iv) 100% interest in Telecom Georgia; (v) 100% interest in Telenet; and (vi) Other assets (*i.e.*, cash). In reaching the valuation of the Reorganized Debtor, Lazard necessarily made numerous assumptions with respect to MIG, industry performance, general business, regulatory, economic, market and financial conditions and other matters, many of which are beyond the Debtor's control.

To arrive at its estimate of the Reorganization Value of MIG, Lazard utilized three generally accepted valuation methods for assessing Reorganization Value: (1) discounted cash flow analysis; (2) comparable company analysis; and (3) precedent transactions analysis. Lazard applied slightly more weight to the Comparable Company Analysis and Precedent Transaction Analysis than the Discounted Cash Flow Analysis.

Solely for purposes of the Plan, Lazard estimated the enterprise value of Magticom to be in a range between approximately $1 billion to $1.2 billion and the value of MIG's 46% interest in Magticom to be in a range between approximately $460 million to $552 million. Using the methodologies discussed above, Lazard estimates the Reorganization Value of MIG to be $475 million to $575 million. The Lazard valuation provides the basis for the Debtor's view that substantial value exists in excess of the Judgment.

Rothschild, the Committee's investment banker and financial advisor, also evaluated each of MIG's business assets and investments on a going concern basis to estimate its Reorganization Value. Rothschild also assumed MIG's assets are comprised of the following (i) 46% ownership interest in Magticom; (ii) operating assets; (iii) 85% interest in Ayety TV; (iv) 100% interest in Telecom Georgia; 100% interest in Telnet; and other assets (i.e. cash). In reaching its valuation of the Reorganized Debtor, Rothschild made numerous assumptions with respect to MIG, industry performance, general business, economic, market and financial conditions, and other matters. Rothschild also conducted an in-depth detailed analysis of the impact of the Change of Control Provisions on MIG's Reorganization Value. Rothschild utilized two generally accepted valuation methods: (1) discounted cash flow analysis and (2) comparable company analysis, while discarding the precedent transactions analysis method as not applicable on account of the Change of Control Provisions. Rothschild also researched numerous restricted stock studies and other matters to determine the valuation impact of the Change of Control Provisions. Based upon its analysis and research, Rothschild concluded that MIG's Reorganization Value is $146 million.

THE ESTIMATED RANGES OF REORGANIZATION VALUE BY EACH OF THE PLAN PROPONENTS AND THEIR FINANCIAL ADVISORS, AS OF AN ASSUMED EFFECTIVE DATE OF OCTOBER 15, 2010, REFLECT INFORMATION AND DIFFERING VIEWS REGARDING THE BUSINESS AND ASSETS OF THE DEBTOR AVAILABLE AS OF DECEMBER, 2009. THE VALUATION DISPUTES BETWEEN THE DEBTOR AND THE COMMITTEE AND THEIR RESPECTIVE FINANCIAL ADVISORS HAVE BEEN RENDERED MOOT BY THE SETTLEMENT AGREEMENT INCLUDING PROVISIONS FOR THE PAYMENT IN FULL OF ALL CREDITORS AS PROVIDED IN THE PLAN. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT THESE VALUES, NEITHER OF THE PLAN PROPONENTS SHALL HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM THEIR COMPETING VIEWS ON VALUATION.[10]

With respect to the Projections prepared by the management of the Debtor and included as Exhibit B to this Disclosure Statement, Lazard assumed that such Projections: (i) were prepared in good faith; (ii) based on fully disclosed assumptions which, in light of the

---

[10] The Debtor and its advisors continue to analyze and conduct due diligence with respect to the various matters summarized in this section, including, without limitation, MIG's various interests in other operating assets which are currently positioned for sale in 2010. Accordingly, the Debtor reserves the right to supplement, modify, update and/or revise the information set forth in this section, if and as it may deem appropriate, through the hearing on approval of this Disclosure Statement and potentially up to the deadline for Filing the Plan Supplement. The Committee reserves all rights with respect to any such new information or amendments.

circumstances under which they were made, are reasonable; (iii) reflect the best currently available estimates; and (iv) reflect the good faith judgments of the Debtor.

**F.  Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation**

It is impossible to determine with any specificity the value each Holder of an Impaired Claim will receive as a percentage of its Allowed Claim. Notwithstanding the difficulty in quantifying recoveries with precision, the Debtor believes that the financial disclosures and Projections contained in this Disclosure Statement imply a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. The Plan Proponents believe that a forced liquidation of MIG's interests in ITCL would trigger the Change of Control Provisions and materially impair the value available to creditors to an amount materially less the amounts due to them. Accordingly, the Debtor believes that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

**G.  Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative**

In the event that one of Classes 5 or 6 does not vote to accept the Plan, the Debtor and Committee may seek Confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all Impaired classes, as long as at least one Impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of the Debtor if the Plan "does not discriminate unfairly" and is "fair and equitable" as to each Impaired class that has not accepted the Plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

The Debtor and Committee believe that the Plan does not discriminate unfairly with respect to the Claims and Interests in Classes.

A plan is fair and equitable as to a class of unsecured Claims that rejects a plan if the plan provides (i) for each Holder of a Claim included in the rejecting class to receive or retain on account of that Claim property that has a value, as of the effective date of the plan, equal to the Allowed amount of such Claim or (ii) that the Holder of any Claim or Interest that is junior to the Claims of such class will not receive or retain on account of such junior Claim or Interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (i) that each Holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the Allowed amount of any fixed liquidation preference to which such Holder is entitled, any fixed redemption price to which such Holder is entitled or the value of such interest or (ii) that the Holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Plan Proponents believe that they will meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Claims in Class 5 and Holders of Interests in Classes 6 and that the Plan satisfies the foregoing requirements for nonconsensual confirmation of the Plan.

## XI.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATIONS OF THE PLAN

The Plan Proponents believe that the Plan affords Holders of Claims and Interests in Classes 5 and 6 the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such Holders.  If, however, the requisite acceptances are not received or the Plan is not confirmed and consummated, the theoretical alternatives include (a) formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code.

### A.  Alternative Plan(s) of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtor and/or the Committee could formulate and propose a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtor's businesses or an orderly liquidation of assets.

The Debtor and the Committee believe that the Plan enables Creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

### B.  Liquidation under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtor's case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtor.

The Debtor and the Committee believe that, in a liquidation under chapter 7, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Estate.  The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other Executory Contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtor's assets.  More importantly, conversion to chapter 7 liquidation would likely result in an immediate sale of the Debtor's indirect interests in ITCL, as chapter 7 trustees rarely continue operations.  Such a sale would likely trigger the "Change of Control" provisions in the ITCL LLC Agreement which, as discussed above, would mean that the purchaser would receive significantly less management and voting rights and other

- 97 -

protections that the Reorganized Debtor would maintain under the Plan. As a result, the purchaser would pay far less for the ITCL interest than the value of such interest in the hands of the Reorganized Debtor.

The Debtor could also be liquidated pursuant to the provisions of a chapter 11 plan of reorganization. In a liquidation under chapter 11, the Debtor's assets theoretically could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, thus resulting in a potentially greater recovery. Conversely, to the extent the Debtor's businesses incur operating losses, the Debtor's efforts to liquidate their assets over a longer period of time theoretically could result in a lower net distribution to Creditors than they would receive through chapter 7 liquidation. Nevertheless, because there would be no need to appoint a chapter 7 trustee and to hire new professionals, chapter 11 liquidation might be less costly than chapter 7 liquidation and thus provide larger net distributions to creditors than in chapter 7 liquidation. Any recovery in a chapter 11 liquidation, while potentially greater than in a chapter 7 liquidation, would also be highly uncertain, and subject to the same "Change of Control" risks discussed above.

Although preferable to a chapter 7 liquidation, the Debtor believes that any alternative liquidation under chapter 11 is a much less attractive alternative to Creditors than the Plan because of the greater return anticipated by the Plan.

## XII.  THE SOLICITATION; VOTING PROCEDURES

### A.  Parties-in-Interest Entitled to Vote

In general, a Holder of a Claim or Interest may vote to accept or to reject a plan if (a) the Claim or Interest is "allowed," which means generally that no party in interest has objected to or is otherwise a Disputed Claim or Interest and (b) the Claim or Interest is "Impaired" by the Plan.

Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is deemed to be "Impaired" under a plan unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the Holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such Claim or Interest as it existed before the default.

If, however, the Holder of an Impaired Claim or Interest will not receive or retain any Distribution under the Plan on account of such Claim or Interest, the Bankruptcy Code deems such Holder to have rejected the Plan and, accordingly, Holders of such Claims and interests do not actually vote on the Plan. If a Claim or Interest is not Impaired by the Plan, the Bankruptcy Code deems the Holder of such Claim or Interest to have accepted the Plan and, accordingly, Holders of such Claims and interests are not entitled to vote on the Plan.

Second Amended Disclosure Statement

### B. Classes Entitled to Vote to Accept or Reject the Plan

Holders of Claims and Interests in Classes 5 and 6 are entitled to vote to accept or reject the Plan. By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and, therefore, the Holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan. Consequently, Classes 1 through 4 are deemed to have accepted the Plan and, therefore, none of the Holders of Claims in Classes 1 through 4 are entitled to vote to accept or reject the Plan.

### C. Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots will be determined by the Voting Agent and the Debtor and Committee, in their sole discretion, which determination will be final and binding. As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of ballots must be delivered to the Voting Agent prior to the Voting Deadline. The Debtor and Committee reserve the absolute right to contest the validity of any such withdrawal. The Debtor and Committee also reserve the right to reject any and all ballots not in proper form, the acceptance of which would, in the opinion of the Debtor and Committee or their counsel, be unlawful. The Debtor and Committee further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular ballot. The interpretation (including the ballot and the respective instructions thereto) by the Debtor and Committee, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtor and Committee (or the Bankruptcy Court) determine. Neither the Debtor, the Committee nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### D. Withdrawal of Ballots; Revocation

Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be received by the Voting Agent in a timely manner at The Garden City Group, Inc., 5151 Blazer Parkway, Suite A, Dublin, Ohio 43017. The Debtor intends to consult with the Committee and the Voting Agent to determine whether any withdrawals of ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the

Debtor and Committee expressly reserves the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change his or its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

### E.  Voting Objection Deadline

Pursuant to Bankruptcy Rule 3018(a), the deadline for the Debtor to File and serve any objections (each a "Voting Objection") to temporary allowance of a Claim for purposes of voting on the Plan in a different class or different amount than is set forth in the Proof of Claim timely Filed by the applicable Bar Date as set by the Court, shall be [****], 2010 at 4:00 p.m. (Eastern) (the "Voting Objection Deadline"). Any party with a response to a Voting Objection may be heard at the Confirmation Hearing. Responses to any Voting Objection may be Filed with the Court up to and including the date of the Confirmation Hearing. If, and to the extent that, the Debtor and such party are unable to resolve the issues raised by the Voting Objection on or prior to the Confirmation Hearing, any such Voting Objection shall be heard at the Confirmation Hearing.

### F.  Further Information; Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or the Solicitation Order), please contact the Voting Agent at:

Attn: MIG Bankruptcy Administration
c/o THE GARDEN CITY GROUP, INC.
5151 Blazer Parkway, Suite A
Dublin, Ohio 43017
Telephone: (800) 327-3664
Website: http://migreorg.com

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtor and the Committee believe that Confirmation and consummation of the Plan are preferable to all other alternatives. Consequently, the Debtor and Committee urge all Holders of Claims in Classes 5 and 6 to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED on or before 5:00 p.m. Eastern Time on the Voting Deadline.

Dated: August 15, 2010

| | |
|---|---|
| /s/ Scott D. Cousins | /s/ Ian Connor Bifferato |
| Scott D. Cousins (DE Bar No. 3079) | Ian Connor Bifferato |
| Sandra G. M. Selzer (DE Bar No. 4283) | Thomas F. Driscoll III |
| GREENBERG TRAURIG, LLP | BIFFERATO, LLC |
| The Nemours Building | 800 N. King Street, Plaza Level |
| 1007 North Orange Street, Suite 1200 | Wilmington, Delaware 19801 |
| Wilmington, Delaware 19801 | Telephone: (302) 225-7600 |
| Telephone: (302) 661-7000 | Facsimile: (302) 254-5833 |
| Facsimile: (302) 661-7360 | cbifferato@bifferato.com |
| cousinss@gtlaw.com | tdriscoll@bifferato.com |
| selzers@gtlaw.com | |
| | |
| -and- | -and- |
| | |
| Nancy A. Mitchell | Carmen H. Lonstein |
| Maria J. DiConza | Andrew P.R. McDermott |
| GREENBERG TRAURIG, LLP | BAKER & MCKENZIE LLP |
| 200 Park Avenue | One Prudential Plaza, Suite 3500 |
| New York, New York 10166 | 130 E. Randolph Drive |
| Telephone: (212) 801-9200 | Chicago, Illinois 60601 |
| Facsimile: (212) 801-6400 | Telephone: (312) 861-8000 |
| mitchelln@gtlaw.com | Facsimile: (312) 698-2370 |
| diconzam@gtlaw.com | carmen.lonstein@bakernet.com |
| | andrew.mcdermott@bakermckenzie.com |
| | |
| Counsel to the Debtor and Debtor-in-Possession | Counsel to the Official Committee of Unsecured Creditors |

*DEL86319060v9*

- 101 -